UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-816 (JMR/RLE)

| | | |
|---|---|---|
| Timothy Gamradt and Carla Gamradt | ) | |
| v. | ) | ORDER |
| Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America | ) | |

Plaintiff Timothy Gamradt worked as a prison guard for the United States Bureau of Prisons ("BOP"). Mr. Gamradt was injured on the job, during a training drill. He and his wife, Carla, bring this lawsuit seeking damages for those injuries.

Plaintiffs originally brought suit against three defendants: Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America. By stipulation of the parties, Federal Laboratories, Inc., and Mace Securities International have been dismissed. Defense Technology Corporation of America, the remaining defendant, moves for summary judgment. While plaintiffs prevail on a number of issues, defendant's summary judgment motion is granted.

I. Background

A. A Question of Names

This litigation involves two entities with confusingly similar names. The first is defendant Defense Technology Corporation of America ("DTC"), a Delaware corporation. It is a subsidiary of

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED SEP - 2 2003
DEPUTY CLERK'S INITIALS

Armor Holdings, Inc., and does business in Casper, Wyoming. The second company is Defense Technology Corporation of America of Casper, Wyoming, ("DTC-Wyoming"), a Wyoming corporation. In 1996, DTC-Wyoming sold its assets to DTC.[1] Prior to its acquisition, DTC-Wyoming manufactured law enforcement security equipment, including black smoke grenades.

B. Facts

For purposes of summary judgment, all facts are construed in favor of plaintiffs.

On June 2, 1998, Mr. Gamradt participated in a simulated hostage situation drill at the Federal Prison Camp in Duluth, Minnesota. During this drill, guards were equipped with various security tools, including two types of grenades: the first was a "flash bang" grenade which releases a flash of light accompanied by a loud noise; the second was a "black smoke" grenade which discharges a thick smoke-like substance designed to conceal approaching guards. During the drill, when the team member carrying the flash bang grenade went down, another guard lit a black smoke grenade. The smoke grenade missed its intended target, discharging its smoke cloud within a prison stairway. Plaintiff was in the hallway when the smoke was released and claims injury from the grenade's discharge. During the drill, none of the guards

[1]The terms and circumstances of this acquisition are of some interest here, and are considered below.

- including plaintiff - wore a gas mask or any other respiratory protection device.

Following the drill, Mr. Gamradt asked the BOP for information about the grenade. The BOP could not identify the grenade's precise manufacturer, but informed him that grenades were purchased from two suppliers -- DTC-Wyoming, and Federal Laboratories, Inc.

In order to resolve this matter, the Court must consider the purchase agreement between DTC and DTC-Wyoming. The purchase agreement contains a choice of law provision which requires the application of New York law. The purchase agreement specifies the assets and liabilities transferred, and provides that DTC would assume an enumerated list of DTC-Wyoming's liabilities. See Asset Purchase Agreement at 7; Schedule §2.1(a)(ii). The purchase agreement further requires DTC-Wyoming to indemnify the purchaser, DTC, for any product-liability suits arising out of its prior dealings. DTC funded its acquisition using a combination of cash and shares of Armor Holdings, Inc.

II. Discussion

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce

significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322.

A. Choice of Law

Plaintiffs wish to invoke the purchase agreement's New York choice of law provision. As a result, the Court must first determine whether that provision governs here.

As a general rule, this Court, sitting in diversity, applies the substantive law of Minnesota, its forum state. Minnesota honors choice of law clauses. See Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997) (citing Haagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 47 (Minn. Ct. App. 1994)). Under Minnesota law, a choice of law provision governs all contract and closely related tort claims between the contracting parties. See Northwest Airlines, 111 F.3d at 1392. Plaintiffs here were clearly not parties to the purchase

agreement or in privity with the contracting parties. Because this contract merely relates to certain of its signatories' potential liabilities in third-party tort suits, the contract's choice of law provision does not apply. See T.H.S. Northstar Assoc. v. W.R. Grace & Co., 840 F. Supp. 676, 678 (D. Minn. 1993) (finding contract's choice of law provision does not control dispute over whether that contract constituted a merger).

The Court finds the purchase agreement requires that New York law be applied in any dispute between its signatories. But this is not such a dispute; this case is simply a tort claim by a third-party arising out of incidents occurring in Minnesota. Accordingly, Minnesota law governs here.

B. Successor Liability

Having decided Minnesota law applies, the Court now turns to DTC's first ground for summary judgment. Defendant DTC argues that, because DTC-Wyoming manufactured and sold the smoke grenade in question, DTC-Wyoming - not defendant DTC - is liable.

Minnesota follows the traditional approach to successor liability: when, as here, one corporation sells or otherwise transfers assets to another, the receiving corporation is liable for the actions of the transferor corporation only to the extent provided by contract or by law. See Minn. Stat. § 302A.661; Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 98 (Minn. 1989) (citing J.F. Anderson Lumber Co. v. Myers, 206 N.W.2d 365, 368-69 (1973)). A

successor corporation currently engaged in the manufacture and sale of a product is not generally liable for products manufactured and sold before a change in corporate ownership. See Niccum, 438 N.W.2d at 99-100.

Having stated the general rule, the Court also notes that Minnesota recognizes four exceptions to the general rule for successor liability. The Minnesota Supreme Court has noted the following four circumstances where the exception applies:

> 1. Where the purchaser expressly or impliedly agrees to assume such debts.
>
> 2. Where the transaction amounts to a consolidation or merger of the corporation ("de facto merger").
>
> 3. Where the purchasing corporation is merely a continuation of the selling corporation.
>
> 4. Where the transaction is entered into fraudulently in order to escape liabilities such as debts.

Id. at 98. The question before the Court, then, is whether any of these exceptions apply.

The first exception recognizes corporate successor liability when the merging company expressly or impliedly agrees to assume the second company's existing liabilities, debts, or obligations. Here, the purchase agreement expressly waives tort liability for DTC and requires DTC-Wyoming to indemnify these claims. This exception does not apply.

The second exception, applied to consolidation or merger, includes an equitable exception to the bar against successor

liability in the case of a de facto merger. DTC argues Minn. Stat. § 302A.661, Subd. 4, limiting transferee liability, is the sole method of imposing successor liability and that Minnesota does not recognize de facto merger.

Minnesota's courts, however, have held otherwise. While recognizing the exception, those courts have not precisely delineated its contours. In a number of unpublished opinions, Minnesota's Court of Appeals has provided guidance to those situations where de facto merger occurs. In doing so, they have applied a multi-factor analysis. The analysis asks:

> 1. Whether there is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operation.
>
> 2. Whether there is a continuity of shareholders which results from the purchasing corporation paying for the acquiring asset with shares of its own stock, this stock ultimately coming to be held by the shareholders of the corporation so that they become a constituent part of the purchasing corporation.
>
> 3. Whether the seller corporation ceases its ordinary business operation, liquidates, and dissolves as soon as legally and practically possible.
>
> 4. Whether the purchasing corporation assumed the obligation of the seller ordinarily necessary for the continuation of normal business operations of the seller corporation.

See Fine v. Schwinn Cycling Fitness, Inc., 2000 Minn. App. LEXIS 1292 *6-7 (Minn. Ct. App. Dec. 26, 2000) (unpublished) (explaining multi-factor de facto merger test); see also State v. Gopher Oil Co., 1995 Minn. App. LEXIS 1425, *6-9 (Minn. Ct. App. Nov. 21,

1995) (unpublished) (citing Sylvester Bros. Dev. v. Burlington Northern R.R., 772 F. Supp. 443, 447-48 (D. Minn. 1990)) (adopting the four factor analysis); Costello v. Unipress Corp., 1996 Minn. App. LEXIS 291, *3-4 (Minn. Ct. App. March 12, 1996) (unpublished); New York Life Ins. Co. v. Landmark Dev. Corp., 1993 Minn. App. LEXIS 522, *7-9 (Minn. Ct. App. May 11, 1993) (unpublished) (finding that a question of material fact exists when individual elements weigh in favor of each party); see also Minn. Mining & Mfg. Co. v. Rynne, 661 F.2d 722, 724 (8th Cir. 1981); Soo Line R.R. Co. v. B.J. Carney & Co., 797 F. Supp. 1472, 1483 (D. Minn. 1992).[2]

Given the Minnesota Supreme Court's recognition of the de facto merger exception, and the Court of Appeals' frequent delineation of this analysis, this Court considers it likely the Minnesota Supreme Court would accept the de facto merger analysis. See, e.g., Cieslukowski v. Norton Motors Int'l, Inc., 2002 U.S. Dist. Lexis 17229, *23-24 (D. Minn. Sept. 10, 2002); T.H.S. Northstar Assoc., 840 F. Supp. 678 (D. Minn. 1993) (applying the four-element test).

Under this analysis, when analyzing a de facto merger no single factor is dispositive. See New York Life Ins. Co., 1993

[2]While the opinions of the Minnesota Court of Appeals do not necessarily bind this Court, see Angostura Int'l Ltd. v. Melemed, 25 F. Supp. 2d 1008, 1011 n.4 (D. Minn. 1998) (citing Haugen v. Total Petroleum, Inc., 971 F.2d 124, 126 (8th Cir. 1992), steadfast application of these principles suggests a persuasive and coherent position. This Court feels it appropriate to apply this de facto merger analysis.

Minn. App. Lexis 5221, *3-4. To prove a de facto merger, however, it is clear that a continuity of shareholders -- accomplished through a stock purchase -- is required. Sylvester Bros., 772 F. Supp. at 448. Here, DTC argues that in its acquisition of DTC-Wyoming's assets, DTC-Wyoming received only a minority share and not a controlling interest in the successor. Given this fact, DTC claims the de facto merger exception is inapplicable as a matter of law. The Court rejects this argument. The rule does not require predecessor shareholders to maintain a controlling share; merely that they receive an equity interest. See id.

DTC also claims that, partially funding the acquisition of DTC-Wyoming with Armor Holdings, Inc.'s, shares, as opposed to DTC stock, bars a finding of de facto merger. The record presented to the Court, however, does not outline the business structure or parent/subsidiary relationship between Armor Holdings, Inc., and DTC. Given this ambiguity, the Court finds a question of fact exists as to the required continuity of shareholders. The existence of this fact question precludes summary judgment.

A continuation of management, personnel, physical location, and assets and operations demonstrates a de facto merger. See T.H.S. Northstar Assoc., 840 F. Supp. at 679 (assuming the obligations necessary to continue another's business indicates a de facto merger). It is undisputed that, following the sale, DTC continued to sell and manufacture black smoke grenades, and that

DTC retained DTC-Wyoming's telephone number, employees, and physical location as part of its business operation. It purchased DTC-Wyoming's good will, customer lists, accounts receivable, patents, trademarks, inventory, raw materials, finished goods, plant, property, equipment, and software. For purposes of summary judgment, a fact question remains regarding whether DTC continued the business following the acquisition of DTC-Wyoming.

The third factor asks whether the seller continued to operate following the merger. The Superior Court of Massachusetts, in Farago v. Def-Tec. Corp., 2000 Mass. Super. LEXIS 441, *20 n.5, (Mass. Sept. 1, 2000), found DTC acted as the successor corporation to DTC-Wyoming. Certainly, that case turns on its own facts, but the determination of a sister court is illuminating.

DTC argues the purchase agreement's terms required DTC-Wyoming to continue to exist for three years after the sale in order to address product liability claims. The record, however, does not address whether DTC-Wyoming continued to do business thereafter. In Farago, the Massachusetts court found DTC-Wyoming continued to operation as XM Corporation, an international distributor of pepper spray products for Armor Holdings, Inc. Here, given DTC-Wyoming's sale of its assets to DTC, its agreement not to compete for five years thereafter, and the lack of evidence showing it has resumed business in grenade sales, the Court finds there is a fact question as to whether DTC-Wyoming ceased to operate following the sale of

its assets.

Similarly, the Court considers whether DTC continued DTC-Wyoming's existing operations and filled its commitments. Following the sale of DTC-Wyoming's assets, DTC assumed control of the plant and continued to produce DTC-Wyoming products. Given these facts, a jury could find DTC continued DTC-Wyoming's business following the sale.

Plaintiffs ask the Court to apply the fourth exception, claiming the merger took place for fraudulent purposes. They argue this exception applies because DTC-Wyoming's business was losing money at the time of the sale. The Court finds, as a matter of law, that this fact - which is the only basis upon which plaintiffs seek to invoke the fraud exception - standing alone, cannot support allegations of wrongful or fraudulent purposes.

This case is easily distinguished from those situations where the Minnesota courts found improper transfer. In Huray, a successor company operated with the same directors, officers and employees as the predecessor company, and did not pay sufficient consideration for the assets purchased. See Huray v. Fournier NC Programming, Inc., 2003 Minn. App. LEXIS 620, *17 (Minn. Ct. App. May 20, 2003) (unpublished) (finding inadequate consideration evidence of fraud). The present transaction involved substantial payment to DTC-Wyoming's shareholders. There is similarly no evidence before the Court that this transaction was structured to

avoid existing liability to the predecessor's creditors. Id. at *10 n.4 (structuring to evade debts is fraudulent). Here, there is no evidence of a sham sale which created an identical corporation.

The Court cannot find fraud simply because a successful company acquired a faltering competitor. Ongoing companies, which have real business, real customers, and real assets, occasionally lose money. The fact that they lose money certainly affects whether a target is a desirable acquisition, but does not make the transaction a fraud. Here, there are simply no grounds upon which this Court could find this transaction anything but an arm's length transaction.

C. Was Any Duty Owed?

Even if plaintiffs prevail at trial on the issue of successor liability, their victory will be pyrrhic. Plaintiffs claim DTC failed to warn of risks associated with the use of the smoke grenade. The Court finds, as a matter of law, that there is not a duty to warn here.

In order to establish a prima facie case of failure to warn, a plaintiff must show: (1) there was a duty to warn about the risk in question; (2) the warnings given, if any, were inadequate; and (3) the lack of an adequate warning caused the plaintiff's injury. See Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987). The existence of a duty to warn is a question of law. Id.

In Minnesota, a manufacturer has a duty to warn users of its

products of any product-related dangers of which the manufacturer has actual or constructive knowledge. See Mozes v. Medtronic, Inc., 14 F. Supp.2d 1124, 1129 (D. Minn. 1998). Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if "the user knows or should know of potential danger." Holowaty v. McDonald's Corp., 10 F. Supp. 2d 1078, 1084 (D. Minn. 1998) (quoting Minneapolis Soc. of Fine Arts v. Parker Klein Assoc. Architects, 354 N.W.2d 816, 821 (Minn. 1984), overruled an other grounds in Hapka v. Paquin Farms, 458 N.W.2d 683 (Minn. 1990)). Therefore, where the alleged danger is open and obvious, Minnesota courts do not require a warning. As one court explained, "there is certainly no usual duty to warn the purchaser that a knife or an axe will cut, a match will take fire, dynamite will explode, or a hammer will mash a finger." Peppin v. W.H. Brady Co., 372 N.W.2d 369, 375 (Minn. Ct. App. 1985); see also Hoeg v. Shore-Master, 1994 WL 593919 *1 (Minn. Ct. App. 1994) (unpublished) (no duty to warn of elastic properties of a spring); Mix v. MTD Prods., Inc., 393 N.W.2d 18, 19 (Minn. Ct. App. 1986) (no duty to warn of danger involved in reaching hand under running lawn mower); Peppin, 372 N.W.2d at 375 (no duty to warn that aluminum conducts electricity).

The Court considers it significant that neither side has found a case suggesting a duty to warn for anti-riot explosive devices. The Court's research has been similarly unproductive. This

strongly suggests the dangers posed by "civilian" versions of weapons designed for military use are open and obvious.

Because the dangers associated with a knife, axe, match and dynamite are obvious, Minnesota courts have determined there is no basis on which to assume that a warning would make the product safer. The Court finds that, as with the dangers attendant to a knife, axe or stick of dynamite, the dangers associated with a black smoke grenade are open and obvious.

The fact that an intentionally detonated smoke grenade would explode and discharge smoke was open and obvious. There is no evidence suggesting the condition and effect of the black smoke grenade were not visible or obvious to Mr. Gamradt or his colleagues during the training exercise. As plaintiffs' own brief states, "everyone of normal intelligence can understand that this smoke should not be dispensed in an enclosed area." Pl. Memo. at 19. Notice is not required of what one knows or reasonably should be expected to know -- i.e., that the smoke emitted from a black smoke grenade may be hazardous and should not be inhaled. DTC did not owe a duty to warn of the dangers associated with the black smoke grenade.[3]

Alternatively, the Court finds DTC was not compelled to warn,

---

[3]As the Court has explained, there is no duty to warn about an obvious hazard; here, the black smoke grenade. Because there was no duty, and no evidence of defendant's ignored evidence that a warning would necessary, there is no basis for finding an actual defect.

even if it is ultimately deemed a successor corporation. The law defines those successor corporations which have a duty to warn consumers about a predecessor's products. Niccum, 438 N.W.2d at 100. The considerations relevant to imposing this obligation include whether the successor:

> (1) assumed its predecessor's service contracts; (2) contracted to perform or actually performed service of the product at issue; (3) knew of defects in the product at issue; and (4) knew the location or the owner of the product at issue.

See id. Otherwise stated, if a successor has no knowledge of defects and no knowledge of the location of a product, there is no entity to warn and nothing to warn against.

While plaintiffs have asserted DTC had an ongoing duty to warn, they have introduced no evidence to support their position. In the absence of such evidence, there is no need for a trial on the point. See Fed. R. Civ. P. 56(e). Beyond mere allegations, plaintiffs have not shown DTC knew of any actual defect -- or, indeed, that there was one -- in the particular black smoke grenade. Plaintiffs have similarly failed to provide any evidence showing DTC knew of the location of the black smoke grenade at issue or had any other ongoing relationship with plaintiff's employer. See Costello, 1996 Minn. App. LEXIS 291, *6-7. Finding no proof of failure to warn, DTC's motion for summary judgment on this point is granted.

D. Proof of Duty

Finally, DTC argues summary judgment is appropriate because plaintiffs have not designated an expert to testify about failure to warn. While it is true no such expert has been designated, the absence of an expert does not compel summary judgment. This is because there is a legal difference between causation - where expert testimony can be necessary - and duty. Whether a duty to warn existed is a legal question for the Court. See Balder 399 N.W.2d at 81. No specific type of evidence is needed for its proof. On the question of whether there is a legal duty:

> The court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

See id. The Court understands plaintiffs' medical experts are prepared to testify that black smoke was detrimental to Mr. Gambradt's lungs. This is sufficient testimony on causation for purposes of summary judgment. Where, as here, there was an arguably clear link to the release of the smoke and plaintiff's injury, the Court cannot grant summary judgment.

III. Conclusion

Construed in a light most favorable to plaintiffs, the Court finds there was no duty to warn of dangers inherent in the use of black smoke grenades. The absence of a duty is fatal to a tort

claim, because a breach of a legal duty is a central element. Accordingly, DTC's motion for summary judgment [Docket No. 26] is granted.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 29, 2003

JAMES M. ROSENBAUM
United States Chief District Judge