# AFTER ACTION REPORT

## JUNE 2, 1998

## SANDSTONE/DULUTH TRAINING EXERCISE

## FEDERAL CORRECTIONAL INSTITUTION

## SANDSTONE, MN

U.S. Department of Justice

Federal Bureau of Prisons

Federal Correctional Institution

Sandstone, Minnesota 55072

July 6, 1998

MEMORANDUM FOR G. L. HERSHBERGER, REGIONAL DIRECTOR
NORTH CENTRAL REGION

FROM: Donald Romine, Warden

ATTN: Mark Bezy, Correctional Services Administrator

SUBJECT: Sandstone/Duluth Training Exercise - June 2, 1998
After Action Report

Attached is our After Action Report of the training incident that occurred during the joint training exercise between FCI Sandstone and FPC Duluth on June 2, 1998. Included in the report is a brief summary of the incident, chronology of events, analysis of events, conclusions, and recommendations.

We have initiated corrective action and training to ensure this situation is not repeated and that, at a minimum, team leaders, assistant team leaders, and specialized team members are thoroughly familiar with the less than lethal munitions available and utilized by DCT and SORT operations.

If you have any additional questions, please let us know.

cc: Martha Jordan, Warden, FPC Duluth

# INTRODUCTION

On Tuesday, June 2, 1998, a joint training exercise was conducted by the Federal Prison Camp, Duluth, Minnesota, with the Federal Correctional Institution, Sandstone, Minnesota. The exercise was staged at the Duluth location and the Sandstone SORT, HNT and DCT teams responded, along with a number of support staff as role players. The old Education (two-story) Building at Duluth was utilized for the exercise, as it is now vacant and scheduled for demolition.

The drill was initiated at 7:30 a.m., and it was reported a few inmates had taken staff hostages and were occupied in the Education Building. Approximately two hours later, a larger number of inmate sympathizers (FCI Sandstone support staff upon arrival) joined the initial group and began demonstrating outside the building. The HNT, DCT and SORT teams worked on various scenarios in dealing with the events as they unfolded.

The issuance of Splat Master (CO2 operated paint guns), Simunitions for 9MM pistol, flash bangs distraction devices and smoke canisters were approved for use during the exercise.

At approximately 12:30 p.m., the drill was scheduled to conclude and a dynamic SORT entry was required to secure the building. The SORT team entered the building and effectively cleared the lower section of the building. When they attempted to enter the stairwell to approach the second floor, they were fired upon (splat masters) by the hostage takers.

The team was effectively pinned down and could not move up the stairs. A distraction device was called for by the number one team member to move the hostage takers out of the area. The SORT team member who carried the distraction device had been shot previously, during the building entry, and was removed from the area. The decision was made by the Assistant Leader to utilize a smoke grenade (black). The Assistant Leader gave the order to throw the grenade to the top of the stairs and enter only after the smoke cleared.

The delivery of the grenade was inaccurate and it hit a wall and fell back down in front of the team. The SORT team was quickly covered in smoke and they rushed up the stairs. The exercise continued and SORT requested DCT to respond up the stairs to provide assistance. The DCT responded and went up the stairs through the smoke-filled staircase. The exercise continued until the area was secured.

Nine of the SORT team members inhaled smoke; some to the point of becoming ill and experiencing difficultly in breathing. Five of the DCT members (providing back up for cuffing up hostage takers) also were exposed to the smoke and experienced problems.

The affected staff experienced a great deal of coughing, some experienced vomiting, difficulty breathing, and spitting up black sputum. At least two of the support staff (rioters/hostage takers) reported problems as a result of the smoke.

A total of seven (7) staff were treated at FPC Duluth medical clinic on June 2, 1998. On the preceding dates of June 4th and 5th, seven staff were seen at the medical clinic at Sandstone. A total of eleven (11) staff filed CA-1's with the Sandstone Safety Department on the incident, and six (6) additional staff called to indicate they had problems but did not file a report.

On June 5, 1998, Warden Romine appointed the Captain to review the incident and conduct an after-action review of the incident.

# CHRONOLOGY OF EVENTS

| | |
|---|---|
| 7:30 a.m. | Mock drill exercise initiated at Duluth. |
| | Sandstone staff notified and prepare to depart for Duluth. |
| 8:00 a.m. | Initial group of Sandstone staff depart. |
| 8:20 a.m. | Last group of Sandstone staff, SORT/DCT bus, SORT equipment truck, and two escort vehicles depart. |
| 9:10 a.m. | First group of Sandstone staff begin arriving at Duluth. |
| 9:25 a.m. | SORT/DCT bus arrives at Duluth. |
| 9:35 a.m. | Sandstone SORT equipment truck and escorts arrive at Duluth. Initiate unloading equipment and dressing out both SORT and DCT. |
| 9:45 a.m. | Begin surveillance of the problem area and begin collecting intelligence. |
| 10:15 a.m. | A number of various maneuvers are initiated, as called for by the Command Center, over the next two hours. The SORT is dispatched to retrieve an injured individual, the DCT teams are activated to clear the yard area of rioting inmates and smoke is utilized on the yard, the DCT teams continue to retrieve inmates who surrender and they are secured. The SORT team does additional task to extract inmates who surrender. Both teams receive fire from the inmates in attempts to get near the building. ( Unable to clearly document the times of these events.) |
| 11:55 p.m. | DCT enters a secondary building to clear disruptive inmates from the housing unit. (Simulated at the end of the Education Building.) |
| 12:25 p.m. | The hostage takers indicate they have killed a hostage and Warden Jordan gives the "green light" to the SORT team for a dynamic tactical assault. |
| 12:30 p.m. | SORT Team utilizing the end saw enter the building. One SORT member was shot in the hand and removed from the scene. |
| 12:45 p.m. | Building entry completed and a delay occurred due to problems with the end saw. The clearing of the building was initiated with the bottom floor. |

12:55 p.m. The first floor is cleared and no problems were encountered.

In an attempt to enter the second floor, the SORT Team is pinned down as they are under fire at the stairwell entry. A smoke grenade is dispatched by order of the Asst. Leader to simulate dispatching gas in order to clear the area. The grenade falls back in front of the team, after hitting a wall. The team, under the cover of the smoke, enters the stairwell and up to the second floor.

The DCT Team follows after calls for assistance were heard. It is at this time that a number of staff begin to experience problems due to the heavy smoke.

The hostage taker is secured and the SORT Asst.. Leader advises the drill is over. This information is passed on to all staff in the area and orders to leave the building are issued.

1:15 p.m. The drill is discontinued.

## ANALYSIS OF EVENTS

The planning of the joint Mock Exercise was extensive and well-thought out. The dispatching of the large number of Sandstone staff was very effective, and all staff returned to Sandstone safely.

The HNT, DCT and SORT Teams were not briefed on the circumstances of the drill until their arrival at Duluth. In attempting to prepare for any circumstance, but understanding it is a Mock Drill, less than lethal distraction devices were requested and approved for use in the exercise. The use of these devices was well communicated with both institutions.

Upon arrival at FPC Duluth, the resources of the teams were requested immediately; however, time to set up was limited and a briefing to the teams addressing the issues was not complete.

Smoke grenades were utilized on four occasions. The DCT utilized smoke for crowd control when clearing the yard of rioting inmates. The SORT team utilized smoke on two separate occasions. On both of these occasions it was dispatched for controlling the activities in the upper portion of the building.

On the second occasion, the grenade was dispatched as a substitution for gas. A flashbang was called for but the SORT member carrying the device had been shot and removed from the area. Instead of retrieving the flashbang, the Assistant SORT team leader ordered a smoke grenade (to simulate gas) be thrown to the upper floor. The team was further instructed to wait until the smoke cleared to move.

The attempt to place the grenade failed and it fell back at the feet of the team. The team was not prepare for the use of smoke, and an order to the team to place on their gas masks was not issued. Once the smoke was expelled, and filling the immediate area of the team, the team moved up the stairwell through the smoke. This move was not ordered, but a reaction to the smoke filled environment. The SORT team pursued the hostage takers and accomplished their mission.

A group of staff assigned to DCT was waiting to provide support to the SORT team for cuffing and securing captured inmates. At one point, they heard calls for assistance and responded up the stairs and into the smoke filled area.

Upon entering the upper level, they immediately encountered their hostage taker. Due to the smoke and the coughing of a number of staff, the drill was ended. The Assistant SORT leader instructed all staff to depart the area.

## CONCLUSIONS

- The use of Less Than Lethal Munitions should have been discussed by the Captain, as to intended uses, prior to the exercise with the SORT team leaders. This would have allowed for more guidance and input into the proper use of these devices.

- When the SORT Team member in charge of the distraction devices was wounded and removed from the scene, the equipment should have been passed to another team member.

- The Assistant SORT Leader who made the decision to dispatch the smoke has worked for the agency for nine years. A review reflected he has never received any formal training in the use of smoke or gas.

- The SORT team member who is designated as the "gas man" has been assigned to the team for eight (8) years. He has been designated as the "gas man" for two and a half years. A review reflected he has never received any formal training for his position as the designated "gas man."

- The use of smoke inside of a building is not a safe practice and should not have been utilized in this fashion. The smoke grenade is highly flammable; it also displaces oxygen making it difficult to breath. The staff involved in the decision to place the smoke were not informed on this critical information.

- When the team was overcome with smoke they should have retreated from the area. They could have regrouped and attempted another approach to the second floor area.

- The current SORT team leaders are both recent additions to the SORT team. Their prior experiences do not include any specialized training in Less Than Lethal Munitions.

- In reviewing the canisters/grenades of smoke within our armory, all are clearly marked "For Outside Use Only."

- The order to apply the gas masks should have preceded the placement of the smoke grenade. Time should have been taken to think through this action and the possible repercussions.

## RECOMMENDATIONS

- The SORT and DCT teams should receive specialize training in Less Than Lethal Munitions.
- The SORT Leaders should receive additional training on tactical building entries and assessing situations regarding when to retreat and when to regroup.
- Request the assistance of Regional SORT trainers for the SST SORT team.
- Expand training program to allow for additional training above minimum policy requirements, e.g., the opportunity to conduct special training exercises.
- All staff assigned to the emergency response team will be advised of the proper use of smoke and will be informed that the use of smoke inside any structure is prohibited.
- Verify that all SORT members identified as "specialist" have received formal training. In the instances where this training is not certified, such training will be requested.
- All SORT/DCT members responsible for "gas man" duties will be provided training by a certified trainer. Until this training is completed, they should be removed from these responsibilities.
- SORT and DCT teams will assign one member of the team, e.g., Assistant Team Leader, to remove needed equipment from any downed member.

**From:** Douglas Moore
**To:** IXS
**Subject:** Black smoke canister

Treatment for smoke exposure

Grenade contains chemicals which emit a cloud after ignition.
Smoke can be irritating to eyes, nose, and respiratory systems of some individuals.
If confined to a small area, smoke displaces oxygen which could be life threatening.
Remove individual from area immedletely and seek medical attention.
If exposed do not rub eyes. Flush affected area with water, If irritation persist, seek medical attention.
hazard class 1.4G

Federal Laboratories Inc.
P.O. Box 305
Saltsburg, PA 15681-0305

**FEDERAL LABS** **MATERIAL SAFETY DATA SHEET**

**Section I** **IDENTIFICATION**

**Material/Trade Name:** Black Smoke Mix Date Prepared: 7/89

**Emergency Phone No.:** (412) 639-3511 Nonemergency Phone No.: (412) 639-3511

**Section II** **INGREDIENTS/IDENTITY INFORMATION**

| Components (Synonyms) | CAS No. | TLV | PEL | Other |
|---|---|---|---|---|
| Anthracine | 120-12-7 | None Known | None Known | None Known |
| Nitrocellulose | 9004-70-0 | None Known | None Known | None Known |
| Potassium perchlorate | 7778-74-7 | None Known | None Known | None Known |

**Section III** **PHYSICAL PROPERTIES**

**Boiling Point:** Not Available Specific Gravity: Not Available

**Vapor Pressure (mm Hg):** Not Available Melting Point: Not Available

**Vapor Density (Air=1):** Not Available Evaporation Rate: Not Available

**Solubility in Water:** Partial Volatility: Not Available

**Appearance and Odor:** White Powder

**Section IV** **FIRE AND EXPLOSION HAZARD DATA**

**Flash Point:** Not Available Flammable Limits (%) LEL: Unknown UEL: Unknown
**Auto Ignition Temperature:** Not Available
**Extinguishing Media:** Water, Carbon dioxide

**Unusual Fire and Explosion Hazards:** Shock sensitive. Ignites explosively and burns with noxious and irritating fumes, and heavy smoke.

**Special Fire-fighting Procedures:** Firemen wear full turnout gear and SCBA, and approach fire from upwind using caution. This material provides its own oxygen, so prompt cooling with a large quantity of water is essential. Water applied through a spray nozzle is effective if used quickly and in sufficient volume and manner to wet the entire exposed surface.

**Section V** **REACTIVITY DATA**

**Stable?:** No Conditions to Avoid: Heat, flame, spark, shock, vibration.

**Incompatibility (Materials to Avoid):** Oxidizers, charcoal, fluorine, magnesium, sulphur.

**Hazardous Decomposition or Byproducts:** Oxides of carbon and potassium, chlorides

**Hazardous Polymerization may occur?:** No Conditions to avoid: None known

Section VI HEALTH HAZARD DATA

Primary Routes of Exposure: Inhalation, eye, ingestion, skin contact
Acute Signs and Symptoms of Overexposure: Unreacted material may be irritating to the eyes, skin and respiratory tract. Overexposure may result in destruction of red blood cells, kidney and lung damage, and stomach disturbances.
Chronic Signs and Symptoms of Overexposure: Overexposure to unreacted material may cause birth defects.

Carcinogenicity? No Listed in: None known
Medical Conditions Generally Aggravated by Exposure: Asthma, any respiratory difficulties, pregnancy.

First Aid Procedures:

| | |
|---|---|
| Inhalation: | Remove victim to fresh air. Maintain open airway and restore breathing if necessary. Seek medical attention immediately. |
| Eye Contact: | Hold Eyelids open and flush eyes for 15 minutes with quantities of water. Seek medical attention immediately. |
| Skin Contact: | Remove contaminated clothing. Wash area with soap and water. Seek medical attention. |
| Ingestion: | If victim is conscious, provide water and induce vomiting. Seek medical attention immediately. |

Section VII PRECAUTIONS FOR SAFE HANDLING AND USE

Action to take for spills: Ventilate area. Protect against overexposure. Dampen material with water to prevent dust formation. Carefully scoop up material. Place into a closed container.
Waste Disposal: Hazardous waste - ignitable mixture; dispose of via a licensed disposal firm. See EPA 40 CFR 261.
Precautions During Handling and Storage: Store in a cool, dry, well-ventilated area away from heat and direct sunlight.
Other Precautions: Prolonged storage or storage at low temperatures will cause composition to decompose.

Section VIII EMPLOYEE PROTECTION MEASURES

Ventilation: Local ventilation is preferred to meet PEL requirements. General ventilation is acceptable if exposure is maintained below the PEL.
Respiratory Protection: When airborne concentrations exceed the PEL, use a NIOSH/MSHA approved respirator for dust and organic vapors in accordance with the OSHA respiratory protection requirement (29 CFR 1910.134).
Eye Protection: Chemical/Splash Goggles
Protective Gloves: Chemical resistant
Other Protective Equipment: When handling powdered material wear coveralls or long sleeves.
Work/Hygiene Practices: Eyewash station and safety shower should be available. Wash thoroughly after handling product.

The information herein is given on good faith, based upon the composition of product before end product function. No warranty, expressed or implied, is made.

# ...erial Safety Data Sheet

...used to comply with OSHA's Hazard Communication Standard, ...1910.1200. Standard must be consulted for specific requirements.

Common Name: ( used on label and list )

## SECTION 1 -

| | | | |
|---|---|---|---|
| Manufacturer's Name | DEFENSE TECHNOLOGY CORPORATION OF AMERICA | | |
| Address | P.O. BOX 240 | Emergency Telephone No. | 800-733-3832 |
| City, State, and ZIP | CASPER, WYOMING 82602 | Other Information Calls | 800-733-3832 |
| Signature of Person Responsible for Preparation (Optional) | | Date Prepared | AUGUST 19, 1993 |

## SECTION 2 - HAZARDOUS INGREDIENTS / IDENTITY

| Hazardous Component(s) (chemical & common name(s)) | OSHA PEL | ACGIH TLV | Other Exposure Limits | % (optional) | CAS NO. |
|---|---|---|---|---|---|
| ZINC OXIDE | | 5 mg/m$^3$ | | | 1314-13-2 |
| HEXACHLOROETHANE | | —— (dogs) | MLD 325mg/kg | | 67-72-1 |
| ALUMINUM POWDER | | 10 mg/m$^3$ | | | 7429-90-5 |

## SECTION 3 - PHYSICAL & CHEMICAL CHARACTERISTICS

| | | | |
|---|---|---|---|
| Boiling Point | N/A | Specific Gravity ($H_2O$ = 1) | GREATER THAN 1 |
| Vapor Pressure (mm Hg) | N/A | Vapor Density (Air = 1) | N/A |
| Solubility in Water | SLIGHT | Reactivity in Water | YES (ALUMINUM POWDER) |
| Appearance and Odor | WHITE POWDER | Melting Point | N/A |

## SECTION 4 - FIRE & EXPLOSION DATA

| | | | |
|---|---|---|---|
| Flash Point | Unk. | Method Used | F. C. |
| Flammable Limits in Air % by Volume | | LEL Lower | UNKNOWN |
| UEL Upper | UNKNOWN | | |
| Auto-ignition Temperature | UNKNOWN | Extinguisher Media | DRY CHEMICAL |

Special Fire Fighting Procedures: SELF-CONTAINED BREATHING APPARATUS.

Unusual Fire and Explosion Hazards: BURNS VIGOROUSLY AND MAY EXPLODE IF CONFINED.

REV.8/22/95

QUICK TIFIER Comm... (used on label and list)

## ...ON 5 - PHYSICAL HAZARDS (REACTIVITY DATA)

Unstable ☐ Conditions
Stable ☒ to Avoid

...ability (...s to Avoid) WATER

...s ...osition Products $CCl_4$, $C_2Cl_4$, ALUMINUM OXIDE, ZnCl

...ous ...rization May Occur ☐ Will Not Occur ☒ Conditions to Avoid

## ...TION 6 - HEALTH HAZARDS

...te 2. Chronic

...and ...oms of Exposure IRRITATING TO SKIN AND MUCUS MEMBRANES. IN HIGH CONCENTRATIONS, IT HAS A NARCOTIC EFFECT.

...l Conditions Generally ...ated by Exposure MAY DAMAGE KIDNEY AND LIVER

...al Listed as Carcinogen ...ntial Carcinogen — National Toxicology Program: Yes ☐ No ☒ — I.A.R.C. Monographs: Yes ☐ No ☒ — OSHA: Yes ☐ No ☒

...ncy and ...id Procedures REMOVE TO FRESH AIR; GIVE OXYGEN IF NECESSARY. WASH WITH SOAP AND WATER. IF INGESTED, CONTACT PHYSICIAN.

...UTES ...TRY

1. Inhalation REMOVE TO FRESH AIR; GIVE OXYGEN IF NECESSARY.
2. Eyes FLUSH WITH WATER.
3. Skin WASH WITH SOAP AND WATER.
4. Ingestion CONTACT PHYSICIAN.

## ...CTION 7 - SPECIAL PRECAUTIONS AND SPILL / LEAK PROCEDURES

...tions to be Taken ...dling and Storage STORE AWAY FROM HEAT, SPARKS, AND OPEN FLAMES.

...tions NONE

...to be Taken in Case ...l is Released or Spilled SWEEP INTO CONTAINER; AVOID CONTACT WITH WATER.

Disposal ...s (Consult Federal, State, and Local Regulations) DISPOSE OF BY INCINERATION; STATE AND LOCAL LAWS TAKE PRECEDENCE.

## ...TION 8 - SPECIAL PROTECTION INFORMATION / CONTROL MEASURES

...tory Protection ...ify Type) DUST RESPIRATOR

...ion YES Local Exhaust YES Mechanical (General) YES Special EXPLOSION-PROOF Other ———

...ive YES Eye Protection GOGGLES

Protective ...g or Equipment ———

...ygienic Practices WASH WITH SOAP AND WATER; WEAR MASK; NO SMOKING.

U.S. Department of Justice

Federal Bureau of Prisons

Federal Correctional Institution

Sandstone, Minnesota 55072

JUNE 26, 1998

MEMORANDUM FOR Inez Smith, Captain

FROM: A.L.Baxter, Lieutenant

SUBJECT: SORT Team Members

The following are the SORT team members who were activated on June 2, 1998, for the the mock exercise at FPC Duluth, MN.:

[redacted]
(E/W)
(D/W)
(D/w)
(E/W)
(D/W)
(E/W)
(E/W)
(D/W)
(M/W)

[redacted]
(M/W)
(M/W)
(D/W)
(D/W)
Gamradt, Tim (E/W)
[redacted]
(M/W)
(M/W)
(D/W)
(M/W)

B7C

U.S. Department of Justice

*Federal Bureau of Prisons*

*Federal Correctional Institution*

*Sandstone, Minnesota 55072*

June 29, 1998

B7C

MEMORANDUM FOR: Captain Smith

FROM: [redacted]

ATTN:

SUBJECT: Duluth Sort Exercise

I am on the B-Team of the Sort Team and we were tasked with different missions. We knew that their were hostages inside the building. The first I was involved when we were covering other Sort and DCT members when a person was injured and they rescued that person with a hospital board. The next mission I was involved in was breaching the west door where most of the activity was during the exercise. I was providing cover behind a shield while Mr. Gamradt was cutting down the door. When we got the door cut off the team rushed in and started to clear the rooms on the bottom floor of the building going east. When we got to the far east we couldn't breach the door going south so we cleared the north part and went beside the building and entered through a window on the east side of the building. We cleared the south part of the building and then we breached the door that was now facing the north. When we got through the door we started to clear rooms and then we were faced with the stairwell that led to the second floor and were faced with immense gunfire from the second floor. Then [redacted]s tasked with throwing smoke on the second floor and the smoke rolled back down the stairwell by the team. Then the team proceeded to go up the stairwell in the smoke and under gunfire and clear the second floor of the building and our mission was over.

U.S. Department of Justice

*Federal Bureau of Prisons*

---

*Federal Correctional Institution* | *Sandstone, Minnesota 55072*

June 26, 1998

MEMORANDUM FOR Captain Smith

B7C

FROM: [redacted]

SUBJECT: Training at Duluth (smoke)

while assisting in a building entry, a smoke grenade was used by the s.o.r.t. team in a stairwell. I and the some of the disturbance control team members were in a hallway about 6 feet from the stairwell. The s.o.r.t. team then went up the stairwell. I then heard someone yell D.C.T we need some help up here . I and two other D.C.T. members responded to the call for assistance. We did not expect the use of smoke so we did not have our gas mask . on.

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**Federal Correctional Institution**
*P.O. Box 999*
*2300 County Road 29*
*Sandstone, MN 55072*

June 23, 1998

MEMORANDUM FOR: Captain Smith

FROM: [redacted] [redacted]

SUBJECT: Duluth Training

After the door was breeched I followed the first two shield teams into the hall. The team worked its way down the hallway clearing all rooms. Toward the end of the hallway was a stairwell leading upstairs. I posted at the stairwell with two other team members and provided cover, well the rest of the team finished clearing level one. I covered the stairwell for approximately 15 minutes until the team leader and the rest of the team members returned to the stairwell. Then the team leader informed one of the team members to throw smoke up the stairwell. Once the smoke was dispersed, I went up the stairwell. (There was know visibility in the stairwell because the smoke was so thick.) When I reached the top of the stairwell I posted on the right side of the entrance going into the hallway. I stood there for approximately 20 to 30 seconds until I could not breath anymore I then ran to an open window and tried to get some fresh air. I then helped restrain one of the role players and the training exercise was over. The team assembled outside for accountability, most of the team members were coughing up black mucus.

Later that evening when I was at home I experienced symptoms of chills, heavy chest and nausea. The next day I coughed up some black mucus. It took me about five days to get over the heavy chest feeling.

U.S. Department of Justice

*Federal Bureau of Prisons*

---

*Federal Correctional Institution* | *Sandstone, Minnesota 55072*

October 14, 1997

MEMORANDUM FOR: Inez Smith, Captain

FROM: [redacted] B7C

THRU:

SUBJECT: SORT Maneuvers, FPC Duluth - Smoke Usage

On Tuesday June 2, at the joint training exercise at FPC Duluth, I was in a cover position with Officer [redacted] outside the northern rear entrance to the building. From the position we could not see the team inside the building. The reason that I understood the smoke was thrown for was to help conceal the teams movement. The only information that I heard on the radio was about where the threats were at and that they were at the stairwell that the canister had rolled back down after being thrown. After the smoke started to fill up the rooms a few people were coughing, but not too excessively. After about five minutes approximately the entire team and the role players could be heard from our position. After the team came outside at the end of the scenario, and the smoke had cleared, I went inside to retrieve a few pieces of dropped equipment with a member of the role playing team from Duluth. We noticed that where the smoke canister finally rested, the floor tile had apparently caught on fire, and were still smoldering when we stomped them out as we were leaving. The floor tile even at that time were giving off a very acrid smoke. As of the end of the maneuvers, and over the past 20 days, I have apparently not suffered any of the problems experienced by the other members of the team that were inside the building.

# UNITED STATES GOVERNMENT

# Memorandum

Federal Correctional Institution, Sandstone, Minnesota

**Date:** 6-18-98

**From:** [redacted]

**Subject:** SORT Training

**To:** I. Smith, Captain

On 6-2-98, the SORT team was at the base of the stairwell of building 226 at FPC Duluth. We were involved in a mock exercise. The team was attempting to proceed up the stairwell to clear the second floor. We were receiving fire from the inmate at the top of the stairwell pinning the team down[redacted]whom was standing in front of me asked me for a flash bang, we were out of flash bangs so I handed him a smoke grenade and told him to throw it and not to advance up the e stairs until the smoke cleared.[redacted]hrew the grenade and it fell back in front of the team. The team then rushed up the stair well. The smoke filled the stair well as the team proceeded up to the second level.

The smoke grenade was black smoke drawn from the armory at FCI Sandstone.

I would not have had a smoke grenade throw inside the building if I had known it would have caused injuries to anyone. I personally regret that this has happened an am sorry that staff were injured.

U.S. Department of Justice

*Federal Bureau of Prisons*

---

*Federal Correctional Institution* *Sandstone, Minnesota 55072*

June 26, 1998

B7C

MEMORANDUM FOR INEZ SMITH, CAPTAIN

FROM: [redacted]

SUBJECT: Duluth Exercise

On Tuesday June 2, 1998 I participated in a combined SORT/HNT/DCT exercise at Duluth FPC. The SORT team was given an order to conduct a building entry on the education building were staff were being held hostage. The team attempted to enter the building on the west side, through the first floor fire escape door. The cutting tool used to gain entry into the building was inadequate, causing a long period of time before the door was breached. Being the shield man I was the first person through the door once it was breached, I immediately encountered a threat in the hallway at which time I ordered him to drop his weapon. He raised his weapon at which time I fired my weapon hitting the individual with two rounds. The first room to the left I again encountered a threat but this time he had what appeared to be a hostage. He was also ordered to drop his weapon and release the hostage, when he made a threat with his weapon and he was shot by myself and someone behind me. Myself and [redacted] cuffed the hostage taker and hostage, DCT then took control of the individuals and I resumed my position in the hallway and assisted in clearing the rest of the first floor. Upon reaching the east end of the building an attempt was made to breach the second door which had no success. Six members of the team then exited the building and gained entry through an outside window, clearing the remainer of the first floor. The team then attempted to move to the second floor using the stairwell, where they received a heavy amount of gun fire. A smoke grenade was then thrown up the stairwell in attempt to get the individual to fall back from the stairwell so the team could gain access to the second floor. The smoke grenade unfortunately came back down the stairwell causing the team to inhale a large amount of the smoke. Upon reaching the second floor we continued to clear the building, the last individual was located and cuffed, the remainder of the building was then cleared.

B7

[redacted]

**U.S. Department of Justice**

*Federal Bureau of Prisons*

---

*Federal Correctional Institution* — *Sandstone, Minnesota 55072*

JUNE 20, 1998

MEMORANDUM FOR: CPT. SMITH

FROM: [redacted]

B7C

SUBJECT: DISTURBANCE IN DULUTH

On June 2, 1998, the Sandstone DCT & SORT teams were enlisted to aid the Duluth FPC in a mock exercise. At approximately 12:00 pm, Sort was ordered to enter and clear a building of all hostage takers and hostages.

[redacted] ordered [redacted] and myself to post security outside of the building that was to be entered. It was our responsibility to stop any hostages from fleeing out the other end of the building; where the assault was to take place. [redacted] and the rest of the SORT team entered the building on the opposite side. As the assault was beginning, [redacted] was shot by one of the hostages, and never entered the building. Officers [redacted] and myself were the only SORT team members not to enter the building as the smoke was deployed that day. I did not see who or when the smoke was used [since I was outside the building during the entire operation].
After the mission was completed, I notice several of the SORT team members were have spells of headaches and were "puking".

U.S. Department of Justice

*Federal Bureau of Prisons*

*Federal Correctional Institution* — *Sandstone, Minnesota 55072*

June 26, 1998

B7C

MEMORANDUM FOR INEZ SMITH, CAPTAIN

FROM: [redacted]

THRU: L[redacted]axter

SUBJECT: HOSTAGE SCENARIO

Federal Prison Camp,Duluth MN. June.2 1998. A Hostage situation in the Education Building. A green light was given to enter and rescue the Hostages by the Command Center. Team's A and B approached the breaching point of the building. The breaching of the building took longer than we thought and we started to receive gun fire.A shot was fired from a window to our left and I was shot in the left hand. I was then elminmated from the scenario.

-one team could of stayed at phase line yellow until the door was breached.
-Have torch and burn sticks.
-Smoke outside the building to provide cover.
-more shield to proved more cover.
-team members could of taken my Distraction Device.

U.S. Department of Justice

*Federal Bureau of Prisons*

*Federal Correctional Institution* | *Sandstone, Minnesota 55072*

May 8, 1998

MEMORANDUM FOR Inez Smith, Captain

FROM: [redacted] B7C

SUBJECT: Mock Exercise/FPC Duluth

This memorandum, per your request, is in regards to a mock exercise/joint training session that occurred at FPC Duluth on June 2, 1998. During that training a smoke canister was utilized that created certain injuries to staff.

Specifically, a building that was occupied by role players was to be secured by the SORT team. As I was conducting informational duties with the Command Center. I provided instruction to the Assistant SORT leader, [redacted] that he was to lead the team into the building. They were to breach a specific door, clear the main floor, and remove all occupants from the area. Following, they were to move up the stairwell and clear the second floor.

Upon departing the Command Center, I arrived at the building and observed the SORT entering the building. As description of the assault plan with [redacted] did not include my participation in the assault, I remained outside until the first floor was cleared. Once done, I entered the building with the Disturbance Control team, who lined along the walls of the corridor. I arrived at the far side of the corridor and observed the SORT team staged at the base of the stairwell. A canister was thrown into the stairwell and dense smoke immediately filled the area. The team rushed up the stairwell and entered the second floor. I followed the team up the stairwell and observed that the second floor was also cleared.

Following, the team exited the area and staged outside the main entrance of the building. A head count was conducted, verifying all members were out of the building.

U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
*Sandstone, MN 55072*

June 26, 1998

MEMORANDUM FOR: CAPT. SMITH

FROM: [redacted]

BK

SUBJECT: S.O.R.T. INCIDENT

This is what I recall during the bldg. entry, specifically, when the smoke grenade was thrown in the stairwell.

I was teamed up wit[redacted]he had the shield and I, the 9mm. We were taking fire from the top of the stairwell, and apparently we didn't have any flash bangs so[redacted]old office[redacted] to toss a smoke grenade up the stairwell, he did.

Me and offic[redacted]were the last shield team to go up the stairs, we went up a few steps, the smoke was so thick, you could not see your hand in front of your face, the rest of the team that had gone up before us were log-jammed in the stairwell and we were having a hard time breathing, so we backed out of the stairwell. After a period of about 30 sec. We figured the team wouldn't be jammed in the stairwell, so we went in again. For some reason, either their were people in front of us, or due to the thick smoke, we became stuck in the stairwell again. This time we didn't back out, we stayed in the stairwell for maybe 2min. Until we were able to reach the top of the stairs.

Although everyone seemed to be choking or spitting up while we were doing it, the team still managed to clear the entire second floor of the bldg.

United States Government
MEMORANDUM
*Federal Correctional Institution*
*Sandstone, Minnesota 55072*

**DATE: June 19, 1998**

**REPLY TO ATTN OF:** [redacted]

**SUBJECT: Duluth Training**

**TO: Capt. Smith**

37

On June 2nd the SORT team had a training excercise in Duluth at the Federal Prison Camp. Duluth staff let us utilize the old education building for our training. We had difficulty breaching the door to enter the building. Once we got the door off we began clearing the lower level rooms. We encountered gunfire from the stairway to the upper level. We left one team member at the stairs until we finished clearing the lower level. We had to breach a second door on the lower level. Again we had difficulty with the door. Our equipment that we utilizing was not adaquate for the job. We had exit the building and go to an exterior window and re-enter the building again so we could finish clearing the lower level. We finished clearing the lower level and proceeded to secure the upper level. The team lined up to begin tactical maneuver to go up the stairs and start clearing the upper level. We were still receiving fire from the stairway. Smoke was thrown in hopes of getting the aggressors to fall back away from the stairs and allow us to proceed up the stairs. The smoke came back down on us and things went bad after that. We inhaled a lot of smoke in the stairway. We finished clearing the upper level and then exited the building.

**U.S. Department of Justice**
Federal Bureau of Prisons
North Central Region

*Kansas City, KS 66101-2492*

July 22, 1998

MEMORANDUM FOR DONALD ROMINE, Warden, FCI Sandstone

FROM: G. L. HERSHBERGER, Regional Director

SUBJECT: **FCI Sandstone/FPC Duluth Training Exercise After Action Report**

We have reviewed your After Action Report of the FCI Sandstone/FPC Duluth Training Exercise and concur with the conclusion and recommendations. We further recommend that during the next scheduled training for your DCT's and SORT, each team be instructed in the manufacturer's procedures regarding the proper use and application of the available less than lethal munitions.

Furthermore, we are making available two certified SORT trainers for your August SORT training. These trainers are scheduled to spend a day of the training with your SORT leaders, which should benefit your institution. We plan to certify the SORT's in the use of less than lethal munitions during next year's regional crisis management training.

If we can be of any further assistance, please feel free to contact me.

REVIEWED AND RELEASED
JAN 14 2000
FOIA/PA SECTION
FEDERAL BUREAU OF PRISONS

# Federal Employee's Notice of Traumatic Injury and Claim for Continuation of Pay/Compensation

U.S. Department of Labor
Employment Standards Administration
Office of Workers' Compensation Programs

**Employee: Please complete all boxes 1 - 15 below. Do not complete shaded areas.**
**Witness: Complete bottom section 16.**
**Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.**

**Employee Data**

1. Name of employee (Last, First, Middle): GAMRADT, TIMOTHY LEE
2. Social Security Number: 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
3. Date of birth Mo. Day Yr.: 10 26 67
4. Sex: ☒ Male ☐ Female
5. Home telephone: (320) 838-3693
6. Grade as of date of injury: Level 7 Step 5
7. Employee's home mailing address (Include city, state, and ZIP code): 6243 CLARK ROAD, ASKOV, MN. 55704
8. Dependents: ☒ Wife, Husband ☐ Children under 18 years ☒ Other WIFE PREGN[ANT]

**Description of Injury**

9. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine): F.P.C. - DULUTH
10. Date injury occurred Mo. Day Yr.: 6 2 98 Time 1:00 ☐ a.m. ☒ p.m.
11. Date of this notice Mo. Day Yr.: 6 4 98
12. Employee's occupation: CORRECTONAL OFFICER
13. Cause of injury (Describe what happened and why): INHALATION OF BLACK SMOKE MIX; MANUFACTURED BY DEFENSE TECHNOLOGY CORPORATION OF AMERICA (S.O.R.T. TRAINING)
14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg): SKIN IRRITATION SMOKE INHALATION - AREAS OF INJURY LUNGS, EYES, NASAL PASSAGES, THROAT, STOMACH ACHE, VOMITING, HEAD ACHE & CHILLS

a. Occupation code
b. Type code
c. Source code
OWCP Use - NOI Code

**Employee Signature**

15. I certify, under penalty of law, that the injury described above was sustained in performance of duty as an employee of the United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by my intoxication. I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☒ a. Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues beyond 45 days. If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☐ b. Sick and/or Annual Leave

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government agency) to furnish any desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative). This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

**Signature of employee or person acting on his/her behalf** [signature] 6-4-98 **Date** 6-4-98

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

**Have your supervisor complete the receipt attached to this form and return it to you for your records.**

**Witness Statement**

16. Statement of witness (Describe what you saw, heard, or know about this injury)

Name of witness | Signature of witness | Date signed

Address | City | State | ZIP Code

**U.S. Department of Justice**

*Federal Bureau of Prisons*

---

*Federal Correctional Institution* *Sandstone, Minnesota 55072*

JUNE 18,1998

B7C

MEMORANDUM FOR:CAPTAIN INEZ SMITH

FROM: [redacted]

SUBJECT: JUNE 2ND S.O.R.T. SCENARIO

Upon clearing and securing of the lower level of the building in which the scenario was being held in fpc duluth, we received fire from the stairwell leading too the second floor. I was in the doorway leading into the stairwell providing cover and was in a position to advance. [redacted] was immediately too my left. I asked him for a flash bang so that we could make a entry with shock, speed and surprise minimizing risks to ourselves. He stated that we didn't have any left and too throw smoke. He then handed me a smoke grenade and said to make it good. I was unable to throw it onto the second floor without exposing myself too fire due too the stairwell being two directional with a landing midway. I threw the smoke grenade onto the landing and the stairwell was immediately engulfed with black smoke. Proper preparation had not been taken to apply gas masks and we were in a position to move due to the smoke overtaking our position. We then did a entry through the smoke up the staiwell too the second level.

I believe we made too hasty of a decision without first looking at the repurcussions of our actions. We utilized the improper device trying too make best of a dangerous situation with what we had available. At best it was a very good learning experience.

**U.S. Department of Justice**

*Federal Bureau of Prisons*

---

*Federal Correctional Institution*

*Sandstone, Minnesota 55072*

JUNE 21, 1998

B7C

MEMORANDUM FOR ALL CONCERNED

FROM: [redacted]

THRU: RECREATION

SUBJECT: SORT TRAINING

AS THE SORT TEAM ENTERED THE BUILDING, WE IMMEDIATELY ENCOUNTERED ROLE PLAYERS IN THE FIRST ROOM. I PROCEEDED TO DISARM/CUFF AND TRANSFER THE INDIVIDUALS TO DCT, WHO THEN REMOVED THEM FROM THE PREMISES. WE CONTINUED DOWN THE HALLWAY, I ARRIVED AT THE STAIRWAY, THEN CLEARED A SMALL ROOM UNDER THE STAIRS AND TOOK COVER AS I BEGAN TO TAKE HOSTILE FIRE FROM LEVEL ( B ). ABOUT 3 MINUTES HAD PAST BEFORE LEVEL ( A ) COULD BE CLEARED. THE REMAINING TEAM MEMBERS ARRIVED AT THE STAIRS AND WE PREPARED TO ASSAULT LEVEL ( B ). I VIEWED A CANISTER OF SMOKE BEING THROWN TOWARDS THE WALL IN AN ATTEMPT TO RICOCHET IT UP TO LEVEL ( B ). THE CANISTER FAILED TO MAKE IT TO ITS DESTINATION, THEN FELL DOWNSTAIRS TO OUR FEET. THE STAIRWAY IMMEDIATELY BECAME PITCH BLACK WITH SMOKE. I PROCEEDED TO MOVE TO LEVEL ( B ) IN AN ATTEMPT TO ESCAPE THE SMOKE, AS WELL AS TO CLEAR THE REMAINDER OF THE BUILDING. AFTER FINALLY ARRIVING ON LEVEL ( B ), I STARTED TO COUGH PROFUSELY BUT CONTINUED TO CLEAR THE BUILDING. THE ROLE PLAYERS WERE APPREHENDED AND THE SCENARIO WAS COMPLETED.

**From:** William Morgan
**To:** IXS
**Date:** 6/12/98 12:12pm
**Subject:** June 2, 1998 Duluth Smoke Inhalation Incident

Inez,

Per your request, the following is the information I have to this date.

CA-1's

[redacted] filed a CA-1 with Safety only.

[redacted] a CA-1 with OWCP.

[redacted], filed a CA-1 with Safety only.

[redacted] filed a CA-1 with Safety only.

[redacted] filed a CA-1 with OWCP.

[redacted] filed a CA-1 with OWCP.

[redacted] filed a CA-1 with Safety only.

[redacted] filed a CA-1 with Safety only.

[redacted], filed a CA-1 with Safety only.

[redacted] filed a CA-1 with Safety only.

[redacted], filed a CA-1 with Safety only.

Contacted Safety

(Note: in addition to those above, the following staff called safety and said they had minor problems due to the smoke, however, did not want to file any required paperwork.)

[redacted]

Staff Treated at FPC DTH on 6/2/98

[redacted] Tim Gamradt, [redacted]

Staff seen at FCI SST on 6/4 & 6/5/98

[redacted] Tim Gamradt, [redacted]

Any questions on this matter, please contact me.