In the United States District Court
For the District Of Minnesota
Fifth Division

| | |
|---|---|
| Timothy Gamradt and Carla Gamradt, husband and wife, Plaintiffs, | Civ. File No. 02 CV 816 JMR/RLE |
| vs. | |
| Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America, Defendants. | |

**Memorandum of Defendant Defense Technology Corporation of America in Support of Motion for Summary Judgment**

## Introduction

Timothy Gamradt and his wife, Carla, seek damages from the defendants for injuries suffered in an incident on June 2, 1998. Gamradt, an employee of the United States Bureau of Prisons, suffered smoke inhalation injuries after a smoke grenade was discharged during a training exercise. He claims the smoke grenade was manufactured by a predecessor corporation to Defense Technology Corporation of America and that the smoke grenade was unreasonably dangerous because it did not contain a warning against using the device indoors. Defense Technology denies each of these claims and now moves for summary judgment on three grounds:

1. Defense Technology Corporation of America is not liable for the acts of a predecessor corporation where the predecessor corporation did not

actually acquire any stock or other control of Defense Technology Corporation of America as a part of the transaction.

2. Defense Technology Corporation of America or its predecessor are not adequately identified as the manufacturer of the product when Gamradt provides conflicting evidence of which product caused his injuries.

3. A claim of inadequate warning cannot proceed where the only expert to state that a warning is required also states that he has no particular expertise in the area of warning labels and the requirements for their use.

**Facts**

The court is familiar with the facts of this matter from a previous summary judgment motion brought by Defense Technology Corporation of America. The pertinent facts are succinctly stated in this court's order of September 2, 2003 and are repeated here only to the extent they are relevant to the current motion.

**A. Gamradt's injury.**

Gamradt suffered a smoke inhalation injury during a Bureau of Prisons training exercise on June 2, 1998. Gamradt was part of a hostage-rescue team assigned the task of subduing the hostage-takers. The scenario required Gamradt's team to advance up an enclosed stairwell. Immediately before the advance, a black smoke grenade was thrown up the stairs toward the position of the hostage-takers. The toss missed its mark and the stairwell filled with smoke. Gamradt and his fellow team-members advanced up the stairs through the smoke. Gamradt

inhaled the discharge from the black smoke grenade before he was able to exit the stairwell. He is currently being treated for reactive airways dysfunction syndrome (RADS), a pulmonary condition associated with acute exposure to respiratory irritants.

**B. The Corporate Relationships**

The named defendant, Defense Technology Corporation of America, is a wholly owned subsidiary of Armor Holdings, Inc. Armor Holdings formed Defense Technology as a Delaware corporation in 1996. Defense Technology - Delaware was formed as a part of the acquisition of assets from a munitions manufacturing corporation in Wyoming. The selling corporation, owned by Robert and Sandra Oliver, was also called Defense Technology Corporation of America, but it was incorporated in Wyoming.

The court has already reviewed the pertinent provisions of the Asset Purchase Agreement, but they are included here for ease of reference.[1] Armor Holdings and Defense Technology - Delaware did not assume any obligations or liabilities of the Wyoming corporation except as specifically listed in the agreement.

Part of the purchase price was in the form of a stock transfer from Armor Holdings to the owners of the Wyoming corporation. In accordance with the terms of the Asset Purchase Agreement, that stock was placed in escrow with

1 Exhibit 1, selected provisions of the Asset Purchase Agreement of August 23, 1996.

Union Bank of Switzerland on September 30, 1996.[2] The terms of the Escrow Agreement gave the escrow agent complete control over the Armor Holdings stock. Under that agreement, the owners of the Wyoming corporation did not even receive dividends or distributions from the stock until the release date.

The Wyoming corporation changed its name to "XM Corporation" on September 30, 1996.[3] At some point thereafter, Armor Holdings sued XM Corporation for material breaches of the terms of the Asset Purchase Agreement, among other things. That lawsuit was settled on May 29, 1998.[4] A central part of the settlement agreement was that XM Corporation, the predecessor to Defense Technology – Delaware, surrender all escrowed stock in Armor Holdings back to Armor Holdings. As a result, the owners of the Wyoming corporation never gained control of the Armor Holdings stock.

**C. The identification of the manufacturer of the black smoke grenade that injured Gamradt.**

The identity of the black smoke grenade that injured Gamradt is unknown. At his deposition, Gamradt was only able to describe the general characteristics of the black smoke grenades used by his SORT team. Gamradt described the smoke grenade as silver colored and about the size of a pop can.[5] Later, Gamradt produced a page from a 1995 (pre-Asset Purchase Agreement) catalog on which

---

2 Exhibit 2, Escrow Agreement of September 30, 1996.
3 Exhibit 3, Articles of Amendment and Appointment of Registered Agent.
4 Exhibit 4, Settlement Agreement and Mutual Release.
5 Exhibit 5, Gamradt deposition of February 23, 2003, page 80-81.

he noted that the depicted grenade is "what I remember as the grenade used on 6-2-1998."[6]

After Gamradt produced the catalog page depicting the No. 98 smoke grenade, Defense Technology – Delaware provided Gamradt with exemplars of three different smoke canisters. The canister is the part of the smoke grenade that contains the smoke mix and the ignition fuse. Canisters are made from different metals and come in different sizes. The exemplar provided to Gamradt included two different sizes – the #3 canister, which is about the size of a pop can, and the #98 canister, which is about the size of a screwdriver handle. The #3 canister was chosen because it is the size indicated on a Material Safety Data sheet supplied by Gamradt in support of his claims. Because the #3 canister comes in steel and aluminum, one of each was provided. The #98 canister only comes in aluminum.

Gamradt inspected all three canisters and, through his attorney, stated that none of the exemplars was the black smoke grenade used at the time of his accident.[7] Gamradt confirmed this in response to requests for admission.[8] Gamradt expressly denied that either of the #3 canisters was the type of canister that caused his injuries. He also expressly denied that the exemplar of the #98 canister was the type that caused his injury, but at the same time, confirmed his identification of the page from the 1995 catalog showing the #98 canister.

---

[6] Exhibit 6, No. 98 Tactical Continuous Discharge Grenade catalog page.

[7] Exhibit 7, letter of September 20, 2005 from Andrew Engebretson.

[8] Exhibit 8, Plaintiff's Response to Defendant's Request for Admission.

**D. The testimony concerning the need for a warning label.**

There is significant dispute over whether the smoke grenade used at the time of the Gamradt accident contained any warning label at all. Defense Technology – Delaware believes that it will be able to establish that all smoke grenades manufactured by it or its predecessor included a warning label stating, "Do not use indoors." Gamradt claims that the smoke grenade used at the time of the accident did not contain any warning label.

In support of his claim that the smoke grenade was unreasonably dangerous because it lacked a warning, Gamradt offers the opinion of Dr. Thomas Mulrooney to the effect that all smoke grenades should contain a label that cautions against use in an enclosed area.[9] When asked about the basis for this opinion at his deposition, Dr. Mulrooney stated that he had never even seen a smoke grenade. He did not know that there were different manufacturers of smoke grenades. He has never consulted with a manufacturer of smoke grenades on warning issues, has not studied the effectiveness of different types of warning labels, is not aware of any regulations that apply to the use of warning labels. Dr. Mulrooney stated that he had no opinion on what an appropriate warning label might say.[10]

---

[9] Exhibit 9, Dr. Thomas Mulrooney letter of May 20, 2003.

[10] Exhibit 10, deposition of Dr. Thomas Mulrooney, taken February 1, 2006, p. 35-38.

## Argument

Fed. R. Civ. P. 56(c) authorizes a district court to grant summary judgment if the evidence shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[11] The moving party bears the initial burden of establishing the nonexistence of a genuine issue of material fact.[12] Once the burden is met, the nonmoving party may not then "rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."[13]

**I. Defense Technology Corporation of America is not liable for the acts of a predecessor corporation where the predecessor corporation did not actually acquire any stock or other control of Defense Technology Corporation of America as a part of the transaction.**

It is undisputed the black smoke grenade injured Gamradt was manufactured prior to August 1996. Therefore, any potential liability for Gamradt's injury must be based on evidence that Defense Technology - Delaware is liable for the supposed acts of the Wyoming corporation.

The liability of a successor corporation for the actions of its predecessor is well settled in Minnesota law. Minnesota follows the traditional rule of successor liability:

---

11 *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).
12 *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552.
13 *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986).

> [W]here one corporation sells or otherwise transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the transferor, except:
>
> (1) where the purchaser expressly or impliedly agrees to assume such debt;
> (2) where the transaction amounts to a consolidation or merger of the corporation;
> (3) where the purchasing corporation is merely a continuing of the selling corporation; and
> (4) where the transaction is entered into fraudulently in order to escape liability for such debts.[14]

This court has already decided that these rules are applicable in this case. In addition, the court has decided that Defense Technology – Delaware can only be liable for the actions of its predecessor under the de facto exception.[15]

The traditional factors considered in determining whether a consolidation or merger occurred include:

> 1. Continuity of management, personnel, assets and operations;
> 2. Continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock;
> 3. A seller that ceases operations, liquidates and dissolves as soon as legally possible; and
> 4. A purchasing entity that assumes the obligations of the seller necessary for uninterrupted continuation of business operations.[16]

---

14 *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989), quoting *J.F. Anderson Lumber Co. v. Myers*, 296 Minn. 33, 37-38, 206 N.W.2d 365, 368-69 (1973).

15 Exhibit 11, Court Order, dated September 2, 2003, p. 7.

While no one factor is dispositive, "it is clear that a continuity of shareholders – accomplished through a stock purchase – is required."[17] The prior motion for summary judgment was denied because the record was incomplete on this question.

The record is now complete. Although the Asset Purchase Agreement calls for the transfer of stock in Armor Holdings to the owners of the Wyoming corporation, the parties agreed to hold the stock in escrow. While the stock was in escrow, the owners of the Wyoming corporation did not have any control over the stock in Armor Holdings.

No Minnesota case, state or federal, has applied the de facto merger doctrine when the evidence did not demonstrate an actual transfer of stock from the successor corporation to the predecessor corporation. In *T.H.S. Northstar Associates*, the predecessor corporation (Zonolite) dissolved and its shareholders became shareholders of the successor corporation.[18] The court found a de facto merger. In *Huray v. Fournier Programming, Inc.,*[19] the predecessor and the successor corporations were major shareholders of each other and shared the same

---

16 *T.H.S. Northstar Associates v. W.R. Grace & Co.*, 840 F. Supp. 676, 678 (D.Minn. 1993).

17 Exhibit 11, p. 9, citing *Sylvester Bros. Dev. v. Burlington Northern R.R.*, 772 F. Supp. 443, 448 (D. Minn. 1990).

18 *T.H.S. Northstar Associates v. W.R. Grace & Co.*, 840 F.Supp. 676, 679 (D.Minn. 1993).

19 2003 WL 21151772 (Minn. Ct. App. May 20, 2003).

officers/managers and directors/governors. In *Keller v. Clark Equip.*,[20] the sole consideration for the sale was the exchange of common stock.

On the other hand, if there is no actual exchange of stock, there is no de facto merger. The court in *Niccum v. Hydra Tool Co.,*[21] refused to find a de facto merger where no actual transfer of stock was involved. Similar results were reached in *J.F. Anderson Lumber Co. v. Meyers*[22] and *Everest v. American Transp. Corp.*[23] where none of the shareholders in the successor corporation were also shareholders of the predecessor corporation. Likewise, the lack of continuity of shareholders was fatal to the claims in *Sylvester Bros. Dev.*[24]

The requirement of a transfer of stock for a finding of de facto merger is evidence of the integration of the predecessor and the successor corporations. The stock of the successor corporation must "be held by the shareholders of the selling corporation so that they become a constituent part of the purchasing corporation."[25] Here, the owners of the Wyoming corporation were never a constituent part of Defense Technology – Delaware. They changed the name of their corporation and ultimately moved out of Wyoming. They did not exercise any control over Defense Technology – Delaware. The stock that was involved never came into the possession of the owners of the Wyoming corporation so that

---

20 715 F. 2d 1280 (8th Cir. 1983).
21 438 N.W.2d 96 (Minn. 1989).
22 296 Minn. 33, 206 N.W. 2d 365 (1973).
23 685 F. Supp. 203 (D. Minn. 1988).
24 772 F. Supp. 443 (D. Minn. 1990).
25 *Keller,* 715 F.2d at 1291 (8th Cir. 1983).

they became a "constituent part" of Defense Technology – Delaware. In fact, the owners of the Wyoming corporation quickly became at odds with Armor Holdings, to the point of a lawsuit over breaches of the very agreement Gamradt claims supports application of the de facto merger theory. Rather than becoming an integral part of the operations of the successor corporation, the owners of the Wyoming corporation were held at arms length by means of the escrow agreement. Because the corporations remained separate and there was no actual transfer of stock, the de facto merger exception does not apply. Defense Technology – Delaware cannot be liable for the actions of the Wyoming corporation.

## II. Defense Technology Corporation of America or its predecessor are not adequately identified as the manufacturer of the product when Gamradt provides conflicting evidence of which product caused his injuries.

It may seem, on first blush, that the question of identification of a product manufacturer is a question of fact. That is true if the factual dispute is between Gamradt and Defense Technology – Delaware. Summary judgment is appropriate, however, if the identification evidence produced by Gamradt is insufficient to "carry the burden of proof at trial."[26] Gamradt's evidence is insufficient.

One of the fundamental issues for trial is whether Defense Technology – Delaware or its predecessor manufactured the smoke grenade used on June 2, 1998. We cannot examine the actual smoke grenade because it was discarded.

---

26 *Celotex Corp. v. Catrett*, 417 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986).

The investigation of the accident did not identify the manufacturer of the smoke grenade. The invoice and supply records from the Bureau of Prisons have been destroyed pursuant to a regular document retention policy. Other records suggest that the Bureau of Prisons had smoke grenades from at least two manufacturers on hand.

Gamradt himself does not know the manufacturer of the smoke grenade. At his deposition, he was able to give a description of the smoke grenade. Gamradt also drew a sketch of the lettering on the smoke grenade. The smoke grenade was "aluminum colored" and "six inches high, in … and around the size of a pop can."[27] This description is consistent with the #3 canister used by the predecessor to Defense Technology – Delaware. Unfortunately, Gamradt later identified a #98 canister as the one used on the day of the accident. The #98 canister is about the same height as the #3 canister, but it is much smaller in diameter. In addition, the information from the Bureau of Prisons does not mention #98 canisters.

In hopes of resolving the issue, Gamradt was given the opportunity to examine exemplar smoke grenades meeting both descriptions – an aluminum canister the size of a pop can and an actual #98 canister. Gamradt failed to identify any of the exemplar canisters, but reiterated his identification of a picture of the #98 canister. Gamradt also equivocated about whether the sketch of the smoke canister was accurate.

---

[27] Exhibit 5, Gamradt Deposition, taken February 23, 2003, p. 80-81.

The cumulative effect of these discrepancies makes it impossible for Gamradt to carry his burden of identifying the manufacturer of the smoke grenade. He has now identified a smoke grenade that differs from his original description in size and lettering. He has identified a smoke grenade that the Bureau of Prisons has no record of using. Gamradt has identified a picture of a smoke grenade, but unequivocally states that the physical object itself was not involved in his accident.

Summary judgment is appropriate when a plaintiff makes directly contradictory statements on a critical element of the claim. In *Lane v. BFI Waste Systems of North America,*[28] the plaintiff testified that he was disabled and unable to work in a Social Security disability hearing, but asserted that he could perform the essential functions of his job in support of an Americans with Disabilities Act claim. The *Lane* court found that these statements were so contradictory that no reasonable jury could believe that both of them were true. The *Lane* court held that, in the absence of any attempt to reconcile the inconsistent statements, summary judgment was appropriate.

Gamradt's inconsistencies call for a similar result. Gamradt has taken on the responsibility of identifying the specific smoke grenade that caused his injury. He provided a description of that device and selected a catalog depiction that seemed to fit that description. When faced with the actual objects, however, Gamradt failed to provide a sufficient identification to carry his burden of proof.

---

[28] 257 F.3d 766 (8th Cir. 2001).

Gamradt has examined an exemplar of all the possible black smoke grenades manufactured by Defense Technology – Delaware. He could not identify any of them. The catalog depiction that he does identify does not match any other evidence of possible smoke grenades in use by the Bureau of Prisons. Further, it is diametrically inconsistent with his statements concerning the physical exemplar. No reasonable jury could conclude that Gamradt has adequately identified a Defense Technology smoke grenade as the one used at the time of his injury. Without this proof, the claim of failure to warn must fail.

## III. A claim of inadequate warning cannot proceed where the only expert to state that a warning is required also states that he has no particular expertise in the area of warning labels and the requirements for their use.

The sole claim in this matter is that the smoke grenade used on the day of the accident was unreasonably dangerous because it did not contain a warning against indoor use. If that is true, Gamradt must still establish that the smoke grenade was unreasonably dangerous without a warning label. If , as Defense Technology – Delaware contends, there was a label warning against indoor use, Gamradt must establish that this warning was inadequate.

Gamradt relies on the opinions of Dr. Mulrooney to establish both elements of his claim – that the smoke grenade was unreasonably dangerous and that a warning label should include a warning of the danger of inhalation injury. Dr. Mulrooney expressed each of those opinion in a letter dated May 20, 2003.

When his deposition was taken, however, Dr. Mulrooney stated that he had never even seen a smoke grenade. He did not know that there were different manufacturers of smoke grenades. He has never consulted with a manufacturer of smoke grenades on warning issues, has not studied the effectiveness of different types of warning labels, is not aware of any regulations that apply to the use of warning labels. Dr. Mulrooney stated that he had no opinion on what an appropriate warning label might say.[29]

It is axiomatic that an expert must be qualified to express an opinion in the field of the testimony. The expertise need not be gained through formal training, but an expert should possess specialized knowledge that will assist the jury in resolving the specific issues in the case.[30] An expert who lacks education, employment, or personal experience in the area of the testimony should not be allowed to testify.[31]

The expert in the *Wheeling Pittsburgh Steel Corp.* case had not studied, written, or been employed in the field in which he testified. The Eighth Circuit held that it was error to allow such a witness to offer opinion testimony. Similarly in *Anderson v. Raymond Corp.,*[32] involved an expert who never designed or consulted on the design of a stand-up lift truck and had not ever operated or even seen a stand-up lift truck before

---

29 Exhibit 10, deposition of Dr. Thomas Mulrooney, taken February 1, 2006, p. 35-38.

30 *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167 (1999).

31 *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706 (8th Cir. 2001).

32 340 F.3d 520 (8th Cir. 2003).

testifying. The district court refused to allow the testimony and the Eighth Circuit affirmed, stating that the expert's opinion "was not sufficiently reliable to assist the jury."[33]

Dr. Mulrooney's opinions are no different. They lack any indicia of reliability. Dr. Mulrooney himself admits that his opinions are nothing more than his personal feeling as a treating physician.[34] Even in that arena, Dr. Mulrooney cannot offer any study or literature on the question of warnings. His testimony in this regard should be excluded. It is entirely appropriate to proceed from a motion to exclude the testimony of experts to summary judgment in favor of the defendants. In *Wright v. Willamette Industries, Inc.,*[35] the court determined that a motion for summary judgment should have been granted after it found the expert's opinion on causation inadmissible. Similarly, in *American Family Insurance Group v. J.V.C. Americas Corporation,*[36] the court first examined the question of whether the plaintiffs' expert should be allowed to testify. Once the expert testimony was excluded for lack of reliability, the court then turned to the question of whether the plaintiff could make a prima facie case. Finding that the elements of a prima facie case required expert testimony, the court went on to grant summary judgment to the defendant.

---

[33] 340 F.3d at 523.

[34] Exhibit 10, Deposition of Dr. Thomas Mulrooney, take February 1, 2006, p. 38.

[35] 91 F. 3d 1105 (8th Cir. 1996).

[36] 2001 WL 1618454 (D. Minn. April 30, 2001).

This matter requires the same result. If Dr. Mulrooney cannot testify to the opinions in his May 20, 2003 letter, Gamradt cannot establish the necessary elements of his case. The Eighth Circuit has already ruled that ordinary persons may not appreciate the hazards presented by the emissions from the smoke grenade. The jury will require expert assistance to determine if the smoke grenade was unreasonably dangerous and whether the hazard required a warning label. Gamradt cannot carry his burden of proof on this issue.

**Conclusion**

There are three separate and independent grounds for summary judgment in favor of Defense Technology Corporation of America. First, Defense Technology – Delaware cannot be liable for the actions of its predecessor corporation on a theory of de facto merger because the requirement that the owners of the predecessor corporation actually receive stock in the successor corporation is not satisfied.

Second, Gamradt's shifting identification of the manufacturer of the smoke grenade requires the jury to make a choice between directly contradictory statements of the plaintiff. This is not sufficient to create a genuine issue of fact for trial.

Third, the only witness Gamradt has offered on the issue of whether the smoke grenade is unreasonably dangerous as to require a warning label is disqualified because he lacks the expertise to assist the jury in resolving these issues. In the absence of admissible expert testimony, the claim that the smoke

canister required a warning label or that the warning label was insufficient must fail.

Dated: March 31, 2006.

**Schneider Law Office**

**/s/ Steven W. Schneider**
Steven W. Schneider #130795
*Attorney for Defense Technology Corporation of America*
P.O. Box 16
Duluth, MN 55801-0016
218/391-4315

and

**Reyelts Leighton Bateman Hylden & Sturdevant, Ltd.**

Charles B. Bateman #135343
Tracy A. Schramm #313245
*Attorney for Defense Technology Corporation of America*
700 Providence Building
332 West Superior Street
Duluth, Minnesota 55802
218/727-6833