valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agree as follows:

ARTICLE I

Definitions

In addition to terms defined elsewhere in this Agreement, the following terms when used in this Agreement shall have the meanings indicated below:

"Affiliate" shall mean, with respect to any Person, any Person that directly or indirectly controls, is controlled by or is under common control with the Person in question.

"Agreement" shall mean this Asset Purchase Agreement, together with all exhibits and schedules referred to herein.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Commission" shall mean the Securities and Exchange Commission.

"Common Stock" shall mean the common stock of ABA, par value $.03 per share.

"DTC-Ohio" shall mean Def-Tec Corporation, an Ohio corporation.

"Environmental Laws" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. §36901 et seq., as amended ("RCRA"), the Comprehensive Environmental Response Cleanup and Liability Act, 42 U.S.C. §9601 et seq., as amended ("CERCLA"), the Clean Water Act, 33 U.S.C. §1251 et seq., as amended ("CWA"), the Clean Air



S.a.O

Act, 42 U.S.C. §7401 et seq., as amended ("CAA"), the Toxic Substances and Control Act, 7 U.S.C. §136 et seq., as amended ("TSCA"), and the Hazardous Materials Transportation Act 49 U.S.C. §1801 et seq., as amended, and the federal, state and local laws, rules, regulations and programs promulgated thereunder, together with any other similar federal, state and local laws, rules, regulations and programs in effect regulating the environment.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Financial Statements" shall mean the unaudited balance sheet of the Seller as at December 31, 1995 and the related statements of income, cash flows and stockholders' equity for the fiscal year then ended (the "1995 Financial Statements"); and the audited balance sheets of the Seller as at December 31, 1994 and December 31, 1993 and the related statements of income, cash flows and stockholders' equity for the fiscal years then ended, in each case including any related notes, each prepared in accordance with United States generally accepted accounting principles, consistently applied with prior periods.

"Guaranty" shall mean, as to any Person, all liabilities or obligations of such Person in respect of any indebtedness or other obligations of others guaranteed, directly or indirectly, in any manner by such Person, or in effect guaranteed, directly or indirectly, by such Person through an agreement, contingent or otherwise, to purchase such indebtedness or obligation, or to



A.a.O

purchase or sell property or services, primarily for the purpose of enabling the debtor to make payment of such indebtedness or obligation or to assure the owner of such indebtedness or obligation against loss, or to supply funds to or in any manner invest in the debtor, or otherwise.

"Investments" shall mean, with respect to any Person, all advances, loans or extensions of credit to any other Person, all purchases or commitments to purchase any stock, bonds, notes, debentures or other securities of any other Person, and any other investment in any other Person, including partnerships or joint ventures (whether by capital contribution or otherwise) or other similar arrangement (whether written or oral) with any Person, including but not limited to arrangements in which (i) the Person shares profits and losses, (ii) any such other Person has the right to obligate or bind the Person to any third party, or (iii) the Person may be wholly or partially liable for the debts or obligations of such partnership, joint venture or other arrangement.

"Net Tangible Assets" shall mean the sum of the Purchased Assets of the Seller as set forth in Schedule 2.1(a)(2) less the sum of the Assumed Liabilities of the Seller as set forth in Schedule 2.1(a)(ii), in each case valued in a manner provided in Section 5.6.

"Person" shall mean any natural person, corporation, unincorporated organization, limited liability company,



S.a.O

partnership, limited liability partnership, association, joint stock company, joint venture, trust or government, or any agency or political subdivision of any government, or any other entity.

"Recognized Environmental Condition" shall mean the presence or likely presence of any Hazardous Substances or Petroleum Products (as such terms are defined in CERCLA) on the real property or Leased Property owned or leased, as the case may be, by the Seller under conditions that indicate an existing release, a past release or a material threat of a release of any Hazardous Substances or Petroleum Products into structures on the real property or in the ground, groundwater or surface water of such real property. A Recognized Environmental Condition does not include de minimis conditions that do not present a material risk of harm to public health or the environment and that would not be the subject of an enforcement action if brought to the attention of appropriate agencies.

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Subsidiary" of any Person shall mean any Person, whether or not capitalized, in which such Person owns, directly or indirectly, an equity interest of more than 50%, or which may effectively be controlled, directly or indirectly, by such Person.



S.a.O

ARTICLE II

Purchase of Assets; Consideration

§2.1 Terms of the Purchase

On the basis of the representations, warranties, covenants, and agreements contained in this Agreement and subject to the terms and conditions of this Agreement:

(a) The Seller shall sell, assign, transfer, and convey as a going concern to the Purchaser at the Closing (as hereinafter defined) all properties and assets of the Seller at the date of the Closing of every kind and nature whatsoever (other than the assets listed on Schedule 2.1(a)(1) (the "Excluded Assets")), including the names, trademarks, contractual rights, books and records (other than stock ledgers and stock transfer books), customer lists, price lists, business, and good will of the Seller, as more particularly set forth on Schedule 2.1(a)(2) (collectively, the "Purchased Assets") pursuant to instruments of assignment and bills of sale satisfactory to the Purchaser; and, in consideration therefor, the Purchaser shall:

(i) Deliver at the Closing to the Seller (A) $ in immediately available funds provided that the Net Tangible Assets of the Seller acquired by the Purchaser are at least $ as set forth on the Seller's Closing Date Balance Sheet (as defined in Section 5.6) subject to reduction, as provided in Section 5.6; and (B) a certificate registered in the Seller's name for that number of unregistered shares of ABA Common Stock as will have a value, as determined by the average closing price of ABA's Common Stock on the American Stock Exchange for the ten consecutive trading day period ending two trading days prior to the Closing date, of $ , subject to



S.A.O. (A)

adjustment as set forth in Sections 2.5 and 5.6 hereof, to be held in escrow in accordance with the terms hereof; and

(ii) Assume at the Closing only those obligations and liabilities of the Seller as are set forth on Schedule 2.1(a)(ii) (the "Assumed Liabilities"). The Assumed Liabilities shall not include, unless specifically included in Schedule 2.1(a)(ii), (A) any tax or other obligation or liability arising out of or based upon the transactions contemplated by this Agreement or incurred by the Seller, the Executive or the Stockholder by reason of the review and negotiation of this Agreement; (B) any obligation or liability under any contract, agreement, instrument, lease, license, understanding, or arrangement which is assigned by the Seller to the Purchaser (I) if failure to obtain a required consent to assignment by the Seller to the Purchaser deprives the Purchaser of the enjoyment of any of the Seller's rights thereunder, (II) if such contract, agreement, instrument, lease, license, understanding, or arrangement is not assigned by the Seller to the Purchaser as a result of Section 2.1(e) or otherwise, or (III) if a party is in default thereunder; (C) $ of liability, or such greater amount as may then be outstanding, in respect of the Seller's obligation to Key Bank of Wyoming ("Key Bank") pursuant to that certain Amended and Restated Line of Credit and Security Agreement, dated March __, 1996, between Key Bank and the Seller which represents the non-revolving portion of such credit facility, and is secured by a mortgage, in favor of Key Bank, on the Executive's and the Stockholder's residence in Steamboat Springs, Colorado; (D) any obligation or liability arising out of or connected with, directly or indirectly, the Excluded Assets; and (E) any environmental, tax or other liabilities not reflected as such in the Seller's audited Balance Sheet as at December 31, 1995. Without limiting the generality of the foregoing, any liabilities or obligations, including but not limited to any shipping and freight charges, customs duties, and storage and warehouse costs arising out of or connected with any inventory and products shipped by the Seller to , shall be a liability and obligation of the Seller and shall not constitute an Assumed Liability; and



S.A.O. (initials)

(iii) In the event that the international net sales by the Purchaser of the products sold as of the date hereof by the Seller to customers outside the United States of America, its territories and possessions are equal to or greater than (A) $ for the consecutive 12-month period ending on the first anniversary of the Closing date, (B) $ for the consecutive 12-month period ending on the second anniversary of the Closing date, and (C) $ for the consecutive 12-month period ending on the third anniversary of the Closing date, or alternatively, such international net sales are greater than (C) $ for the consecutive two-year period ending on the second anniversary of the Closing date, or (D) $ for the consecutive three-year period ending on the third anniversary of the Closing date, in each such case, as determined in accordance with the Purchaser's and/or ABA's audited financial statements for the year in question, then the Purchaser shall deliver to the Seller a certificate registered in the name of the Seller for that number of unregistered shares of ABA Common Stock as will have a value, as determined by the average closing price of ABA's Common Stock on the American Stock Exchange (or such other exchange as such shares may then be trading) for the ten consecutive trading day period ending two trading days prior to the date of determination of such international net sales by the Purchaser of such products, of $ with respect to the consecutive 12-month period ending on the first anniversary of the Closing date, $ with respect to the consecutive 12-month period ending on the second anniversary of the Closing date and $ with respect to the consecutive 12-month period ending on the third anniversary of the Closing date, or alternatively, $666,666 with respect to the consecutive two-year period ending on the second anniversary of the Closing date, or $ with respect to the consecutive three-year period ending on the third anniversary of the Closing date. Pricing of the Purchaser's products in connection with the determination of such international net sales of such products shall be agreed to in advance between the Purchaser and Seller for each of the first three 12-month periods following the Closing date. At the sole and absolute discretion of the Purchaser, the amounts required to be paid to the



S.a.O

Seller under this Section 2.1(a)(iii) may be paid in cash at the times and in the amounts specified in this Section 2.1(a)(iii).

(b) Except as specifically set forth in Section 2.1(a)(ii), neither the Purchaser nor ABA shall assume or be responsible for any obligation or liability of the Seller of any nature, whether accrued, contingent, absolute or otherwise.

(c) The consideration paid by the Purchaser shall be allocated among the Purchased Assets as set forth in Schedule 2.1(c), and the parties hereto, as applicable, agree to file Internal Revenue Service Form 8594 as set forth on Schedule 2.1(c) hereto. Such amounts represent the fair market value of such assets arrived at in arms length negotiations by the parties hereto, and the parties hereto agree that, for financial reporting and tax purposes, they will not take any actions inconsistent therewith.

(d) With respect to any properties or assets sold hereunder that cannot be physically delivered to the Purchaser because they are in the possession of third parties or otherwise, the Seller, the Executive and the Stockholder shall give irrevocable instructions to the party in possession thereof, if such be the case, with copies to the Purchaser, that all right, title, and interest therein have been vested in the Purchaser and that the same are to be held for the Purchaser's exclusive use and benefit.



SAO

any circumstances that could reasonably lead to such a change, nor do the Seller, the Executive or the Stockholder have any knowledge of any of the foregoing; or (l) experienced any other event or condition of any character which has had or could have a material adverse effect on the condition (financial or otherwise), results of operations, assets, liabilities, properties, business or prospects of the Seller, or on its employee, customer or supplier relations. None of the Seller's Affiliates sell, market, manufacture, distribute or otherwise deal with the products so sold, marketed, manufactured or distributed by the Seller.

§3.6 Litigation

Except as set forth on Schedule 3.6, there are no actions, suits, investigations, claims or proceedings ("Litigation") pending or, to the knowledge of any of the Seller, the Executive or the Stockholder, threatened before any court or by or before any governmental or regulatory authority or arbitrator, (a) affecting the Seller (as plaintiff or defendant) which could, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of the Seller or (b) against the Seller relating to the Purchased Assets or the transactions contemplated by this Agreement and there exist no facts or circumstances known to Seller, the Executive or the Stockholder creating any reasonable basis for the institution of any such action, suit, investigation, claim or proceeding described



A.a.o

above. Schedule 3.6 sets forth a list of any Litigation commenced against the Seller in the last five (5) years. Vantage Enterprises, Inc., doing business in Ohio as Vanterprises, Inc., is not, and has not been, an Affiliate of the Seller, Spotgallant Management Company, or any of their respective Affiliates.

§3.7 Brokers

Neither the Seller, the Executive nor the Stockholder have employed any financial advisor, broker or finder, and none of them has incurred or will incur any broker's, finder's, investment banking or similar fees, commissions or expenses in connection with the transactions contemplated by this Agreement.

§3.8 Compliance

The Seller is in material compliance with all federal, state, local and foreign laws, ordinances, regulations, judgments, rulings, orders and other requirements applicable to it including, without limitation, those relating to (a) the development, manufacture, packaging, distribution and marketing of products, (b) employment, safety and health, and (c) building, zoning and land use. The Seller is not subject to any judicial, governmental or administrative order, judgment or decree. Purchaser has been furnished with true and correct copies of all reports of inspections of the Seller's business and properties through the date hereof, under all applicable federal, state, foreign and local laws and regulations, all of which are set forth on Schedule 3.8 hereto.



S.a.O

§3.14 Absence of Undisclosed Liabilities

Other than as disclosed by the Financial Statements dated December 31, 1995, or as set forth on Schedule 3.14 hereto, the Seller does not have any direct or contingent liabilities, commitments or obligations (other than nonmaterial liabilities, commitments or obligations incurred since December 31, 1995, in the ordinary course of business to Persons who are not Affiliates of the Seller, the Executive or the Stockholder) or any unrealized or anticipated losses from any commitments of the Seller, and there is no basis for assertion against the Seller of any such liability, commitment or obligation.

§3.15 Title to Securities

The Stockholder is the record and beneficial owner of the shares of capital stock of the Seller listed opposite its name on Schedule 3.15, and, except as set forth on Schedule 3.15 hereto, such shares of capital stock of the Seller are owned free and clear of any liens, encumbrances, pledges, security interests and claims whatsoever, including, without limitation, claims or rights under any voting trust agreements, shareholder agreements or other agreements.

§3.16 Title to and Condition of Personal Property

The Seller has good and marketable title to each item of equipment and other personal property, tangible and intangible, included as an asset in the Financial Statements dated December 31, 1995 (other than property disposed of in the ordinary



S.a.O

# SCHEDULE 2.1 (a) (2)

## PURCHASED ASSETS

1. All accounts receivable except those listed on Schedule 2.1 (a) (1)

2. All patents, patents pending and trademarks listed in Schedule 3.20

3. All inventory; including raw material, work in process and finished goods located in Casper, Wyoming.

4. All property, plant, equipment and software except those listed on Schedule 2.1 (a) (1).

5. A. 1900 N. Loop - building, land and improvements
   B. 1749 S. Loop - building, land and improvements
   C. 9120 Neosho - building, land and improvements

6. The name Defense Technology Corporation of America

7. All vehicles owned except the Ford Probe.

8. All prepaid expenses and inventory

9. All Sellers' molds and tooling

10. Prepaid insurance excluding product liability insurance

11. Key Bank Account #

12. Key Bank Account #

13. First Interstate - Safety Deposit Box

14. Deposits

15. Product liability insurance refund for year ending April 6, 1996.

16. Banco Merchantile Account # Signatories: Robert L. Oliver and Sandra A. Oliver.

17. Chase Federal Account # Signatories: Robert L. Oliver and Sandra A. Oliver.

2.1 (a) (ii)

ASSUMED LIABILITIES

1. Accounts payable including received but not invoiced amounts (Accounts payable as of 8-22-96 attached as Exhibit A)

2. Accrued interest - except Raytheon Credit accrued interest

3. Note payable - Finoff and Associates (approximately $ )
Subject to consent prior to closing.

4. Key Bank - $

5. CAEDA - 9125 Neosho Road (approximately $ )
Computers/Office Equipment (2nd note for $ )
Subject to consent prior to closing.

6. Notes payable - Ford Motor Credit, PO Box 17649
Denver, Colorado 80217-0649

a. 1993 Ford Aerostar - 1FMDA41XXPZA23076
b. 1992 Ford Aerostar - 1FMDA41XIN2B23015
c. 1994 Ford Explorer - 1FMDU34X2RUD84704
d. 1994 Ford Pick-up - 1FTEF14NXRLA70262

7. Mortgage for 1900 N. Loop in the amount of (approximately $ )

8. Mortgage for 1749 S. Loop in the amount of (approximately $ )

9. Lease held on property at 1855 South Loop, which expires December 31, 1996

10. Equipment leases - (Subject to consent prior to closing).

A. Lease America Corporation - Ricoh Copier
4333 Edgewood Road, N.E.
Cedar Rapids, Iowa 52499

B. Xerox Corporation - Xerox Copier
PO Box 7598
Philadelphia, PA. 19101-7598

C. Pitney-Bowes Credit Corporation - Mail Machine
- 2 UPS Manifest Machines
201 Merritt Seven
Norwalk, CT 06856

Assumed Liabilities 2.1 (a) (ii)
Page 2

11. Ford Motor Credit
PO Box 17649
Denver, CO 80217-0649

1994 Ford Explorer - 1FMDU34X0RUB67961
Vehicle Lease

12. Notes payable insurance excluding product liability

13. Commissions payable

14. Accrued payroll

15. Accrued health insurance (claims incurred but not reported)

16. Accrued Wyoming Unemployment

17. Accrued Wyoming Workers Compensation

18. Accrued Molds

19. Sales Tax

20. Vested vacation due non-Miami employees

21. Accrued FUTA

22. Accrued FICA

23. Accrued Medicare

24. Accrued Income Tax Withholding

ASSUMED LIABILITIES

Page 3

25. Committed Purchase Orders as of August 22, 1996

A. Aceto Corporation $ — Blanket PO Chemicals

B. American Body Armor — Gas Masks
(This order has been prepaid).

C. Lonza — Chemicals
(This order has been prepaid).

D. Omni Distributors — Blanket PO Disposable Distraction Devices

E. Rubatex — Foam
(50% of this order has been prepaid).

F. Piper Impact — Blanket PO for Aluminum Shells

G. Several other purchase orders totalling $

26. Accrued Florida Unemployment

27. Accrued Florida Worker's Compensation

28. Accrued Excise Tax

SCHEDULE 3.1

QUALIFIED JURISDICTIONS OF SELLER

Defense Technology Corporation of America is a Wyoming Corporation, who is also qualified to do business in Florida and Montana.

SCHEDULE 3.6

SCHEDULE OF LITIGATION

1. Vantage Enterprises, Inc. vs Def-Tec Corporation et al, case No. 95 CV 525 in the Ashtabula County, Ohio, Court of Common Pleas: an action for $ 3,400,000 plus interest at 10% per annum, from November 1993, plus punitive damages, on a note. The Seller and the Executive are parties defendant. The matter has been settled in principle as of June, 1996. A copy of the agreed but unexecuted Settlement Agreement and Mutual Release was delivered to counsel for the Purchaser on August 21, 1996.

2. Seller is a defendant in product liability suits which are fully covered by insurance except for a deductible of $50,000.00 pepper spray cases, $10,000.00 all other products, with a $350,000.00 annual aggregate. (See Schedule 3.18, page two (2) through five (5)).

3. Neuman U.S. Suit - Neuman is a Virginia Corporation, has sued the Seller for unpaid invoices in the amount of $105,127.70. At the time the suit was brought, Neuman had not received a payment from Seller of $17,512.00 which was made on 7-13-96, thus the corrected balance of unpaid invoices is $87,615.07, which we include on our accounts payable detail.

Seller does not dispute it owes for these invoices, but at present does not have the ability to pay. Seller has answered the complaint on time and is presently trying to buy some time until they are in a position to resolve this situation.

4. Any and all items shown in Schedule 3.14

SCHEDULE OF LITIGATION 3.6
continued
Settled Litigation

1. In November 1994, Parameter Driven Software, a Michigan Corporation filed suit against DTCoA for unpaid invoices relating to the purchase of a computer system. March 23, 1995 settlement was reached A settlement agreement, mutual release, and covenant not to sue was executed March 23, 1995.

2. In December 1994, Lydia Whitten, a former employee filed suit charging violation of equal pay for equal work, sexual discrimination. On July 25, 1995, DTCoA settled suit and received an Order of Dismissal with Prejudice.

3. In December 1994, Advance Design Plastics, a Colorado Corporation sued DTCoA for unpaid invoices for $ 147,000. On April 17, 1995 a Mutual Release of All Claims was negotiated

4. On January 5, 1995, received signed Release and Settlement of Claim resulting from events arising from said employment of Defendant Leland D. Rhodes III. DTCoA dismissed their suit with prejudice,

5. In 1993, Mr. Robert Crandall, a former machine shop supervisor, filed both a wrongful termination case in State District Court and an age discrimination claim with the Federal Equal Employment Opportunity Commission. DTCoA in 1994, prevailed on the State District Court litigation, when the judge granted summary judgment in favor of DTCoA.

6. Roxie Richards, a former receptionist in the National Sales office, filed a claim with the Equal Employment Opportunity Commission, alleging that her termination discriminated against her on the basis of her sex. Ms. Richards also alleged that she had been wrongfully terminated in violation of state law, though she never formally filed suit on this claim.

SCHEDULE 3.14

UNDISCLOSED LIABILITIES

1. Lease agreements for one Ford Explorer, Pitney Bowes mail machine, Ricoh copier, and Xerox copier. ( See Schedule 2.1 (a) (ii) ).

2. On 02/12/96 the U.S. Department of Transportation Research and Special Programs Administration conducted an unannounced audit of Seller. On 02/15/96 an exit briefing was held and the following violations were presented:

   a. Approximately 15 products manufactured by Seller did not have the appropriate explosive approvals.

   b. Product approvals granted to DEF-TEC had not been transferred to Seller.

   c. Wooden boxes used for transportation were not tested in accordance with Department of Transportation standards, and did not carry the proper labeling information.

   d. The MK21 and MK46 did not qualify for the exception they were shipped under and therefore, did not carry the correct DOT specifications.

Upon notification, seller initiated corrective action on all as follows:

Violation 1 - Dr. Chang with the Bureau of Explosives was here June 18, 1996 to review and test all unapproved products to obtain proper Competent Authority for shipment with DOT.

Violation 2 - All Competent Authorities issued to DEF-TEC have been transferred to Seller as of 03/21/96.

Violation 3 - The wooden boxes used have been tested and now carry correct labeling information.

SCHEDULE 3.14

PAGE 2

Violation 4 - Seller has discontinued the use of the canisters cited and now use a DOT specified 39 cylinder, which meets all of the criteria.

While corrective action has been taken on all issues, Seller was still in violation for shipping illegally. Possibilities of sanctions rangeing from warning letters to civil penalties are possible. If civil penalties exist, it can range from $ 250.00 - $25,000.00 per violation. The latter penalty is extreme since the corrective action that Seller has taken will be considered in mitigation should sanctions be imposed. In addition, appeals can be made from any sanctions.

3. See Schedule 3.6.

4. See Schedule 3.27 concerning tax matters.

§3.26 Employment Agreements and Employee Benefit Plans

(a) Employment Agreements. Except as set forth on Schedule 3.26(a), there are no employment, consulting, severance or indemnification arrangements, agreements or understandings between the Seller and any officer, director, consultant or employee ("Employment Agreements"). The Seller has previously delivered to Purchaser true and complete copies of all of the Employment Agreements. Except as set forth in Schedule 3.26(a), the terms of employment or engagement of all directors, officers, employees, agents, consultants and professional advisers of the Seller are such that their employment or engagement may be terminated upon not more than two weeks notice given at any time without liability for payment of compensation or damages and the Seller has not entered into any agreement or arrangement for the management of its business or any part thereof other than with its directors or employees.

(b) Employee Benefit Plans. Except as set forth on Schedule 3.26(b), the Seller has no pension, retirement, stock purchase, stock bonus, stock ownership, stock option, profit sharing, savings, medical, disability, hospitalization, insurance, deferred compensation, bonus, incentive, welfare or any other employee benefit plan, policy, agreement, commitment, arrangement or practice currently or previously maintained or contributed to by the Seller for any of its directors, officers, consultants, employees or former employees (the "Seller Plans"). The Seller has



1.a.0

Purchaser or the consummation by ABA or the Purchaser of the transactions contemplated hereby.

§4.8 Litigation

Except as set forth on Schedule 4.8, or as disclosed in the SEC Filings, there are no actions, suits, investigations, claims or proceedings ("Litigation") pending or, to the knowledge of ABA or the Purchaser, threatened before any court or by or before any governmental or regulatory authority or arbitrator, (a) affecting ABA or the Purchaser (as plaintiff or defendant) which could, individually or in the aggregate, have a material adverse effect on the condition (financial or otherwise), results of operations, properties, assets, liabilities, business or prospects of ABA or the Purchaser or (b) against ABA or the Purchaser relating to the transactions contemplated by this Agreement and there exist no facts or circumstances known to ABA or the Purchaser creating any reasonable basis for the institution of any such action, suit, investigation, claim or proceeding described above.

## ARTICLE V

## Additional Agreements

§5.1 Survival

The representations, warranties, covenants and agreements of ABA, the Purchaser, the Seller, the Executive and the Stockholder set forth in this Agreement shall survive the Closing date; provided, however, that the representations and warranties of



A

S.a.O

the Seller, the Executive and the Stockholder contained in Article III and the representations and warranties of ABA and the Purchaser contained in Article IV shall survive the Closing date until June 30, 1999; and provided, further, that none of the limitations of the immediately preceding proviso shall apply with respect to indemnification obligations of a party arising in connection with the breach of any representation or warranty set forth in Sections 3.7, 3.11, 3.12, 3.15, 3.22, 3.27, 3.30, 3.31 or 3.35 of this Agreement, and none of such limitations shall apply with respect to any action based upon intentional or fraudulent actions, misrepresentations or breaches of any party.

§5.2 Investigation

The representations, warranties, covenants and agreements set forth in this Agreement shall not be affected or diminished in any way by any investigation (or failure to investigate) at any time by or on behalf of the party for whose benefit such representations, warranties, covenants and agreements were made. All representations and warranties contained herein or in any schedule, certificate, exhibit, list or other document delivered pursuant hereto, shall be deemed to be representations and warranties for purposes of this Agreement.

§5.3 Indemnification

(a) By Seller, the Executive and the Stockholder. Subject to the limitations set forth in Sections 5.1 and 5.3(e), the Seller, the Executive and the Stockholder agree, jointly and



S.a.O

severally, to indemnify and hold harmless ABA, the Purchaser and their respective directors, officers, employees and agents from, against and in respect of, the full amount of any and all liabilities, damages, claims, deficiencies, fines, assessments, losses, taxes, penalties, interest, costs and expenses, including, without limitation, reasonable fees and disbursements of counsel and accountants, arising from, in connection with, or incident to (i) any breach or violation of any of the representations, warranties, covenants or agreements of any of the Seller, the Executive or the Stockholder contained in this Agreement or any agreement referred to herein and delivered at or prior to the Closing; (ii) any and all claims arising out of, relating to, resulting from or caused (whether in whole or in part) by any transaction, event, condition, occurrence or situation in any way relating to the Seller or the conduct of its business arising or occurring on or prior to the Closing date without regard to whether such claim exists on the Closing date or arises at any time thereafter; (iii) any obligation or liability of the Seller of any nature, whether accrued, contingent, absolute or otherwise, not assumed by ABA or the Purchaser in accordance with this Agreement; (iv) any and all actions, suits, proceedings, demands, assessments or judgments, costs and expenses incidental to any of the foregoing; and (v) any obligation or liability of the Seller or the Stockholder for any taxes attributable to or arising from the



S.a.O

ownership or sale or use of the Purchased Assets or the conduct of any business by the Seller.

(b) By ABA and the Purchaser. Subject to the limitations set forth in Sections 5.1 and 5.3(e), ABA and the Purchaser agree, jointly and severally, to indemnify and hold harmless the Seller, the Executive and the Stockholder from, against and in respect of, the full amount of any and all liabilities, damages, claims, deficiencies, fines, assessments, losses, taxes, penalties, interest, costs and expenses, including, without limitation, reasonable fees and disbursements of counsel, arising from, in connection with, or incident to (i) any breach or violation of any of the representations, warranties, covenants or agreements of ABA or the Purchaser contained in this Agreement or any agreement referred to herein and delivered at or prior to the Closing; (ii) any of the Assumed Liabilities; and (iii) any and all actions, suits, proceedings, demands, assessments or judgments, costs and expenses incidental to any of the foregoing.

(c) Indemnity Procedure. A party or parties hereto agreeing to be responsible for or to indemnify against any matter pursuant to this Agreement is referred to herein as the "Indemnifying Party" and the other party or parties claiming indemnity is referred to as the "Indemnified Party".

An Indemnified Party under this Agreement shall, with respect to claims asserted against such party by any third party, give written notice to the Indemnifying Party of any

liability which might give rise to a claim for indemnity under this Agreement within sixty (60) business days of the receipt of any written claim from any such third party, but not later than twenty (20) days prior to the date any answer or responsive pleading is due, and with respect to other matters for which the Indemnified Party may seek indemnification, give prompt written notice to the Indemnifying Party of any liability which might give rise to a claim for indemnity; provided, however, that any failure to give such notice will not waive any rights of the Indemnified Party except to the extent the rights of the Indemnifying Party are materially prejudiced.

The Indemnifying Party shall have the right, at its election, to take over the defense or settlement of such claim by giving written notice to the Indemnified Party at least fifteen (15) days prior to the time when an answer or other responsive pleading or notice with respect thereto is required. If the Indemnifying Party makes such election, it may conduct the defense of such claim through counsel of its choosing (subject to the Indemnified Party's approval of such counsel, which approval shall not be unreasonably withheld), shall be solely responsible for the expenses of such defense and shall be bound by the results of its defense or settlement of the claim. The Indemnifying Party shall not settle any such claim without prior notice to and consultation with the Indemnified Party, and no such settlement involving any equitable relief or which might have an adverse effect on the



S.A.O

Indemnified Party may be agreed to without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld). So long as the Indemnifying Party is diligently contesting any such claim in good faith, the Indemnified Party may pay or settle such claim only at its own expense and the Indemnifying Party will not be responsible for the fees of separate legal counsel to the Indemnified Party, unless the named parties to any proceeding include both parties and representation of both parties by the same counsel would be inappropriate. If the Indemnifying Party does not make such election, or having made such election does not, in the reasonable opinion of the Indemnified Party proceed diligently to defend such claim, then the Indemnified Party may (after written notice to the Indemnifying Party), at the expense of the Indemnifying Party, elect to take over the defense of and proceed to handle such claim in its discretion and the Indemnifying Party shall be bound by any defense or settlement that the Indemnified Party may make in good faith with respect to such claim. In connection therewith, the Indemnifying Party will fully cooperate with the Indemnified Party should the Indemnified Party elect to take over the defense of any such claim.

The parties agree to cooperate in defending such third party claims and the Indemnified Party shall provide such cooperation and such access to its books, records and properties as the Indemnifying Party shall reasonably request with respect to any matter for which indemnification is sought



H
J.a.O

hereunder; and the parties hereto agree to cooperate with each other in order to ensure the proper and adequate defense thereof.

With regard to claims of third parties for which indemnification is payable hereunder, such indemnification shall be paid by the Indemnifying Party upon the earlier to occur of: (i) the entry of a judgment against the Indemnified Party and the expiration of any applicable appeal period, or if earlier, five (5) days prior to the date that the judgment creditor has the right to execute the judgment; (ii) the entry of an unappealable judgment or final appellate decision against the Indemnified Party; or (iii) a settlement of the claim. Notwithstanding the foregoing, provided that there is no dispute as to the applicability of indemnification, the reasonable legal fees and expenses of counsel to the Indemnified Party shall be reimbursed on a current basis by the Indemnifying Party if such legal fees and expenses are a liability of the Indemnifying Party. With regard to other claims for which indemnification is payable hereunder, such indemnification shall be paid promptly by the Indemnifying Party upon demand by the Indemnified Party.

(d) Escrow Provisions. In order to secure the obligations of the Seller, the Executive and the Stockholder hereunder, Seller will deliver to NationsBank, N.A., as escrow agent, or if NationsBank, N.A. is not then able to act as such, such other party as the Purchaser and the Seller shall mutually agree upon (the "Escrow Agent") pursuant to an escrow agreement to



S.a.o

of any party, and (B) any liabilities arising out of a breach of Sections 3.6, 3.14, 3.27, 3.30, 3.31, 3.35 or 5.7 hereof.

§5.4 Seller to Change Name

On the Closing date, the Seller will file an appropriate amendment to its Certificate of Incorporation to change its name to XM Corporation, and shall not further change or amend its name or use any other trade or fictitious name.

§5.5 Registration of ABA Common Stock

ABA will use its best efforts to include the shares of ABA Common Stock issued to the Seller in a registration statement of ABA to be filed with the Commission on or before December 15, 1997. One-half of the shares of ABA Common Stock received by the Seller and/or the Stockholder, as the case may be, pursuant to this Agreement shall be subject to a lock-up agreement through March 15, 1998, and the remainder of such shares of ABA Common Stock shall be subject to a lock-up agreement through June 30, 1999, substantially in the form of Exhibit B attached hereto (the "Lock-Up Agreement"), and shall also be held in escrow until March 15, 1998 and June 30, 1999, as applicable, and be available to satisfy the Seller's, the Executive's and the Stockholder's obligations to ABA and the Purchaser.

§5.6 Preparation of Closing Date Balance Sheet

(a) At Closing, Seller shall provide Purchaser with a schedule of Purchased Assets and Assumed Liabilities correct as of the Closing date, prepared in accordance with GAAP (the "Closing



S.a.O.

# ESCROW AGREEMENT

ESCROW AGREEMENT made as of this 30th day of September, 1996 (the "Escrow Agreement"), by and among **Armor Holdings, Inc.**, a Delaware corporation with offices at 191 Nassau Place Road, Yulee, Florida 32097 ("AHI"); **Defense Technology Corporation of America,** a Delaware corporation and a wholly-owned subsidiary of AHI with offices at 191 Nassau Place Road, Yulee, Florida 32097 (the "Purchaser"); **Robert Oliver,** residing at 8101 S.W. 53rd Avenue, Miami, Florida 33143 (the "Executive"); **Sandra Oliver,** residing at 8101 S.W. 53rd Avenue, Miami, Florida 33143 (the "Stockholder"); and **Defense Technology Corporation of America,** a Wyoming corporation with offices at 2136 Oil Drive, Casper, Wyoming 82604 (the "Seller") and **Union Bank of Switzerland, New York Branch,** with offices at 1345 Avenue of the Americas, New York, New York 10105 (the "Escrow Agent"), which term shall include any successor escrow agent appointed in accordance with Section 7(b) hereof.

The parties hereto are entering into this Escrow Agreement pursuant to that certain Asset Purchase Agreement, dated as of August 23, 1996 (the "Purchase Agreement"), among AHI, the Purchaser, the Executive, the Stockholder and the Seller. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement.

This Escrow Agreement is designed to implement the provisions of Section 5.3(d) of the Purchase Agreement pursuant to which the Escrow Fund is being deposited with the Escrow Agent pending the occurrence of the Release Dates contemplated in Section 5.3(d) of the Purchase Agreement.

Accordingly, in consideration of the mutual agreements herein contained, the parties hereto hereby agree as follows:

1. <u>Appointment of Escrow Agent.</u> The Escrow Agent is hereby appointed to act as escrow agent hereunder and the Escrow Agent agrees to act as such, pursuant to the terms hereinafter set forth herein.

2. <u>Escrow Fund.</u> On the date hereof, in accordance with Section 5.3(d) of the Purchase Agreement, the Seller is delivering to the Escrow Agent a certificate registered in the name of Seller for 270,728 shares of common stock, $.01 par value per share (the "Common Stock"), of AHI, together with a stock power duly endorsed in blank, and all necessary stock transfer tax stamps (the "Escrow Fund"). The Escrow Fund shall be held in escrow by the Escrow Agent, pending its disposition as hereinafter provided.



S.a.O

3. <u>Disposition of Escrow Fund.</u> (a) The stock certificate registered in the name of the Seller representing the shares of AHI shall be held in escrow in accordance with the terms of this Escrow Agreement. One-half of the Escrow Fund shall be held in escrow until March 15, 1998 ("First Release Date"), and the remainder shall be held in escrow until June 30, 1999 ("Final Release Date") (each, a "Release Date").

(b) Notwithstanding anything to the contrary contained herein, should any claim or claims ("Claim") be made by the Purchaser or by any third party arising out of or in connection with the Purchase Agreement or the transactions contemplated therein while any shares of AHI Common Stock are held in escrow, then such shares shall remain in escrow and continue to be held by the Escrow Agent in accordance with the terms of this Escrow Agreement until the final resolution of such Claim, notwithstanding the occurrence or passing of a Release Date. Unless and until the Escrow Agent has received written notice of a Claim, the Escrow Agent shall not be liable for the release of any shares or funds otherwise in compliance with the terms, conditions and procedures of this Escrow Agreement.

(c) The Purchaser shall have the right, in the exercise of its reasonable and good faith judgment, upon written notice to the Escrow Agent, to set-off and deduct from the Escrow Fund, and/or cause the Escrow Agent to release from escrow and deliver to the Purchaser, the number of shares of AHI Common Stock having a value equal to the amount of any losses for which the Seller, the Executive or the Stockholder are required to indemnify the Purchaser pursuant to the provisions of Section 5.3(a) of the Purchase Agreement, including, but not limited to, by reason of Section 2.1(f) of the Purchase Agreement; provided, however, that prior to any such set-off, deduction or release of shares (x) the Purchaser shall give notice to the Seller of the Claim for which indemnity is sought, and the Seller shall have a period of 15 days in which to cure or otherwise remedy, to the satisfaction of the Purchaser, any such Claim, and (y) during such 15 day period, the Seller and the Purchaser shall hold good faith negotiations to resolve any dispute with respect to any such Claim for indemnification (however, such negotiations shall not extend such 15 day period); and (z) that prior to any such set-off, deduction or release of shares the Seller shall be afforded the opportunity to pay to the Purchaser, in immediately available funds, the amount of any such loss within 15 days of notice thereof. For purposes of this Section 3(c) and Section 5.3(d) of the Purchase Agreement, the value of the shares of AHI Common Stock to be released from escrow by the Escrow Agent and delivered to Purchaser in satisfaction of a Claim shall equal the average closing price of AHI's Common Stock on the American Stock Exchange (or such other exchange as such shares may then be listed) for the 10 consecutive trading day



S.a.O

period ending two trading days prior to the date on which the shares are set off, deducted or released from escrow in satisfaction of a Claim, or in the event shares are returned to the Escrow Fund by Purchaser pursuant to Section 3(d) hereof, such shares of AHI Common Stock shall be valued in the manner hereinabove provided, averaged over the 10 consecutive trading day period ending two trading days prior to the date such shares are returned. Any fractional share shall be rounded up or down to the nearest whole share or the cash equivalent substituted in lieu thereof, as AHI may determine.

(d) If the amount of deduction is subsequently determined to be in excess of the amount which the Purchaser is legally entitled to deduct, the Purchaser shall promptly return such funds in cash or AHI Common Stock, as the case may be, to the Escrow Fund or if the Escrow Fund has terminated, shall pay such difference to the Seller after such final determination. AHI Common Stock returned to the Escrow Fund shall be valued as set forth in Section 3(c) of this Escrow Agreement.

(e) Notwithstanding anything contained herein to the contrary, the Seller shall have the right to instruct the Escrow Agent to sell any of the shares held in the Escrow Fund following the effectiveness of a registration statement of AHI registering all of such shares with the Securities and Exchange Commission. AHI shall notify both the Seller and the Escrow Agent of the effectiveness of such registration statement. In the event any shares of AHI Common Stock are sold at the request of the Seller while held in the Escrow Fund, subject to the terms and conditions of the Purchase Agreement, this Escrow Agreement, that certain Lock-Up Agreement dated as of August 23, 1996 by and among AHI and the Seller (the "Lock-Up Agreement") and all applicable laws and regulations, the proceeds of any such sale shall be remitted to the Escrow Agent and held as part of the Escrow Fund until released in accordance with the provisions of this Section 3.

(f) If no event enumerated in Section 3(c) of this Escrow Agreement or event pursuant to which the Seller, the Executive or the Stockholder are required to indemnify the Purchaser pursuant to the provisions of Section 5.3(a) of the Purchase Agreement, including, but not limited to, by reason of Section 2.1(f) thereof, has occurred prior to either Release Date, then (x) upon the occurrence of the First Release Date, AHI and the Seller shall jointly execute written instructions to the Escrow Agent to deliver to the Seller one-half of the Escrow Fund as is deliverable to the Seller on such Release Date; and (y) upon the occurrence of the Final Release Date, the balance of the Escrow Fund shall be released to Seller unless the Purchaser shall have given the Escrow Agent written notice of a Claim prior thereto, in which event the Escrow Fund shall continue to be held in escrow

pursuant to Section 3(b).

(g) If the Escrow Agent shall receive written instructions signed by AHI and the Seller directing the Escrow Agent to deliver all or any portion of the Escrow Fund as specified in such instructions, the Escrow Agent shall do so as soon as reasonably possible after receipt of such instructions. The instructions shall contain the following:

(i) the total amount of funds and/or number of shares of AHI Common Stock that the Escrow Agent is thereby directed to pay out of the Escrow Fund;

(ii) the party or parties to whom, or the account or accounts to which, the Escrow Agent is thereby directed to pay such amounts or number of shares; and

(iii) the date upon which the Escrow Agent is directed to pay such amount or number of shares.

The Escrow Agent may rely fully on the provisions set forth in the instructions without any responsibility to determine whether such instructions comply with this Section 3(g).

(h) So long as there is no breach of any representation, warranty, covenant or agreement by the Seller, the Executive or the Stockholder under the Purchase Agreement or the other agreements contemplated thereby, and subject to any rights in favor of third parties that may be granted by the Seller, the Executive or the Stockholder, the Seller shall be entitled to vote the shares of AHI Common Stock in the Escrow Fund and to receive dividends thereon, when, as and if declared by the Board of Directors of AHI.

4. **Rights to Escrow Fund.** The Escrow Fund shall be for the exclusive benefit of AHI and the Seller and their respective successors and assigns, and no other person or entity shall have any right, title or interest therein, except as otherwise contemplated herein or by the Purchase Agreement.

5. **Distributions from the Escrow Fund.** (a) The Escrow Agent shall continue to hold the Escrow Fund in its possession until authorized hereunder to distribute the Escrow Fund, or any specified portion thereof, as follows:

(i) Pursuant to Section 3 of this Escrow Agreement.





S.a.

(ii) If other than pursuant to Section 3, as determined by a final order, decree or judgment of a court of competent jurisdiction in the United States of America in a proceeding to which AHI and the Seller are parties (a "Final Decree"); or

(iii) as provided in Section 6 or 7(b) hereof relating to termination and resignation of the Escrow Agent.

(b) It is understood that the Escrow Agent may disburse any portion of the Escrow Fund without any instructions if such distribution is pursuant to Section 5(a)(ii) or 5(a) (iii).

6. <u>Termination of Escrow.</u> This Escrow Agreement may be terminated at any time by and upon the receipt by the Escrow Agent of 10 days' prior written notice of termination executed by AHI and the Seller, directing the distribution of all property then held by the Escrow Agent under and pursuant to this Escrow Agreement. In the event that a dispute arises in connection with the release of the Escrow Fund, the Escrow Agent shall have the sole and absolute right to resign in accordance with the provisions of Section 7(b) hereof. This Escrow Agreement shall automatically terminate if and when all amounts in the Escrow Fund shall have been distributed by the Escrow Agent in accordance with the terms of this Escrow Agreement.

7. <u>The Escrow Agent.</u>

(a) <u>Obligations.</u>

(i) The obligations of the Escrow Agent are those specifically provided in this Escrow Agreement and no other, and the Escrow Agent shall have no liability under, and no duty to inquire into the terms and provisions, of any agreement between the parties hereto. The Escrow Agent is acting hereunder as an accommodation to the parties hereto. The duties of the Escrow Agent are purely ministerial in nature, and it shall not incur any liability whatsoever, except for its willful misconduct or gross negligence. The Escrow Agent may consult with counsel of its choice, and shall not be liable for following the written advice of such counsel.

(ii) The Escrow Agent shall not have any responsibility for the genuineness or validity of any document or other item deposited with it or of

any signature thereon or for the identity, authority or right of any person executing or depositing the same and shall not have any liability for acting in accordance with any written instructions or certificates given to it hereunder signed by the proper parties.

(b) **Resignation and Removal.** The Escrow Agent may resign from its duties hereunder at any time by giving at least 30 days' prior written notice of such resignation to AHI and the Seller and specifying a date upon which such resignation shall take effect; provided, however, that the Escrow Agent shall continue to serve until its successor accepts the Escrow Fund pursuant to a written assignment and assumption instrument pursuant to which the rights of the Escrow Agent are assigned to such successor and such successor expressly assumes the obligations of the Escrow Agent hereunder. Notwithstanding the foregoing, however, the Escrow Agent shall, in the alternative, have the right, at any time, following 10 days written notice to the other parties hereto, to resign as Escrow Agent and deposit the Escrow Fund with a court of competent jurisdiction and the Escrow Agent shall thereupon have no further obligation with respect thereto. Upon receipt of such notice, a successor escrow agent shall be appointed by AHI and the Seller, such successor escrow agent to become the Escrow Agent hereunder on the resignation date specified in such notice. If an instrument of assignment and assumption by a successor escrow agent shall not have been delivered to the Escrow Agent within 45 days after the giving of such notice of resignation, the resigning Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent. AHI and the Seller, acting jointly, may at any time remove the Escrow Agent and substitute a new escrow agent by giving 10 days' prior written notice thereof to the Escrow Agent then acting and paying all fees and expenses of such Escrow Agent through the date of termination.

(c) **Indemnification.** AHI and the Seller shall jointly and severally, hold the Escrow Agent harmless from and against and indemnify the Escrow Agent for any loss, liability, expense (including reasonable attorneys' fees and expenses), claim or demand arising out of or in connection with the performance of its obligations in accordance with the provisions of this Escrow Agreement, except for any of the foregoing arising out of the gross negligence or willful misconduct of the Escrow Agent. The foregoing indemnities in this Section 7(c) shall survive the resignation or substitution of the Escrow Agent and the termination of this Escrow Agreement.

(d) **Expenses of the Escrow Agent.** AHI shall bear the cost for reasonable expenses incurred by the Escrow Agent in the performance of services pursuant to this Escrow Agreement

including, but not limited to, reasonable legal fees, and AHI agrees to promptly reimburse the Escrow Agent upon receipt of a written request for reimbursement and the presentation of proper vouchers or receipts therefor.

8. Disputes.

(a) Escrow Agent's Responsibility. If any dispute should arise with respect to the payment and/or ownership or right of possession of the Escrow Fund, the Escrow Agent is authorized and directed to retain in its possession, without liability to anyone, all or any portion of the Escrow Fund until such dispute shall have been settled either by agreement of the parties concerned or by a Final Decree, but the Escrow Agent shall be under no duty whatsoever to institute or defend any such proceedings.

(b) Costs. AHI and the Seller shall each bear all of their own fees and expenses incurred by them in resolving any dispute arising under this Escrow Agreement. Any costs incurred by the Escrow Agent in connection with any dispute arising under this Escrow Agreement shall be reimbursed to the Escrow Agent pursuant to the provisions of Section 7(d). If the Escrow Agent is not reimbursed for such expenses within 30 days' written notice thereof pursuant to Section 7(d) hereof, the Escrow Agent shall be entitled to resign, upon 15 days' prior written notice to the parties hereto. If no successor escrow agent is named by the end of such 15 day period, the Escrow Agent shall have the right to deposit the Escrow Fund with an appropriate court and the Escrow Agent shall have no further obligation under this Escrow Agreement or, in the alternative, the Escrow Agent shall be entitled to continue to serve as Escrow Agent if all of its costs have been and are continuing to be paid on a current basis by the parties hereto.

9. Fees of the Escrow Agent. The fees of the Escrow Agent shall be limited to those set forth on Schedule A attached hereto and shall be borne by AHI and shall be billed to and paid by AHI in accordance with the Escrow Agent's regular billing practices.

10. Notices. All notices or other communications which are required or permitted to be given hereunder shall be in writing and shall personally be delivered, sent by certified mail, return receipt requested, or sent by a nationally-recognized overnight courier, to the parties hereto at the addresses first above written, or to such other addresses as the party to whom notice is to be given may have furnished to the other parties in writing. Any such communication shall be deemed to have been given when (i) delivered, if personally delivered, (ii) on receipt, if sent by mail, and (iii) on the business day after dispatch, if sent by nationally-recognized overnight courier.





A.a.O

11. Counterparts. This Escrow Agreement may be executed in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

12. Governing Law and Jurisdiction. This Escrow Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the principles of conflicts of laws thereunder. This Escrow Agreement shall be subject to the exclusive jurisdiction of the courts located in New York County, New York. The parties to this Escrow Agreement agree that any breach of any term or condition of this Escrow Agreement shall be deemed to be a breach occurring in the State of New York by virtue of a failure to perform an act required to be performed in the State of New York, and the parties irrevocably and expressly agree to submit to the jurisdiction of the courts of the State of New York for the purpose of resolving any disputes among the parties relating to this Escrow Agreement or the transactions contemplated hereby. The parties hereto irrevocably waive, to the fullest extent permitted by law, any objection which they may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Escrow Agreement, or any judgment entered by any court in respect hereof brought in New York County, New York, and further irrevocably waive any claim that any suit, action or proceeding brought in New York County, New York has been brought in an inconvenient forum.

13. Benefits of Agreement. All the terms and provisions of this Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; and nothing in this Escrow Agreement, express or implied, is intended to confer on any person, corporation, group or other entity other than the parties hereto or their respective successors and assigns, any rights, remedies, obligations or liabilities under or by reason of this Escrow Agreement. Anything contained herein to the contrary notwithstanding, this Escrow Agreement shall not be assignable by any party hereto without the consent of the other parties hereto.

14. Full Force and Effect. This Escrow Agreement shall remain in full force and effect until the Escrow Agent has delivered all shares and/or funds in the Escrow Fund in accordance with the terms hereof.

15. Modification. This Escrow Agreement shall not be altered or otherwise amended, except pursuant to an instrument in writing signed by each of the parties hereto.

16. **Descriptive Headings.** The descriptive headings in this Escrow Agreement are for convenience only and shall not control or affect the meaning or constructing of any provision of this Escrow Agreement.

17. **Transfer.** The Seller shall not sell, assign, transfer exchange or otherwise dispose of, or grant any option or warrant with respect to, all or any part of the Escrow Fund, nor shall it create, incur or permit to exist any pledge, lien, mortgage, hypothecation, security interest, charge or other encumbrance with respect to all or part of the Escrow Fund.

18. **Purchase Agreement and Lock-Up Agreement.** The parties hereto agree that this Escrow Agreement shall be subject to the terms and conditions of the Purchase Agreement and the Lock-Up Agreement. To the extent any provision of Section 3 is in conflict with any provision of the Purchase Agreement, the provisions of the Purchase Agreement shall prevail. The parties hereto (other than the Escrow Agent) acknowledge their respective obligations under Article V of the Purchase Agreement and the Lock-Up Agreement, and agree to be bound by such.

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed and delivered on the date first above written.

ARMOR HOLDINGS, INC.

By: [signature]
Name: ROBERT SCHILLER
Title: VICE PRESIDENT

DEFENSE TECHNOLOGY CORPORATION OF AMERICA, a Delaware corporation

By: [signature]
Name: ROBERT SCHILLER
Title: VICE PRESIDENT

DEFENSE TECHNOLOGY CORPORATION OF AMERICA, a Wyoming corporation

By: [signature]
Name: ROBERT L. OLIVER
Title: CEO

[signature]
ROBERT OLIVER

[signature]
SANDRA OLIVER

UNION BANK OF SWITZERLAND, NEW YORK BRANCH, as Escrow Agent

By: [signature]
Name: Lawrence E. Gore
Title: Managing Director

E Roddy
AVP

 pk8 C:\WP-DOCS\RMR\ABA\DEFTECH\ESCROW6.AGT

S.a.o

70-263776

FILED

OCT 1 1996 15700

**SECRETARY OF STATE**
**State of Wyoming**
**The Capitol**
**Cheyenne, WY 82002-0020**

# ARTICLES OF AMENDMENT
## (BY SHAREHOLDERS)

1. The name of the corporation is: DEFENSE TECHNOLOGY CORPORATION OF AMERICA

2. Article 1 is amended as follows:

   "1. The name of the corporation is: XM Corporation."

3. The amendment was adopted on September 30, 1996, by the shareholders.

4. The amendment was adopted unanimously by vote of 4500 shares, being all of the shares issued and outstanding on the date of the amendment.

5. The amendment **does not** provide for an exchange, reclassification, or cancellation of issued shares.

Date: September 30, 1996

Deborah A. Conley
Deborah A. Conley, President
DEFENSE TECHNOLOGY CORPORATION OF AMERICA

RECEIVED
'96 OCT -1 P 4:57
WYOMING
SECRETARY OF STATE

**SECRETARY OF STATE**
**State of Wyoming**
**The Capitol**
**Cheyenne, WY 82002-0020**

90-263776
D

# STATEMENT OF CHANGE OF REGISTERED AGENT/REGISTERED OFFICE

1. The name of the corporation is: XM CORPORATION (formerly, DEFENSE TECHNOLOGY CORPORATION OF AMERICA)

2. The street address of its **current** registered office is: 2136 Oil Drive, Casper, Wyoming 82604.

3. The street address of its **new** registered office is: 1720 Carey Avenue, Cheyenne, Wyoming 82001.

4. The name of its **current** registered agent is: CLODAGH MICHEL.

5. The name of its **new** registered agent is: CT CORPORATION SYSTEM.

6. After the changes are made, the street address of its registered office and the business office of its registered agent will be identical.

Date: September 30, 1996

Deborah A. Conley
Deborah A. Conley, President
XM CORPORATION

RECEIVED
'96 OCT -1 P4:57
WYOMING
SECRETARY OF STATE

*Secretary of State*
*State of Wyoming*
*The Capitol*
*Cheyenne, WY 82002-0020*

# CONSENT TO APPOINTMENT BY REGISTERED AGENT

1. **C T CORPORATION SYSTEM** voluntarily consents to serve as the registered agent for **XM Corporation** on the date shown below;

2. The registered agent certifies that it is:

A foreign corporation or not-for-profit corporation authorized to transact business in this state whose business office is identical with the registered office.

3. I know and understand the duties of a registered agent as set forth in the 1989 Wyoming Business Corporation Act.

Dated this 25th day of September, 1996.

**C T CORPORATION SYSTEM**

By *Marcia J. Sunahara*
Marcia J. Sunahara, Asst. Vice President

# SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement (the "Agreement") is made and entered into effective this 29th day of May, 1998, between and among Armor Holdings, Inc., ("AHI"), a Delaware corporation with its principal place of business at 13386 International Parkway, Jacksonville, Florida 32218, Defense Technology Corporation of America ("Deftech"), a Delaware corporation with its principal place of business at 1900 North Loop, Casper, Wyoming 82601, XM Corporation ("XMC"), formerly known as Defense Technology Corporation of America, a Wyoming corporation, with its principal place of business at 4970 South West 72 Avenue, Suite 103, Miami, Florida 33155, Robert Oliver, an individual residing at 8101 South West 53 Avenue, Miami, Florida 33143 and Sandra Oliver, an individual residing at 8101 South West 53 Avenue, Miami, Florida 33143.

WHEREAS, AHI and Deftech have brought an action against XMC, Robert Oliver and Sandra Oliver in the Supreme Court of the State of New York, County of New York, Index No. 600485/97;

WHEREAS, XMC, Robert Oliver and Sandra Oliver have denied the material allegations set forth in the complaint and amendments thereof and have interposed various counterclaims;

WHEREAS, AHI and Deftech have denied the material allegations set forth in the counterclaims and amendments thereof;

WHEREAS, trial of the action is scheduled for June 8, 1998;

WHEREAS, pursuant to an Asset Purchase Agreement, dated as of August 23, 1996, (the "Asset Purchase Agreement") and an Escrow Agreement, dated as of September 30, 1996 and executed in connection therewith, certain shares of AHI common stock were placed in escrow of which there presently remain 84,705 shares in escrow;

WHEREAS, the parties hereto desire and intend to settle all disputes between them, including the claims and counterclaims asserted in the foregoing action.

NOW, THEREFORE, pursuant to and in accordance with this desire and in consideration of the promises and releases made below, the parties agree as follows:

1. Settlement Payment. Upon the exchange of duly executed copies of this Agreement, AHI shall wire transfer funds to the account of Gersten, Savage, Kaplowitz & Fredericks, LLP, as attorneys, as specified by such firm to AHI in writing, in the amount of Seven-Hundred Thousand ($700,000) Dollars, less twenty-five (25¢) cents per share for such amount of AHI shares which would have to be sold at the average closing price for the ten (10) trading days immediately preceding the date of this Agreement necessary to achieve sales of $700,000 worth of shares of AHI common stock, which amount comes to $684,742. Such payment of $684,742, together with the exchange of promises and releases made

hereunder, shall constitute consideration for the mutual release of claims and the entry of a permanent injunction enforcing the restrictive covenants as more fully set forth below.

2. Mutual Releases. In consideration of the parties' agreement to the terms hereunder, AHI and Deftech, on the one hand, and XMC, Robert Oliver and Sandra Oliver, on the other hand, do each hereby for themselves and their respective legal successors and assigns, heirs, executors and personal representatives, release and absolutely and forever discharge each other and their respective past, present and future partners, employees, agents, attorneys, legal successors, assigns, heirs, executors and personal representatives, of and from any and all claims, counterclaims, demands, damages, debts, liabilities, accounts, reckonings, obligations, costs, expenses, liens, actions and causes of action of every kind and nature whatsoever, from the beginning of time to the date of this Agreement, whether known or unknown, certain or speculative, asserted or unasserted, except that XMC, Robert Oliver and Sandra Oliver are not released from the obligations set forth in Section 3 below.

3. Restrictive Covenant. Notwithstanding anything to the contrary set forth above, the parties agree to authorize their counsel to sign a stipulation in the form annexed as Exhibit A hereto to be presented to the Court in the aforesaid action to be "so ordered" (the "Stipulation and Order"). By this Stipulation and Order, XMC, Robert Oliver and Sandra Oliver agree to a permanent injunction until September 30, 2001 binding each of them to the terms of the restrictive covenants set forth in the Asset Purchase Agreement and the Authorized Distributor Agreement, dated as of September 30, 1996. XMC, Robert Oliver and Sandra Oliver further consent to the continuing jurisdiction of the New York State Supreme Court for all purposes, including enforcement and contempt proceedings, with respect to the Stipulation and Order, and agree that any legal action or proceeding in that connection may be commenced by service of process by certified mail, returned receipt requested, at their addresses set forth above.

4. Disposition of Stock. The parties agree that upon the exchange of signed copies of this Agreement and delivery of the settlement funds referred to in Section 1 above, the remaining 84,705 shares of AHI common stock, together with stock powers duly endorsed in blank, shall be released from escrow and delivered to AHI. XMC, Robert Oliver and Sandra Oliver agree to cooperate in order to effectuate the release of the escrow stock.

5. Stipulation of Discontinuance. After the Stipulation and Order has been entered by the Court, a Stipulation of Discontinuance without prejudice signed by counsel for the parties hereto may be filed with the Clerk of the Court without further notice. Said stipulation of discontinuance shall be "without prejudice" solely in order to preserve plaintiffs' rights to enforce the Stipulation and Order with respect to the restrictive covenants described above and for no other purpose.

6. Integration and Amendment. This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior negotiations and agreements, whether written or oral. This Agreement may not be altered or amended except by an instrument in writing executed by the parties hereto.

7. Counterparts. This Agreement may be executed in counterparts which taken together, shall constitute one and the same agreement and shall be effective as of the date first written above.

8. Severability. The invalidity of any provisions of this Agreement shall not affect the continuing enforceability of the remaining provisions.

9. Facsimile Execution. A facsimile signature shall be as valid as an original signature for all purposes hereunder.

10. Further Actions. At any time and from time to time, each party agrees, without further consideration, to take such actions and to execute and deliver such documents as may be reasonably necessary to effectuate the purposes of this Agreement.

11. Interpretation. Each party and counsel for each party have reviewed this Agreement and, accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

12. Jurisdiction and Venue. The parties hereto hereby irrevocably consent to the jurisdiction of the courts of the State of New York and of any federal court located in such State in connection with any action or proceeding arising out of or relating to this Agreement, any document or instrument delivered pursuant to, in connection with, or simultaneously with this Agreement, or a breach of this Agreement or any such document or instrument, and agree that the proper venue for any such action or proceeding shall be New York County.

13. Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to its conflict of laws rules.

IN WITNESS WHEREOF, the parties hereto have executed this Settlement and Release Agreement as of the day and year first written above.

Armor Holdings, Inc.

By:________________________
Name:
Title:

Defense Technology Corporation of America

By:________________________
Name:
Title:

XM Corporation

By: [signature]
Robert Oliver, CEO

[signature]
Robert Oliver

[signature]
Sandra Oliver



(FRI)05. 29'98 12:38/ST. 12:31/NO. 3561208281 P 5/8 FROM KANE KESSLER, P.C.

IN WITNESS WHEREOF, the parties hereto have executed this Settlement and Release Agreement as of the day and year first written above.

Armor Holdings, Inc.

By: [signature]
Name: Jonathan M. Spiller
Title: President & CEO

Defense Technology Corporation of America

By: [signature]
Name: Jonathan M. Spiller
Title: PRESIDENT & CEO

XM Corporation

By: ______________________
Robert Oliver, CEO

______________________
Robert Oliver

______________________
Sandra Oliver