probably guessing 90 percent that, yeah, it's an exercise, it's a training exercise.
Q. **How do you -- so they don't, as an -- as a matter of course, tell you this is a training exercise as opposed to a live --**
A. We didn't know it was a training exercise. I guess officially, they didn't tell us -- I don't think they told us it was a training exercise until we were up there.
Q. **At some point, you'd get --**
A. At some point, we knew that it was a training exercise because we're not using live rounds.
Q. **You were using paint instead of --**
A. Yeah, so....
Q. **Okay. What's your responsibility when you get to the SORT building?**
A. Grab my gear.
Q. **Okay. What gear are you grabbing?**
A. I grab my -- the black duffel bag that I have all my gear in. I have a Kevlar helmet -- you want a list of my gear?
Q. **Okay. You had -- no. I guess everyone has the same gear; correct?**
A. Correct.
Q. **They've all got their black bag with -- with**



**similar --**
A. Similar gear --
Q. **-- gear?**
A. -- correct.
Q. **Is there any gear beyond the similar gear that you're responsible for grabbing?**
A. I think the -- out of the armory, I -- I -- well, I know that I grabbed a shield that -- I was not a shield man at that point, but I used to be the shield man, but I think another guy, Stan Rush, I think, was the shield man that day. So at some other times, yes, I'd grab a shield, or I'd grab some of the -- a rope, rappel rope. That day, I don't --
Q. **And both --**
A. That day -- I don't recall grabbing either a shield or a rope that day.
Q. **And both a shield or the rope are kept within the SORT building?**
A. Yeah.
Q. **Who was responsible for grabbing munitions, ammunition?**
A. Anyone; anyone on the -- on the SORT team. I mean, basically, getting them from the armory, yeah, anyone.



Q. **Who -- who did it on this day?**
A. Well, various different people. I did carry weapons out of the armory that day.
Q. **What did you carry out of the armory?**
A. I don't know exactly. I know I carried a -- maybe ten submachine guns. I think I -- I think I had the -- the gas gun slung on my arm.

MR. KIRSCH: The what?

MR. ENGEBRETSON: Tear gas gun?

A. Tear gas gun. I don't know if it's like a six-shot or an eight-shot. It's a number --
Q. **How do you know what equipment you're going to take?**
A. Your -- they tell you. The armors tell you or your lieutenant says this is what we're bringing to this exercise.
Q. **So as part of the exercise --**
A. You have to armor up.
Q. **Well, let me finish my question first.**
A. Oh, I'm sorry.
Q. **As part of the exercise, someone, a lieutenant, assistant warden, would have -- captain would have predetermined what sort of equipment was going to go to the scene?**



A. Yes.
Q. **And the armors would have that equipment ready for you people to pick up when you came in?**
A. Yeah. And it's -- it seemed as though -- because when we went to the armory that morning to pick up equipment, I -- it kind of seemed as though it was already set up and ready, so that's when we started leading to believe that it was just an exercise.
Q. **Okay. Meaning it was already set out there?**
A. Yeah. Some stuff was already -- the box was already there. It wasn't....
Q. **Who picked up the -- the black smoke?**
A. The smoke containers? I don't know exactly who it was. I couldn't tell you.
Q. **Now, you said smoke containers. What does that mean?**
A. The -- they're like little grenades, aluminum pop can size.
Q. **Okay. What -- what do they look like?**
A. I would say the smoke grenades that we'd use are probably -- you'd say six inches high, in and around the size of a pop can --
Q. **Okay.**
A. -- with a little steel nubbin thing on the

Page 81

top. It must have a spring in it because there's a paddle on it and like a ring, a steel ring. I think I got one on my key chain. The ring that you pull, it's got a little cotter key pin that's spread out on the other side; pull that, let go of it, and then the paddle comes up, and then the smoke disperses.
**Q. What color are these?**
A. They're like aluminum colored, that silvery alum -- like aluminum. I was going to say like kind of the color of your hair, but -- aluminum color.
**Q. Did you see the -- the black smoke containers on the day of the -- on June 2nd?**
A. I -- I did see smoke containers. If -- I recall seeing black smoke or smoke black or -- in the box that was handed to someone as I was -- as I was throwing rifles on my arm.
**Q. Okay. Let me see if I understand.**
A. Yeah. I -- I do remember seeing a grenade that said smoke black or something as we were by the stairwell, you know, that day.
**Q. So when they were originally at the armory, they were in a -- a box?**

Page 82

A. They're in a box, and I can't recall if it was wooden or a --
**Q. Cardboard or --**
A. -- if it was wooden, cardboard, plastic. I don't know.
**Q. But they were packaged in groups of -- you -- do you know how many?**
A. No.
**Q. But I mean are we talking a hundred or ten?**
A. Oh, I'm -- my guess is there's probably less than ten.
**Q. Okay. Do you know how many -- do you know how many smoke grenades you were issued on that day?**
A. No.
**Q. Was the SORT team, on this day, going to be divided into its two subteams, Team A and Team B?**
A. Probably.
**Q. Okay.**
A. After we were gotten up there, probably, yeah.
**Q. But at this -- at this stage when you're acquiring the ammunition from the armory, there's no division between the teams; you're just getting all the equipment you need?**

Page 83

A. You're -- yeah. You're get -- picking up the equipment. I don't know -- and I can't recall if -- if the -- Lieutenant Glen or Lieutenant Al Baxter, if they said Team A, you go to the armory and get the -- the munitions, Team B, start loading the truck with oranges and apples or something --
**Q. All right.**
A. -- and -- I don't remember. On that day, I don't remember if I was on Team A or Team B.
**Q. And I guess what -- maybe where I'm confused is -- is when you went to the -- when you went to --**
A. Armory?
**Q. -- went to the armory, would someone from Team A be responsible for getting their six smoke grenades and someone from Team B would be required to get their six smoke grenades?**
A. From the armory?
**Q. From the armory. Would you be equally arming both of these two teams?**
A. That's the lieutenant's decision.
**Q. Okay.**
A. I -- I would not --
**Q. Okay.**

Page 84

A. That's -- that's somebody else's --
**Q. What do you remember about the -- the -- the case that these smoke grenades came in?**
A. Like I said, I -- I don't remember if it was a cardboard box, a wooden box, a plastic box. It was --
**Q. Do you remember the color of the box?**
A. (Pause.) No. My guess is it would have been cardboard. I mean my guess -- I'm -- I'm trying to visualize something five years ago --
**Q. Right.**
A. -- almost five. I've -- I'm -- I'm thinking it was kind of that brownish cardboard color.
**Q. Do you recall whether there was any writing on the -- on the box?**
A. No. I was -- I was at a position where I was up, so I was looking down at the box. I mean I -- just here, (handing). That's from what I remember.
**Q. Did you --**
A. And I remember seeing all the stuff in there.
**Q. You were just describing kind of a moving motion?**
A. Exactly.

NO. 98 TACTICAL CONTINUOUS DISCHARGE GRENADE
CN, CS AND SMOKE

# NO. 98 TACTICAL CONTINUOUS DISCHARGE GRENADE
# CN, CS AND SMOKE

***The No. 98 is very compact and may be hand thrown or launched from a shotgun. It has an aluminum body with pelletized agent and M201A1 fuze. Irritant is discharged through one gas port on the bottom of the grenade. We recommend the No. 98 for outdoor use only.***

ANDY
THIS IS WHAT
I REMEMBER
AS THE GRENADE
USED ON 6-2-1998
Tim
Gramradt
01-28-2005



- **APPLICATION:**
  The No. 98's compact size allows for concealment, yet quick access for tactical situations.
- **CONSTRUCTION:**
  Aluminum body with pelletized agent and fuze.
- **OPERATION:**
  Irritant or smoke discharged through one (1) gas port on bottom of grenade. Due to pyrotechnic nature of grenade, it is recommended for outdoor use only.
- **DESIGN FEATURES:**
  **Diameter:** 1.4 inches (3.6 cm)
  **Length:** 5 inches (12.7 cm)
  **Agent weight:**
  .09 ounces (26 grams) CN and CS
  **Total Weight:**
  6.0 ounces (168 grams) CN and CS
  6.0 ounces (168 grams) SMOKE
- **PERFORMANCE:**
  **Effective range:** 90 yards (82 meters) when launched
  **Discharge time:** 25 seconds
- **REFERENCES:**
  **CN:** Product Code 1015
  **CS:** Product Code 1016
  **SMOKE:** Product Code 1017

***Specifications Subject to change without notice.***



*DEFENSE TECHNOLOGY CORP. OF AMERICA*
*P.O. BOX 240 - 2136 OIL DRIVE - CASPER, WYOMING, 82604-1511-U.S.A.*
*(800) 733-3832 - (307) 235-2136 - FAX (307) 473-2605*

**ANDREW ENGEBRETSON**
**Attorney at Law**

300 Beal Building
5 North Third Avenue West
Duluth, MN 55802

(218) 786-0565
Fax: (218) 786-0589

September 20, 2005

Mr. Charles B. Bateman
Attorney at Law
332 West Superior Street
Suite 700
Duluth, MN 55802-1801

Schneider Law Office
ATTN: Steven W. Schneider
P.O. Box 16
Duluth, MN 55801-0016

RE: Gamradt v. Defense Technology Corp., et al.
Case No.: 02-816

Gentlemen:

In my last letter I forgot to make mention of the fact that Tim Gamradt came in to our office to look over the exhibits: the dummy grenades and the catalogues. He did not recognize any of these exhibits from Defense Technology and Federal Laboratories as being the smoke grenade that was used during the unfortunate incident in which he was injured.

Very truly yours,

Andrew Engebretson

AE/tjd

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FIFTH DIVISION

---

Timothy Gamradt and Carla Gamradt,

Plaintiffs,

v.

Federal Laboratories, Inc.,
Mace Securities International,
and Defense Technology Corporation
of America,

Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANT'S REQUEST FOR ADMISSION**

Case No. 02-816

---

COME NOW the Plaintiff, his Attorney Andrew Engebretson and makes the following response to the Request for Admission of Defense Technology Corporation of America:

1. Admit that Timothy Gamradt had the opportunity to physically examine the exemplar smoke canister depicted in Exhibit A.

**RESPONSE: Can neither admit nor deny because Plaintiff Timothy Gamradt can no longer recall specifically examining exemplar grenade but that the grenade depicted in Exhibit A is not the type of smoke canister that caused his injuries.**

2. Admit the exemplar smoke canister depicted in Exhibit A is not the type of smoke canister that caused Timothy Gamradt's injuries on June 2, 1998.

**RESPONSE: Admit.**

3. Admit that Timothy Gamradt had the opportunity to physically examine the warning label on the exemplar smoke canister as depicted in Exhibit B.

**RESPONSE: Can neither admit nor deny because Plaintiff Timothy Gamradt can no longer recall specifically examining exemplar grenade but that the grenade depicted in Exhibit A is not the type of smoke canister that caused his injuries.**

4. Admit that the warning label on the exemplar smoke canister as depicted in Exhibit B were not present on the type of smoke canister that caused Timothy Gamradt's injuries on June 2, 1998.

**RESPONSE: Admit.**

5. Admit that Timothy Gamradt had the opportunity to physically examine the exemplar smoke canister depicted in Exhibit C.

**RESPONSE: Can neither admit nor deny because Plaintiff Timothy Gamradt can no longer recall specifically examining exemplar grenade but that the grenade depicted in Exhibit A is not the type of smoke canister that caused his injuries.**

6. Admit that the exemplar smoke canister depicted in Exhibit C is not the type of smoke canister that caused Timothy Gamradt's injuries on June 2, 1998.

**RESPONSE: Admit.**

7. Admit that the depiction of the smoke canister shown in Exhibit D is an accurate depiction of the lettering on the smoke canister that caused Timothy Gamradt's injuries on June 2, 1998.

**RESPONSE: Can neither admit nor deny for the reason that Exhibit D is a copy of sketch made from memory by Plaintiff Timothy Gamradt at his deposition and as such simply represented his best recollection of the lettering on the smoke grenade canister involved in the incident in question.**

8. Admit that Timothy Gamradt identified the smoke canister depicted in Exhibit E as the type of smoke canister that caused his injury on June 2, 1998.

**RESPONSE: Admit. Timothy Gamradt has asked us specifically to point out that Exhibit E is a copy of a page from a catalog issued by Defendant Defense Technology; that this catalog was of course no where around at the time of the incident, and because the language "We recommend the No. 98 for outdoor use only" that appears in the catalog, it does not follow the same language appeared on the canister nor is it Timothy Gamradt's recollection that such language did appear.**

9. Admit that the handwritten note in the upper right quarter of Exhibit E is in Timothy Gamradt's handwriting.

**RESPONSE: Admit.**

Dated: 12/19/05

[signature]
Andrew Engebretson, No. 26797
Attorney at Law
300 Beal Building
5 North Third Avenue West
Duluth, MN 55802
(218) 786-0565

**ATTORNEY FOR PLAINTIFF**

**ANDREW ENGEBRETSON**
**Attorney at Law**

300 Beal Building
5 North Third Avenue West
Duluth, MN 55802

(218) 786-0565
Fax: (218) 786-0589

STATE OF MINNESOTA )
)ss
COUNTY OF ST. LOUIS )

**AFFIDAVIT OF SERVICE BY MAIL**

Jessica J. Peterson, of the City of Duluth, County of St. Louis, in the State of Minnesota, being first duly sworn, says that on the 20 day of December, 2005, she served the following documents:

**PLAINTIFF'S RESPONSE TO DEFENDANT'S REQUEST FOR ADMISSION**

by depositing a true and correct copy thereof in a sealed envelope duly addressed to:

Schneider Law Office
ATTN: Steven W. Schneider
P.O. Box 16
Duluth, MN 55801-0016

Mr. Charles B. Bateman
Attorney at Law
332 West Superior Street, Ste. 700
Duluth, MN 55802-1801

Reyelts Leighton et al.
ATTN: Tracy A. Schramm
332 West Superior Street
Suite 700
Duluth, MN 55802-1801

and depositing same in the post office at Duluth, Minnesota, postage prepaid.

Jessica J. Peterson

Subscribed and sworn to before me
this 20 th day of December, 2005.

Notary Public

DAVID A. KUITI
Notary Public-Minnesota
My Commission Expires Jan 31, 2010

MINNESOTA LUNG CENTER

MAIN OFFICE (612) 863-3750
FAX (612) 863-3827
TOLL FREE (800) 700-LUNG

MICHAEL D. ALTER, M.D.
THEODORE M. BERMAN, M.D.
R. MICHAEL BOWEN, M.D.
WILFRED A. CORSON, M.D.
JOAN M. K. FOX, M.D.
JOSEPH L. GRAIF, M.D.
KATHY R. GROMER, M.D.
EVA M. GRUNDMANIS, M.D.
MITCHELL G. KAYE, M.D.
THOMAS F. MULROONEY, M.D.
MARK R. STANG, M.D.
RALPH E. STEELE, M.D.
WAYNE L. STERN, M.D.
PATRICK J. WRIGHT, M.D.

PENNY M. VAIL
ADMINISTRATOR

May 20, 2003

Andrew Engebretson
300 Beal Building
5 North 3rd Avenue W
Duluth, MN 55802

RE: Timothy Gamradt
DOB: 10/26/1967

Dear Mr. Engebretson:

You called my office today requesting an immediate report regarding some potentially toxic substances to which the above-captioned Mr. Gamradt, a patient of our medical group, was exposed in the workplace.

I am dictating this report in some haste and without access to his entire medical record. This puts me in a bit of a disadvantage because I examined him on only one occasion (January 8, 2003), when it was necessary to update his disability rating. Previously he had been seen by other doctors within our group, particularly by Dr. Ieva Grundmanis, who has since retired.

The material data safety sheet, which you sent to me, mentions three ingredients, zinc oxide, hexachloroethane, and aluminum powder. These together constitute a product called "Pyrotechnic Smoke #2." You have asked me to opine as to the toxicity of inhaling these substances "in any quantity." You also have asked if these chemicals, in the form of "black smoke" should be dispensed only out of doors.

I suspect that one could inhale modest quantities of the chemicals in "pyrotechnic smoke" individually or perhaps in combination without necessarily sustaining serious injury in all circumstances. The pointed issue, however, is that pyrotechnic smoke is not inhaled as a dry powder, but after it has been ignited. That, of course, is what happened to Mr. Gamradt who was, as I recall, trapped in a stairwell when a substance, apparently pyrotechnic smoke, was ignited as a "smoke bomb." He was unable to escape before inhaling substantial quantities of the material and he suffered very serious permanent lung injury as a result.

Without question, black smoke should not be dispensed where it can be inhaled by human beings and this would imply that discharging it indoors would be a greater hazard than discharging it out of doors.

You have asked if it is part of function of a pulmonary doctor to advise various users of substances such as this about "safe usage of toxic inhalants." It is certainly a part of the function of such specialists and it is also very much my opinion, to a reasonable degree of medical certainty, that any container containing these chemicals should be clearly labeled with a warning, which cautions that they not be dispensed in an enclosed area or, indeed, in any area where it is likely that the resulting smoke could be inhaled by anyone at all.

I hope this meets the needs of your current exigency. With a bit more time, I could supply you a more detailed analysis of this case. I have arranged that the recent and relevant medical records of Mr. Gamradt be sent to you by fax. These include his most recent pulmonary function measurements.

Very truly yours,

Thomas Mulrooney, M.D.
Dictated, but not read
TFM/RI283

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
FIFTH DIVISION

---

Case No. Civ. 02-816 JMR/RLE

TIMOTHY GAMRADT and CARLA GAMRADT, husband and wife,

Plaintiffs,

vs.

FEDERAL LABORATORIES, INC., MACE SECURITIES INTERNATIONAL, and DEFENSE TECHNOLOGY CORPORATION OF AMERICA,

Defendants.

---

The deposition of **THOMAS F. MULROONEY, M.D.**, taken pursuant to Notice of Taking Deposition, before Darla K. Quinnell, a Notary Public in and for the County of Dakota, State of Minnesota, taken the 1st day of February, 2006, at Minnesota Lung Center, 920 East 28th Street, Suite 700, Minneapolis, Minnesota, commencing at approximately 10:15 a.m.





APPEARANCES

ANDREW ENGEBRETSON, ATTORNEY AT LAW, 300 Beal Building, 5 North Third Avenue West, Duluth, Minnesota 55802, appeared for and on behalf of the Plaintiffs.

STEVEN W. SCHNEIDER, ESQUIRE, of the SCHNEIDER LAW OFFICE, P.O. Box 16, Duluth, Minnesota 55801-0016, appeared for and on behalf of the Defendant Defense Technology Corporation of America.

*The original transcript is in the possession of Attorney Schneider.*

I N D E X

EXAMINATION BY: PAGE
MR. SCHNEIDER.......................... 3
MR. ENGEBRETSON........................ 39

EXHIBITS REFERRED TO:
STANG EXHIBIT 2........................ 32

EXHIBITS MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 3................... 38
(Letter to Miles Malone from Thomas Mulrooney, M.D.)

DEPOSITION EXHIBIT 4................... 38
(Document entitled Zinc Chloride (Smoke Bomb) Inhalation Lung Injury)





THOMAS F. MULROONEY, M.D.,
having been first sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. SCHNEIDER:
Q. Would you state your name for the record, please.
A. **Yes, I'm Dr. Thomas Mulrooney, M-u-l-r-o-o-n-e-y.**
Q. And, Doctor, you practice or are retired from -- I'm not sure exactly of your status at the Minnesota Lung Center.
A. **I still practice with the group part-time, about half-time.**
Q. Okay. I'm Steve Schneider. We met just before we went on the record here. I represent a company called Defense Technology Corporation of America in a case that has been brought against them by Timothy Gamradt and his wife. And I understand that Timothy Gamradt was a patient of yours for a period of time?
A. **Yes, I think I saw Mr. Gamradt on one occasion. He's been a patient of the group for --**





Q. Some years?
A. **-- seven years or something like that.**
Q. As I was asking my question, I didn't know whether you still consider Mr. Gamradt a patient of yours, like we still consider clients as clients of ours forever.
A. **In that sense he is.**
Q. But you're not actively treating him anymore?
A. **No.**
Q. Doctor, we're here because you've been identified as a person who will testify to certain things in this case, in particular, the items -- the opinions that you expressed in your letter of May 20, 2003. And I'm here to try and figure out the basis of those opinions and maybe flesh them out a little bit, so this may proceed in a little different fashion than what you're used to for a deposition. You said you only saw Mr. Gamradt one time?
A. **Yes.**
Q. And we've got the complete chart here. Dr. Stang left it behind in case you need to refer to that.
A. **Okay. I had them copy not all but a**

good part of that chart, and it includes two reports that I dictated. The first of those reports is dated January 8, 2003, and that must be the day on which I saw Mr. Gamradt. He was referred to me really specifically to comment about his injury and illness and to provide a disability rating.

Previously his visits, I think all but one previously, were with Dr. Grundmanis, who's since left the practice, retired, and is deceased. Apparently, there was one with Dr. Corson, a colleague, who seems to have been asked the same thing, if he would comment regarding maximum medical improvement and disability, and he deferred to me. He thought I had done that more often. I'm not sure if that's true. But in any case, that's how he came to see me on January 8th of 2003.

Q. So did Dr. Corson actually see Mr. Gamradt?

A. Well, truth to tell, I don't know. Maybe not. I only reviewed a letter he wrote in response to someone's inquiry requesting an impairment rating, and he declined. Maybe he did not. In fact, as I read it again, I guess perhaps -- well, I really can't tell by the letter. And I didn't look through the chart, so I don't know





if he just looked at the chart and said he'd rather not try to calculate the rating.

Q. So you saw Mr. Gamradt once in January of 2003?

A. Right.

Q. And the purpose of that visit was to give him -- to make a determination as to maximum medical improvement and to try and figure out a disability rating for him?

A. Yes. Maybe I should look at the chart, at our handwritten notes. But the letter I wrote was addressed to Miles Maloney at the Office of Workers' Compensation. The letter is dated January 8, 2003, but the handwritten notes indicate that he was seen on November 26. I can't --

Q. By you?

A. That's correct. And in fact, looking back at my own letter, I say that he was scheduled to see me on November 26th in order to arrive at a disability rating. Obviously, I was a little slow in doing that to the extent that in the last paragraph of my letter I apologize for the tardiness. And I can't now recall why it took me from the end of November to the first of January to dictate the report, but it did.





Q. Your letter is dated January 8th, or something like that, of 2003, but you actually saw Mr. Gamradt in November of 2002?

A. Correct, November 26.

Q. And that was the only visit?

A. That's the only visit with me. You had asked earlier if Dr. Corson, who had declined to give an opinion about a rating, had seen him. And I've since looked at our chart, and he did see Mr. Gamradt on October 30th of 2002, but, apparently, for some reason, didn't have access to the complete record at the time and, hence, was reluctant to give such an opinion, and rescheduled the man to come back and see me.

Q. So did Dr. Corson prescribe any treatment?

A. He says he refilled medicines that he was taking and he was, at the time, using some inhalers, two inhalers and a pill that had been prescribed by Dr. Grundmanis, his usual attending physician in our group, and Dr. Corson says he refilled those.

Q. Had Dr. Grundmanis retired at the time that --

A. She probably had retired by October of





'02.

Q. Okay.

A. She left abruptly. She got sick, so her retirement was not planned. I think that's probably right.

Q. I was just wondering why he saw --

A. I think that was some of the reason for a certain amount of confusion and delay, because nobody anticipated her leaving the practice. She got sick very abruptly and very ill and left. And this was a complicated case, and when he appeared to see Dr. Corson with no records, I'm sure he struggled. Even with the records it was complicated.

Q. Okay. And when you saw Mr. Gamradt, was it just for the purposes that we described, or were you having in mind at that time that you were going to take over as Mr. Gamradt's ongoing physician for this problem?

A. It was primarily to answer this question about a rating. I work -- this is our main office in downtown Minneapolis where we are today. We have maybe five branch offices, and the one where I work is in Woodbury, Minnesota, one of our eastern suburbs of St. Paul. So it would be unlikely that

we would have scheduled Mr. Gamradt to follow up with me because it's way out of his way. So I didn't anticipate that I'd likely be seeing him again, and I see from the chart that I didn't. He started coming here after that.
Q. Okay. And seeing Dr. Stang?
A. I believe all the subsequent visits have been with Dr. Stang.
Q. Okay.
A. Yeah, that's Stang's signature so --
Q. All right. I was just wanting to make sure I had the sequence correct.
A. Yeah. You talked to him ahead of me today, and he should have the current information.
Q. Okay. Did you do any test on Mr. Gamradt when you saw him in November of 2002?
A. Yes, we did a set of pulmonary function measurements that I reference in the letter.
Q. I don't have a copy of it. Well, I don't have it in front of me, I do have a copy of it.
A. Do you, the one to Maloney? I don't know if I repeated those in the letter for the chart or not.





Q. I should have just looked at the letter. You did the FEV1 and FVC tests. And is this -- are these numbers -- let's see, FEV1 value lies between 59 and 51 percent of predictable?
A. Yes. It might be helpful if I explain what those abbreviations mean.
Q. Okay.
A. We did a set of measurements of his lung function, and that included a measurement of what is called the forced vital capacity, the FVC. And that is a measurement in which the subject is asked to take as big a breath as possible and then to exhale it as forcefully, as rapidly, and as completely as possible. So it's an index of how much air he can move with a single big breath.
The FEV1 stands for the volume of air that he can exhale forcibly in the first second. In other words, it's a subdivision of the total forced vital capacity. And the relevance is that if the breathing tubes are narrowed or in some way obstructed, it's harder to move the air rapidly. You may be able to get it all out, but it takes longer. And so the FEV1 will be particularly reduced. So those two measurements were made.
We also measured a variety of other things,





the total lung capacity measurement of the maximum -- total amount of air within the lungs after a full breath, and another measurement called the diffusing capacity, which is an index of how well the lungs function in terms of getting oxygen into the bloodstream.
My letter to Mr. Maloney indicates that I have been asked, I presume by him, to provide a permanent partial disability rating.
Q. Mm-hmm.
A. And I used for that a reference published by the American Medical Association called the Guides to Disability Determination as kind of a standard reference for such disability. And it requires that you make specific measurements to arrive at that rating. The values that are used are this FEV1 and the FVC and the diffusing capacity. And then if those measurements fall within certain ranges, they yield a particular rating.
Q. Translate into a percentage?
A. To a particular rating, yes. So I made those calculations, and he fell into what's called Class III, which yielded a rating and gave a range, and the range was between 26 and 50 percent impairment of the whole person caused by the organ,





the lung in this case, that's been injured, and so I stated it.
Q. And you haven't seen him since?
A. No.
Q. Did you prescribe any change in medication at that time, or did he just come -- well, you may not have done anything with his medication.
A. I may not because -- I didn't because, of course, he'd been here only days before and Dr. Corson refilled them. But, no, I didn't make any change in his treatment.
Q. So there was no prescription, no setting a follow-up visit with you in particular?
A. No.
Q. This was strictly an evaluation visit?
A. Yes. Yes. I'm not sure exactly how frequently he was being seen, but it looks like about maybe every six months. In any event, I have no notes saying when to return. And it appears to me, and the best of my recollection, the reason I saw him at that time was because Dr. Corson, who had seen him and refilled his prescriptions, felt he didn't have sufficient information to offer the opinions as to partial disability rating, or the

**other question being asked was whether he had -- whether or not he had attained maximum medical improvement.**

Q. Mm-hmm.

A. **And I did that as well, and said I thought he probably had -- well, that he had, based on the fact that he'd been followed by Dr. Grundmanis since about 1997, I think, '98, four or five years, and there had been little change, if any, in his symptoms or breathing tests, and I concluded that it was improbable that they would change in the future.**

Q. As far as Mr. Gamradt's current treatment, his current condition, I suspect on all of that you'd defer to Dr. Stang, who's been following him for the last three years?

A. **I would, yes.**

Q. So I won't ask you any questions about that. I do want to ask you a question about this rating. As I understand the description that you gave me, the disability rating is dependent only on the performance on the FVC and FEV test results, not the particular diagnosis?

A. **That's correct. There is, if I recall, AMA guides one takes into account to a**





**degree, the symptoms. But primarily to a major degree it hinges on these objective measurements, and it does not depend on the diagnosis.**

Q. And so were you at all interested in, at the time of your evaluation, confirming the diagnosis of reactive airway dysfunction syndrome? Was that important for what you were doing?

A. **Well, it was to me.**

Q. Okay.

A. **I don't know if I was specifically asked that, but I was asked to make these comments, so I was interested in knowing or having my own opinion about whether or not -- or what was wrong with him and how it came to occur. I recall that I asked him about the circumstances of his injury.**

Q. Okay.

A. **Would you like me to --**

Q. No, we've -- you reviewed the chart and --

A. **I reviewed the chart, and I interviewed him, asked him what was happening, and how did you get hurt, and he told me.**

Q. And Dr. Grundmanis did, according to Dr. Stang, a very thorough initial intake and wrote a nice letter describing all of the circumstances,





which I'm sure we'll be referring to frequently in this case.

Let me ask you this about the disease, RADS, and particularly the diagnosis of it. Dr. Stang indicated to us that there are really -- and I'm paraphrasing him so feel free to correct me, because this is just a layman's understanding.

But as I understand it, Dr. Stang said there are really three components to a diagnosis of RADS. The first component is lack of contributing preexisting medical or environmental causes for a bronchospasm or airway obstruction, that is the patient should not have suffered from asthma or some other respiratory disease in the past, at least of long-standing, and should not be a smoker of any kind, so that's one.

The second thing is exposure to a respiratory irritant on sort of an acute basis, not a long-term exposure, but a limited time acute exposure. And the third thing is the physical manifestation of obstructed airway, which I can't remember the name of the test, it's some challenge test that Dr. Grundmanis did.

A. **Right.**

Q. And that confirms that the disease





process is present?

A. **That's right.**

Q. Anything else that you need to know to diagnose RADS?

A. **No, that's essentially it. The term was coined by a Dr. Brooks about 20 years ago, who reported a dozen, perhaps, cases of people who had symptoms resembling asthma, that is they had persistent cough and wheezing that fluctuated in severity, that's sort of what asthma does. But they had it develop very abruptly, within 24 hours after a sudden rather intense exposure to some highly irritant chemical, such as chlorine.**

**And in some, I don't think all of his cases, he actually had biopsies of the bronchial lining. But he reported that, apparently, these people had no previous history and hadn't had any other exposures, and so the inference was a very irritable thing and immediately developed this syndrome, and it seemed likely that the first caused the second. Many of those people gradually improved, some didn't.**

**And since then there have been many other reports of a similar syndrome with various other substances. But those characteristics are -- oh,**

and you mentioned the challenge test. When people have asthma, they do not always have their symptoms constantly. They may appear even normal at one moment and at another time have spasm of the bronchial muscles and have wheezing and shortness of breath.

In order to detect that in a person who's not having symptoms at the time he's being examined is sometimes provoke the asthma response. And there's a strictly defined procedure for doing that in which a person inhales minute amounts of a chemical called methacholine; first, a very small dose and incrementally slightly larger doses until there is a drop in the speed of airflow showing that he's obstructed or until he completes the five or seven stage procedure and there isn't any change, and that's called a negative test.

The more quickly the -- if there is a positive response, the quicker it occurs, the lower the dose that provokes it, the more certain one is, the higher the probability is, that that person indeed does have asthma.

This particular man did have that exam performed by Dr. Grundmanis at, I think, his first visit or soon after, and he did have a positive





response, and he had it at, I believe, the second dose. So that is convincing that he did have hyperreactive airways or potential for asthma.

All by itself, that wouldn't say anything about causation, but it confirmed that there was, in fact, something wrong, that the airways were overly reactive. Then you would have to fit that into the other terms; was there exposure to an irritant, was it intense, did the problem begin right then.

Q. I guess what I'm getting at, and I think you actually said this, but the challenge test simply tells you that there's an asthmatic condition, it doesn't tell you whether that's long-standing, and it gives you no indication of what the cause is, is that right?

A. That's correct.

Q. And in the case of diagnosis, when you're trying to diagnose a case of RADS, then the diagnosis is dependent on previous medical history and the history of exposure to respiratory irritants?

A. That's right.

Q. Okay. You said that this was first noted by, I think you said Dr. Brooks --

A. Yes.





Q. -- 20 years or so ago? And it sounds like that was sort of a clinical observation that he had made and reported to his colleagues?

A. Yes.

Q. How did RADS come to become a generally accepted kind of diagnosis? Do you know what kind of tests were done or standardized or --

A. Well, the subsequent papers, and there are lots, are really similar. There are reports of single or multiple cases of people who abruptly developed an asthma-like syndrome after exposure to some irritant, hadn't had symptoms before, and developed them right away. It's the immediacy that's so compelling.

There aren't any experimental studies, of course, in humans. It wouldn't be ethical to expose people to highly irritable things to see what happened to them, so it's based on their observational studies. But they're impressive, again, because of the rapidity with which the symptom appears in the absence of anything previous, which suggests that the irritant, and this is perhaps more of academic interest, but it suggests that this exposure caused the hyperactive airways, didn't simply aggravate something previously





present.

If the person had or was thought to have had asthma in the past, then the irritant exposure might make him a great deal worse, but we wouldn't call it RADS, just call it worse asthma.

Q. Just changes the name of what we call it, not the condition?

A. Right.

Q. And so am I correct that the exposure that we're talking about, in terms of the treatment for the reduced obstructed airflow condition, it doesn't matter whether it's caused by long-standing asthma and then an exposure to an irritant or whether it's no preexisting history and exposure to an irritant? The person has a reduced airflow, and that's what needs to be treated?

A. Yes.

Q. Dr. Stang indicated to me that while he often wants to know as a matter of clinical curiosity what the irritant is, that as far as his treatment is concerned, the treatment -- it's not necessary that he even know what the irritant is as long as the history and the clinical testing produce, you know, the information that leads him to the diagnosis of RADS, is that true?

**A. Well, yes. The treating physician's obligation, of course, is to arrive at diagnostic hypothesis and then construct a treatment plan, and he is satisfied that the results of the treatment will alleviate the complaints.**

**So sometimes treating physicians are less careful about that additional diagnosis, although most of us like to feel that we're pretty secure. So I suppose that he's right.**

Q. Well, I --

**A. If it were I and I were using the term RADS, reactive airway dysfunction, I would want to have a pretty good history of the exposure that was supposed to have caused it and, particularly, information about the substance.**

**Now, Dr. Grundmanis did do that. She recalls in her consultation report that she had access to a material safety data sheet from the suspected substance, which was a smoke bomb. And so it appears to me that she did research that and didn't just use the word RADS casually.**

Q. Okay. Well, then I guess what I'm trying to determine, Doctor, is how important it is that you know the precise nature of the irritant to reach the diagnosis of RADS. And the situation that





I posed to Dr. Stang was, assume that I'm a patient with no preexisting contributing factors; asthma, bronchitis, smoking, or anything like that. And I come to you and report to you that I was walking down the street and I was walking over a street grate, and all of a sudden a big cloud of stuff came up and enveloped me, and I immediately started coughing and have had trouble breathing ever since. And then when you do the tests, the results are consistent an obstructed airway.

Is it important for you to know precisely what irritants I've been exposed to in order to diagnose RADS, or is that a matter of good practice but not essential to the diagnosis? I guess that's kind of what I'm asking.

**A. Well, in the scenario you outlined one would have to say that you appear now to have asthma, and you describe kind of ill-defined exposure that might have caused it. So the best one could say is perhaps you have RADS. But absent information about what came out of the grate in that particular scenario; you're outdoors, the exposure seems brief, you describe something that seems rather unlikely to be RADS, but we wouldn't be sure.**

Q. Couldn't rule it out. Okay. If I





were to tell you -- you've reviewed this chart. If I were to tell you that the MSDS that Dr. Grundmanis relied on, and I think you relied on as well in confirming the diagnosis of RADS, is actually an MSDS for a product different from the one that was used in the accident that injured Mr. Gamradt, would that affect your diagnosis of RADS under these circumstances?

I mean, what I'm telling you is that he was exposed to something, but it was probably a different set of chemicals. Would that make a difference to you?

**A. Well, let me think. It might, of course, if you -- if you said that, I guess the next question would be to ask, Well, what was it he was exposed to. If you said, Well, it was salt water, well, I would say then it doesn't seem -- that's innocuous, that's neutral, not very likely to have caused it.**

**The history given by Mr. Gamradt was that it was a smoke bomb. Usually those contain zinc chloride, a pyrotechnic device, and that is toxic and can cause even lethal, but certainly very serious, lung injury. RADS would be one manifestation, other types of lung scarring. And**





**that's what the safety data sheet Dr. Grundmanis reviewed indicated, that it was zinc chloride, and there's a chlorine substance in it as well.**

Q. Okay. And I understand that, and I appreciate that, and to a certain extent -- I mean, I'm not prepared to tell you what the components were because we're not certain what the components were, but I guess what I'm asking is -- and you mentioned zinc chloride in particular. Is it the zinc chloride in this particular composition -- let me back up.

There's no question that Mr. Gamradt was exposed to black smoke from a smoke grenade. The question is, and the question that Mr. Engebretson and I are dealing with is, number one, who manufactured the thing, and, number two, for your purposes, just exactly what was the chemical composition of the materials that ignited into the black smoke. And what I'm asking is, does the chemical composition make a difference to the diagnosis of RADS?

**A. Well, I guess I would answer that it probably does not if everything else about the story is substantiated. And the story from Mr. Gamradt is that he was in a confined space. If I recall, it**

**was a stairwell.**

Q. Mm-hmm.

A. **That some sort of explosive device was discharged that emitted black smoke, and that for a matter of maybe ten minutes he couldn't escape, but eventually did, and symptoms began right away. So he certainly was exposed to the products of combustion of something.**

Q. Okay.

A. **And I would conclude that in all probability -- other cases of RADS and other related lung injury, that is sometimes scarring in the lung and restriction of lung volumes, as well as asthma, are reported a lot in the medical literature, after exposure to burning things; firemen trapped in buildings where the building was on fire. In many or most of those cases no one is quite sure what was burning, they were engulfed in smoke.**

**So I would conclude that there would be good presumptive evidence that this was RADS if there were, in fact, a black smoke, whether it was what I and she thought it was, zinc chloride, which the literature says is often used for these bombs, or some other thing that burned in a similar manner.**

Q. Okay. You mentioned something, and I





just want to make sure that we're on the same page on this. Is there any evidence that Mr. Gamradt has scarring on his lungs?

A. **Well, no. He had a chest x-ray, Dr. Grundmanis alludes to it at the time, and she says that was normal. Had this happened today, technology changed that much in just eight years, we would probably have done a high resolution CAT scan of his chest, which gives a more detailed and more sensitive look into the inside of the lung.**

Q. Mm-hmm.

A. **And if we'd done that, we'd be a little more certain about whether he did or didn't. And had he done it originally and if it were abnormal, it would certainly have been done later to see if it had changed, and we could see if he had scarring.**

**That wasn't done, and so we really don't -- the reason I mentioned it is that in addition to RADS, exposures to very irritable substances sometimes do cause inflammation in the lung that eventually ends in scarring.**

**And so although the terminology is different and the symptoms may be -- and the treatment certainly is somewhat different, but the net effect**





**is that the person can be injured in that way. And it's been reported with zinc chloride, it has the propensity to cause such latent scarring. And so I mentioned that that might have been the case.**

Q. Okay. But as far as we can tell with the tests that have been done so far, we just don't know for sure?

A. **We do not.**

Q. The x-ray doesn't indicate anything but --

A. **No, and I don't think there have been any subsequent ones.**

Q. I think that's probably true. I think I looked for them and couldn't find them.

As you were describing sort of the process, two questions occurred to me. Is the concentration of the irritant a factor in making a RADS determination?

A. **Yes. Dose and duration are relevant in RADS. There's imprecision about measurement of that. But the cases have been people who had what appeared to have been a rather intense exposure to an irritant substance, that is they were in a confined space and somebody spilled an acid as opposed to having what presumably would be a low**





**level exposure if they were out of doors and the material was disbursed in a huge quantity of air.**

Q. So dose or concentration is important. Time of exposure is important.

A. **(Indicating yes.)**

Q. Is it possible that this device, this smoke grenade, could have been used in circumstances where it would not have caused -- that's a bad question. This smoke bomb was set off in an enclosed space in a stairwell, understand that?

A. **That's my understanding.**

Q. That will increase the concentration of the irritant, am I right, because it's enclosed?

A. **Yes.**

Q. And is it possible that if this device was used, say, outdoors, that the concentrations would never reach the level where a person exposed to the irritant would develop RADS?

A. **In preparing for today I did an abbreviated search of smoke bombs and lung injury associated with them and found a number of reports that -- one that intrigued me most, perhaps because it was the most recent, was a report from Taiwan of 20 soldiers who were exposed.**

**Now, this was zinc chloride, the bomb. They**

**said that's what's customarily used to create smoke in battlefield training. They shoot the bombs off well away from the soldiers to mimic what might appear in combat.**

**And in the case reported it was somehow discharged in a tunnel where the 20 Taiwanese soldiers were, at least for a while, trapped, five to ten minutes before they find their way out of it, and 18 of the 20 sustained injury, some of them life-threatening.**

**So one infers from that that customarily these bombs are discharged out of doors and well away from where people are standing to, I suppose -- they say they're pyrotechnic. I don't know if they're used in displays, maybe they are, in fireworks displays, entertainment, but, apparently, more often in training exercises to mimic what a person might experience in a real fire or in combat. So out of doors and at a distance it would be safe. People would not inhale the smoke.**

Q. Okay.

A. **And indoors, of course, that shouldn't happen.**

Q. Okay. Is this paper that you have in front of you the paper that you were referring to on





the Taiwanese soldiers?

A. **Yes.**

Q. Did you find any others that you thought were important for us to know about?

A. **I didn't -- not that I didn't find more or judge them important, it's that that's the first that appeared and was recent, and it's in a major journal, Chest, which is Journal of American College of Chest Physicians, an excellent journal. That's not the sole report that came up, however. I reviewed it, and actually there's a list of references. They indicate in that particular report that the accident in Taiwan was an unusually large group of people, maybe the largest reported.**

**And the particular thrust of that article was the use of high resolution CAT scanning in evaluating the patients. And that's of interest but not directly relevant to what we're talking about.**

Q. Okay. Let me ask you a couple of things about this and your research. First, did you find any reports or any studies that reported occurrences of RADS involving the outdoor discharge of a smoke grenade?

A. **Well, I didn't look for that, but, no, I did not.**





Q. Okay. Did you find any reports of RADS in patients exposed to smoke grenades prior to the mid-nineties, say 1995?

A. **No. Again, I did not look -- I didn't find, but I didn't seek.**

Q. Okay.

A. **I used -- the slang expression, I Googled the terms. I did this before I left my office last night. And presto, up appeared a variety. And the very first one was the one I printed out. All I can recall is that there were others. I didn't review the references appended here.**

Q. Did you print out a list of what came -- I assume you were searching some sort of medical journal database?

A. **No, I --**

Q. Were you really using Google?

A. **No, I literally used Google. A recent report -- the New England Journal shows that when doctors use the Internet to research the medical literature, that the single most frequent search engine they use is Google, about a third. And others, such as the government's Pub Med, is lower on the list.**





**So I entered the three terms into Google, a great many popped up. I printed out the first one, took it home, and read it this morning before I came.**

Q. If you don't mind my asking, what were the terms that you entered?

A. **I entered "smoke bomb lung injury." And the title of the paper as it appeared, as you can see, is Zinc Chloride (Smoke Bomb) Inhalation Lung Injury. So perhaps in addition to the fact that it was new, the fact that that was, at least my understanding, exactly what Mr. Gamradt was exposed to, made me hit the print key. And for some reason the printer was very slow, so I only printed out the one paper.**

Q. Okay. I've had marked in Dr. Stang's deposition Exhibit 2. It's your letter of May 20, 2003. We may have spent enough time on the first part of this. There's no question in your mind from reviewing the chart and your examination of him that Mr. Gamradt has reactive airways dysfunction syndrome, is that right?

A. **No, I'm satisfied that that's --**

Q. And that opinion does not change if it turns out that the components of this particular --

the chemical components of the particular device that Mr. Gamradt was exposed to were not the same as you assumed in this letter?

A. **It would not.**

Q. It's the chemicals and the combustion and all the other factors that we've talked about?

A. **Yes, I would conclude that if it was something that produced dense, black smoke, it was sufficient.**

Q. Is there a list of the kinds of irritants that are associated with RADS somewhere? I mean, can we go check a medical book?

A. **Yes, you could. Yes, you could. You could search under the term reactive airway dysfunction syndrome, RADS, and find reviews of the topic that would list a host of things that are now thought to be culpable, people exposed to one or another, presumably irritants that would sort of meet the criteria.**

Q. Is that list exclusive? I mean, if I come in and say I was exposed to X chemical or an irritant that's not on the list or doesn't show up when I do a search, I had all the other factors, does that exclude a diagnosis of RADS?

A. **Well, no. The requisite would seem to**





**be that the substance to which the exposure occurred could reasonably be thought to be an irritant. And the list has gotten long, and I haven't attempted -- I noticed that there's an awful lot of things listed, and I haven't read, by any means, all of the underlying papers to see if the case for RADS among all of these different identified substances is as convincing as it was for the things that Dr. Brooks reported. Certainly some substances are highly irritant.**

**I've seen people who've reported exposure to anhydrous ammonia or people who might have mixed cleaning agents and released chlorine, and that's pretty compelling. But whether everything that somebody reports a case about is equally valid, I couldn't say.**

Q. Products of combustion on the list?

A. **Those would be highly suspect, you see, because they release often oxides, nitrogen, and other substances known to be pretty toxic so --**

Q. And that can be basically any kind of combustion? I mean, as long as something's burning, we have an irritant of some kind, right?

A. **Yeah, I think exposure to smoke in an enclosed space is certainly very suggestive.**





Q. So then we'd go to duration and dose to make our final determination.

A. **That's correct.**

Q. Okay. So I've got myself through the first four or five paragraphs and maybe the first page of this letter of May 20th. And then on the second page, Doctor, you talk about the warnings that would be appropriate for the use of these chemicals.

These questions are going to assume that the MSDS and the information on the chemical components you had was accurate, so let's not get tangled up in drawing that distinction. Did you examine the device that was used in Mr. Gamradt's injury?

A. **No.**

Q. Do you know if anybody in your practice examined it?

A. **Well, I do not know. I didn't read anything to indicate that anyone had.**

Q. Okay. Have you ever seen one of these devices?

A. **No, to my knowledge. I was in the Navy. I wondered for a moment if somehow I had, but no recollection of seeing one.**

Q. Have you ever seen in person one of





them set off, deployed?

A. **No.**

Q. Okay. Have you seen it on some video of some kind?

A. **Well, only if I -- I might have -- they're used to --**

Q. A John Wayne movie or something?

A. **Right, I might have seen it in a motion picture not knowing what it was. But I have not been at any display that I knew it was a smoke bomb.**

Q. Okay. Do you know that there are different manufacturers of these kinds of devices?

A. **I do not know.**

Q. Have you ever consulted with a manufacturer of these kinds of devices as to what types of warnings would be necessary --

A. **No.**

Q. -- on this kind of a device?

A. **No, I have not.**

Q. Okay. Have you ever consulted with anybody about warning issues on any of their products?

A. **Not to my recollection.**

Q. All right. Have you undertaken any

kind of study on your own as to the effectiveness of particular kinds of warnings in preventing certain kinds of dangerous behavior with products?
A. **No.**
Q. Okay. Do you even know -- I didn't want to make it that way.
Do you know if there are any regulations that apply to a product such as this that require a specific kind of warning?
A. **I do not.**
Q. Okay. When you say that any -- I'm on the top of the second page, about the middle of the first paragraph. "Any container containing these chemicals should be clearly labeled with a warning," and then you go on to say, "which cautions that they should not be dispensed in an enclosed area," that's your statement as a physician who has treated patients who have been exposed to chemicals, not as any kind of an expert on warnings and the use of these particular products?
A. **That's correct. This reflects my role as a treating -- one of the treating physicians for Mr. Gamradt, familiar with what happened to him, and reflects my feeling that one should be cautioned with such a product not to discharge it in such a**





**manner.**
Q. And do you have any opinion as to what an appropriate warning might say?
A. **Not immediately, no. I suppose I could construct one with adequate thought, but, no, I'm not prepared to do that.**
Q. Okay. Thank you. You know what, if it's okay with you, I'd like to have this marked as an exhibit to this deposition so we can all get copies of it and make sure that we have copies of it. Is that okay?
A. **Sure.**
Q. We're going to mark this article on the Taiwanese soldiers and zinc chloride as whatever the next exhibit is?
MR. ENGEBRETSON: While we're at it, Doctor, do you have an extra copy of the letter you sent to Mr. Maloney down in Chicago?
THE WITNESS: I certainly do.
MR. SCHNEIDER: You want to mark it?
MR. ENGEBRETSON: Might want to mark it.
(Whereupon, Deposition. exhibits 3 and 4 were marked for





identification.)
MR. ENGEBRETSON: I just have a couple of questions.

EXAMINATION

BY MR. ENGEBRETSON:
Q. Speaking of literature, did Mr. Gamradt's case ever get into the literature, as far as you know?
A. **I don't think so. I don't believe anyone out of the group reported it, and I did not.**
Q. Okay. Speaking of this RADS, can this affect an individual's life expectancy?
A. **Well, I suppose the operative word is "can," and the answer to that would, I guess, be probably it could. The reported cases are -- that seem well documented most of the time have shown gradual improvement, but by no means all, and some persons with what has been agreed is RADS have had persistent symptoms even some years after the initial event.**
**And my recollection from the papers I've read is people have tended to conclude that symptoms still present two years after the event are probably going to be permanent. Actually, I relied on that when I said that I concluded in 2003 had, in all**





**likelihood, attained maximum improvement because he hadn't improved in seven or eight years.**
**But it could affect life expectancy, because asthma is not innocuous, and people with damaged lungs are more susceptible to infections and bad consequences. So long way of saying, yes, it could.**
Q. This search for the literature, I take it you do it with the office computer, and you used the Google search engine then?
A. **I did.**
Q. Is RADS also something that Google would respond to?
A. **Probably. Although, last night I did what I earlier discovered doctors very frequently do. I usually use a service called Public Med, which is provided by the National Institutes of Health, but I didn't, and it's probably true of doctors in general because Google is so very convenient. We have it on our opening page, so it's just sitting there, and I typed it in.**
**I'm sure that if you typed in RADS or the full words for it, it would direct you. It's very good. It will actually often route you back to Pub Med or some of these other search engines.**
MR. ENGEBRETSON: I guess that's

all. Read and sign?

MR. SCHNEIDER: Oh, yeah, Doctor, you want to --

THE WITNESS: No, I'll pass.

(Whereupon, this matter was concluded.)





STATE OF MINNESOTA)
) ss.
COUNTY OF DAKOTA )

BE IT KNOWN that, I took the foregoing deposition of THOMAS F. MULROONEY, M.D., on February 1, 2006 in Minneapolis, Minnesota;

That I was then and there a notary public in and for the County of Dakota, State of Minnesota, and that by virtue thereof, I was duly authorized to administer an oath;

That the witness was by me first duly sworn to testify to the truth, the whole truth and nothing but the truth relative to said cause;

That the foregoing transcript is a true and correct transcript of my stenographic notes in said matter;

That the witness elected to waive the reading and signing of the transcript;

That I am not related to any of the parties hereto, nor interested in the outcome of the action;

WITNESS MY HAND AND SEAL this 9th day of February, 2006.

___________________________________

Darla K. Quinnell

My Commission Expires January 31, 2010

657T

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
02-CV-816 (JMR/RLE)

| | | |
|---|---|---|
| Timothy Gamradt and Carla Gamradt | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America | ) | |

Plaintiff Timothy Gamradt worked as a prison guard for the United States Bureau of Prisons ("BOP"). Mr. Gamradt was injured on the job, during a training drill. He and his wife, Carla, bring this lawsuit seeking damages for those injuries.

Plaintiffs originally brought suit against three defendants: Federal Laboratories, Inc., Mace Securities International, and Defense Technology Corporation of America. By stipulation of the parties, Federal Laboratories, Inc., and Mace Securities International have been dismissed. Defense Technology Corporation of America, the remaining defendant, moves for summary judgment. While plaintiffs prevail on a number of issues, defendant's summary judgment motion is granted.

I. Background

A. A Question of Names

This litigation involves two entities with confusingly similar names. The first is defendant Defense Technology Corporation of America ("DTC"), a Delaware corporation. It is a subsidiary of

FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED SEP - 2 2003
DEPUTY CLERK'S INITIALS

Cpy to SIVS 9/3/03

Armor Holdings, Inc., and does business in Casper, Wyoming. The second company is Defense Technology Corporation of America of Casper, Wyoming, ("DTC-Wyoming"), a Wyoming corporation. In 1996, DTC-Wyoming sold its assets to DTC.[1] Prior to its acquisition, DTC-Wyoming manufactured law enforcement security equipment, including black smoke grenades.

B. Facts

For purposes of summary judgment, all facts are construed in favor of plaintiffs.

On June 2, 1998, Mr. Gamradt participated in a simulated hostage situation drill at the Federal Prison Camp in Duluth, Minnesota. During this drill, guards were equipped with various security tools, including two types of grenades: the first was a "flash bang" grenade which releases a flash of light accompanied by a loud noise; the second was a "black smoke" grenade which discharges a thick smoke-like substance designed to conceal approaching guards. During the drill, when the team member carrying the flash bang grenade went down, another guard lit a black smoke grenade. The smoke grenade missed its intended target, discharging its smoke cloud within a prison stairway. Plaintiff was in the hallway when the smoke was released and claims injury from the grenade's discharge. During the drill, none of the guards

[1]The terms and circumstances of this acquisition are of some interest here, and are considered below.

- including plaintiff - wore a gas mask or any other respiratory protection device.

Following the drill, Mr. Gamradt asked the BOP for information about the grenade. The BOP could not identify the grenade's precise manufacturer, but informed him that grenades were purchased from two suppliers -- DTC-Wyoming, and Federal Laboratories, Inc.

In order to resolve this matter, the Court must consider the purchase agreement between DTC and DTC-Wyoming. The purchase agreement contains a choice of law provision which requires the application of New York law. The purchase agreement specifies the assets and liabilities transferred, and provides that DTC would assume an enumerated list of DTC-Wyoming's liabilities. See Asset Purchase Agreement at 7; Schedule §2.1(a)(ii). The purchase agreement further requires DTC-Wyoming to indemnify the purchaser, DTC, for any product-liability suits arising out of its prior dealings. DTC funded its acquisition using a combination of cash and shares of Armor Holdings, Inc.

II. Discussion

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce

significant probative evidence demonstrating a genuine issue for trial. See Anderson, 477 U.S. at 248-49; see also Hartnagel v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. See Celotex, 477 U.S. at 322.

A. Choice of Law

Plaintiffs wish to invoke the purchase agreement's New York choice of law provision. As a result, the Court must first determine whether that provision governs here.

As a general rule, this Court, sitting in diversity, applies the substantive law of Minnesota, its forum state. Minnesota honors choice of law clauses. See Northwest Airlines, Inc. v. Astraea Aviation Servs., Inc., 111 F.3d 1386, 1392 (8th Cir. 1997) (citing Haagstrom v. Am. Circuit Breaker Corp., 518 N.W.2d 46, 47 (Minn. Ct. App. 1994)). Under Minnesota law, a choice of law provision governs all contract and closely related tort claims between the contracting parties. See Northwest Airlines, 111 F.3d at 1392. Plaintiffs here were clearly not parties to the purchase

agreement or in privity with the contracting parties. Because this contract merely relates to certain of its signatories' potential liabilities in third-party tort suits, the contract's choice of law provision does not apply. See T.H.S. Northstar Assoc. v. W.R. Grace & Co., 840 F. Supp. 676, 678 (D. Minn. 1993) (finding contract's choice of law provision does not control dispute over whether that contract constituted a merger).

The Court finds the purchase agreement requires that New York law be applied in any dispute between its signatories. But this is not such a dispute; this case is simply a tort claim by a third-party arising out of incidents occurring in Minnesota. Accordingly, Minnesota law governs here.

B. Successor Liability

Having decided Minnesota law applies, the Court now turns to DTC's first ground for summary judgment. Defendant DTC argues that, because DTC-Wyoming manufactured and sold the smoke grenade in question, DTC-Wyoming - not defendant DTC - is liable.

Minnesota follows the traditional approach to successor liability: when, as here, one corporation sells or otherwise transfers assets to another, the receiving corporation is liable for the actions of the transferor corporation only to the extent provided by contract or by law. See Minn. Stat. § 302A.661; Niccum v. Hydra Tool Corp., 438 N.W.2d 96, 98 (Minn. 1989) (citing J.F. Anderson Lumber Co. v. Myers, 206 N.W.2d 365, 368-69 (1973)). A

successor corporation currently engaged in the manufacture and sale of a product is not generally liable for products manufactured and sold before a change in corporate ownership. See Niccum, 438 N.W.2d at 99-100.

Having stated the general rule, the Court also notes that Minnesota recognizes four exceptions to the general rule for successor liability. The Minnesota Supreme Court has noted the following four circumstances where the exception applies:

> 1. Where the purchaser expressly or impliedly agrees to assume such debts.
>
> 2. Where the transaction amounts to a consolidation or merger of the corporation ("de facto merger").
>
> 3. Where the purchasing corporation is merely a continuation of the selling corporation.
>
> 4. Where the transaction is entered into fraudulently in order to escape liabilities such as debts.

Id. at 98. The question before the Court, then, is whether any of these exceptions apply.

The first exception recognizes corporate successor liability when the merging company expressly or impliedly agrees to assume the second company's existing liabilities, debts, or obligations. Here, the purchase agreement expressly waives tort liability for DTC and requires DTC-Wyoming to indemnify these claims. This exception does not apply.

The second exception, applied to consolidation or merger, includes an equitable exception to the bar against successor

liability in the case of a de facto merger. DTC argues Minn. Stat. § 302A.661, Subd. 4, limiting transferee liability, is the sole method of imposing successor liability and that Minnesota does not recognize de facto merger.

Minnesota's courts, however, have held otherwise. While recognizing the exception, those courts have not precisely delineated its contours. In a number of unpublished opinions, Minnesota's Court of Appeals has provided guidance to those situations where de facto merger occurs. In doing so, they have applied a multi-factor analysis. The analysis asks:

> 1. Whether there is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets and general business operation.
>
> 2. Whether there is a continuity of shareholders which results from the purchasing corporation paying for the acquiring asset with shares of its own stock, this stock ultimately coming to be held by the shareholders of the corporation so that they become a constituent part of the purchasing corporation.
>
> 3. Whether the seller corporation ceases its ordinary business operation, liquidates, and dissolves as soon as legally and practically possible.
>
> 4. Whether the purchasing corporation assumed the obligation of the seller ordinarily necessary for the continuation of normal business operations of the seller corporation.

See Fine v. Schwinn Cycling Fitness, Inc., 2000 Minn. App. LEXIS 1292 *6-7 (Minn. Ct. App. Dec. 26, 2000) (unpublished) (explaining multi-factor de facto merger test); see also State v. Gopher Oil Co., 1995 Minn. App. LEXIS 1425, *6-9 (Minn. Ct. App. Nov. 21,

1995) (unpublished) (citing Sylvester Bros. Dev. v. Burlington Northern R.R., 772 F. Supp. 443, 447-48 (D. Minn. 1990)) (adopting the four factor analysis); Costello v. Unipress Corp., 1996 Minn. App. LEXIS 291, *3-4 (Minn. Ct. App. March 12, 1996) (unpublished); New York Life Ins. Co. v. Landmark Dev. Corp., 1993 Minn. App. LEXIS 522, *7-9 (Minn. Ct. App. May 11, 1993) (unpublished) (finding that a question of material fact exists when individual elements weigh in favor of each party); see also Minn. Mining & Mfg. Co. v. Rynne, 661 F.2d 722, 724 (8th Cir. 1981); Soo Line R.R. Co. v. B.J. Carney & Co., 797 F. Supp. 1472, 1483 (D. Minn. 1992).[2]

Given the Minnesota Supreme Court's recognition of the de facto merger exception, and the Court of Appeals' frequent delineation of this analysis, this Court considers it likely the Minnesota Supreme Court would accept the de facto merger analysis. See, e.g., Cieslukowski v. Norton Motors Int'l, Inc., 2002 U.S. Dist. Lexis 17229, *23-24 (D. Minn. Sept. 10, 2002); T.H.S. Northstar Assoc., 840 F. Supp. 678 (D. Minn. 1993) (applying the four-element test).

Under this analysis, when analyzing a de facto merger, no single factor is dispositive. See New York Life Ins. Co., 1993

[2]While the opinions of the Minnesota Court of Appeals do not necessarily bind this Court, see Angostura Int'l Ltd. v. Melemed, 25 F. Supp. 2d 1008, 1011 n.4 (D. Minn. 1998) (citing Haugen v. Total Petroleum, Inc., 971 F.2d 124, 126 (8th Cir. 1992), steadfast application of these principles suggests a persuasive and coherent position. This Court feels it appropriate to apply this de facto merger analysis.

Minn. App. Lexis 5221, *3-4. To prove a de facto merger, however, it is clear that a continuity of shareholders -- accomplished through a stock purchase -- is required. Sylvester Bros., 772 F. Supp. at 448. Here, DTC argues that in its acquisition of DTC-Wyoming's assets, DTC-Wyoming received only a minority share and not a controlling interest in the successor. Given this fact, DTC claims the de facto merger exception is inapplicable as a matter of law. The Court rejects this argument. The rule does not require predecessor shareholders to maintain a controlling share; merely that they receive an equity interest. See id.

DTC also claims that, partially funding the acquisition of DTC-Wyoming with Armor Holdings, Inc.'s, shares, as opposed to DTC stock, bars a finding of de facto merger. The record presented to the Court, however, does not outline the business structure or parent/subsidiary relationship between Armor Holdings, Inc., and DTC. Given this ambiguity, the Court finds a question of fact exists as to the required continuity of shareholders. The existence of this fact question precludes summary judgment.

A continuation of management, personnel, physical location, and assets and operations demonstrates a de facto merger. See T.H.S. Northstar Assoc., 840 F. Supp. at 679 (assuming the obligations necessary to continue another's business indicates a de facto merger). It is undisputed that, following the sale, DTC continued to sell and manufacture black smoke grenades, and that

DTC retained DTC-Wyoming's telephone number, employees, and physical location as part of its business operation. It purchased DTC-Wyoming's good will, customer lists, accounts receivable, patents, trademarks, inventory, raw materials, finished goods, plant, property, equipment, and software. For purposes of summary judgment, a fact question remains regarding whether DTC continued the business following the acquisition of DTC-Wyoming.

The third factor asks whether the seller continued to operate following the merger. The Superior Court of Massachusetts, in Farago v. Def-Tec. Corp., 2000 Mass. Super. LEXIS 441, *20 n.5, (Mass. Sept. 1, 2000), found DTC acted as the successor corporation to DTC-Wyoming. Certainly, that case turns on its own facts, but the determination of a sister court is illuminating.

DTC argues the purchase agreement's terms required DTC-Wyoming to continue to exist for three years after the sale in order to address product liability claims. The record, however, does not address whether DTC-Wyoming continued to do business thereafter. In Farago, the Massachusetts court found DTC-Wyoming continued to operation as XM Corporation, an international distributor of pepper spray products for Armor Holdings, Inc. Here, given DTC-Wyoming's sale of its assets to DTC, its agreement not to compete for five years thereafter, and the lack of evidence showing it has resumed business in grenade sales, the Court finds there is a fact question as to whether DTC-Wyoming ceased to operate following the sale of

its assets.

Similarly, the Court considers whether DTC continued DTC-Wyoming's existing operations and filled its commitments. Following the sale of DTC-Wyoming's assets, DTC assumed control of the plant and continued to produce DTC-Wyoming products. Given these facts, a jury could find DTC continued DTC-Wyoming's business following the sale.

Plaintiffs ask the Court to apply the fourth exception, claiming the merger took place for fraudulent purposes. They argue this exception applies because DTC-Wyoming's business was losing money at the time of the sale. The Court finds, as a matter of law, that this fact - which is the only basis upon which plaintiffs seek to invoke the fraud exception - standing alone, cannot support allegations of wrongful or fraudulent purposes.

This case is easily distinguished from those situations where the Minnesota courts found improper transfer. In Huray, a successor company operated with the same directors, officers and employees as the predecessor company, and did not pay sufficient consideration for the assets purchased. See Huray v. Fournier NC Programming, Inc., 2003 Minn. App. LEXIS 620, *17 (Minn. Ct. App. May 20, 2003) (unpublished) (finding inadequate consideration evidence of fraud). The present transaction involved substantial payment to DTC-Wyoming's shareholders. There is similarly no evidence before the Court that this transaction was structured to

avoid existing liability to the predecessor's creditors. Id. at *10 n.4 (structuring to evade debts is fraudulent). Here, there is no evidence of a sham sale which created an identical corporation.

The Court cannot find fraud simply because a successful company acquired a faltering competitor. Ongoing companies, which have real business, real customers, and real assets, occasionally lose money. The fact that they lose money certainly affects whether a target is a desirable acquisition, but does not make the transaction a fraud. Here, there are simply no grounds upon which this Court could find this transaction anything but an arm's length transaction.

C. Was Any Duty Owed?

Even if plaintiffs prevail at trial on the issue of successor liability, their victory will be pyrrhic. Plaintiffs claim DTC failed to warn of risks associated with the use of the smoke grenade. The Court finds, as a matter of law, that there is not a duty to warn here.

In order to establish a prima facie case of failure to warn, a plaintiff must show: (1) there was a duty to warn about the risk in question; (2) the warnings given, if any, were inadequate; and (3) the lack of an adequate warning caused the plaintiff's injury. See Balder v. Haley, 399 N.W.2d 77, 81 (Minn. 1987). The existence of a duty to warn is a question of law. Id.

In Minnesota, a manufacturer has a duty to warn users of its

products of any product-related dangers of which the manufacturer has actual or constructive knowledge. See Mozes v. Medtronic, Inc., 14 F. Supp.2d 1124, 1129 (D. Minn. 1998). Although a manufacturer has a duty to warn of reasonably foreseeable dangers, there is no duty to warn if "the user knows or should know of potential danger." Holowaty v. McDonald's Corp., 10 F. Supp. 2d 1078, 1084 (D. Minn. 1998) (quoting Minneapolis Soc. of Fine Arts v. Parker Klein Assoc. Architects, 354 N.W.2d 816, 821 (Minn. 1984), overruled an other grounds in Hapka v. Paquin Farms, 458 N.W.2d 683 (Minn. 1990)). Therefore, where the alleged danger is open and obvious, Minnesota courts do not require a warning. As one court explained, "there is certainly no usual duty to warn the purchaser that a knife or an axe will cut, a match will take fire, dynamite will explode, or a hammer will mash a finger." Peppin v. W.H. Brady Co., 372 N.W.2d 369, 375 (Minn. Ct. App. 1985); see also Hoeg v. Shore-Master, 1994 WL 593919 *1 (Minn. Ct. App. 1994) (unpublished) (no duty to warn of elastic properties of a spring); Mix v. MTD Prods., Inc., 393 N.W.2d 18, 19 (Minn. Ct. App. 1986) (no duty to warn of danger involved in reaching hand under running lawn mover); Peppin, 372 N.W.2d at 375 (no duty to warn that aluminum conducts electricity).

The Court considers it significant that neither side has found a case suggesting a duty to warn for anti-riot explosive devices. The Court's research has been similarly unproductive. This

strongly suggests the dangers posed by "civilian" versions of weapons designed for military use are open and obvious.

Because the dangers associated with a knife, axe, match and dynamite are obvious, Minnesota courts have determined there is no basis on which to assume that a warning would make the product safer. The Court finds that, as with the dangers attendant to a knife, axe or stick of dynamite, the dangers associated with a black smoke grenade are open and obvious.

The fact that an intentionally detonated smoke grenade would explode and discharge smoke was open and obvious. There is no evidence suggesting the condition and effect of the black smoke grenade were not visible or obvious to Mr. Gamradt or his colleagues during the training exercise. As plaintiffs' own brief states, "everyone of normal intelligence can understand that this smoke should not be dispensed in an enclosed area." Pl. Memo. at 19. Notice is not required of what one knows or reasonably should be expected to know -- i.e., that the smoke emitted from a black smoke grenade may be hazardous and should not be inhaled. DTC did not owe a duty to warn of the dangers associated with the black smoke grenade.[3]

Alternatively, the Court finds DTC was not compelled to warn,

---

[3]As the Court has explained, there is no duty to warn about an obvious hazard; here, the black smoke grenade. Because there was no duty, and no evidence of defendant's ignored evidence that a warning would necessary, there is no basis for finding an actual defect.

even if it is ultimately deemed a successor corporation. The law defines those successor corporations which have a duty to warn consumers about a predecessor's products. Niccum, 438 N.W.2d at 100. The considerations relevant to imposing this obligation include whether the successor:

> (1) assumed its predecessor's service contracts; (2) contracted to perform or actually performed service of the product at issue; (3) knew of defects in the product at issue; and (4) knew the location or the owner of the product at issue.

See id. Otherwise stated, if a successor has no knowledge of defects and no knowledge of the location of a product, there is no entity to warn and nothing to warn against.

While plaintiffs have asserted DTC had an ongoing duty to warn, they have introduced no evidence to support their position. In the absence of such evidence, there is no need for a trial on the point. See Fed. R. Civ. P. 56(e). Beyond mere allegations, plaintiffs have not shown DTC knew of any actual defect -- or, indeed, that there was one -- in the particular black smoke grenade. Plaintiffs have similarly failed to provide any evidence showing DTC knew of the location of the black smoke grenade at issue or had any other ongoing relationship with plaintiff's employer. See Costello, 1996 Minn. App. LEXIS 291, *6-7. Finding no proof of failure to warn, DTC's motion for summary judgment on this point is granted.

D. Proof of Duty

Finally, DTC argues summary judgment is appropriate because plaintiffs have not designated an expert to testify about failure to warn. While it is true no such expert has been designated, the absence of an expert does not compel summary judgment. This is because there is a legal difference between causation - where expert testimony can be necessary - and duty. Whether a duty to warn existed is a legal question for the Court. See Balder 399 N.W.2d at 81. No specific type of evidence is needed for its proof. On the question of whether there is a legal duty:

> The court goes to the event causing the damage and looks back to the alleged negligent act. If the connection is too remote to impose liability as a matter of public policy, the courts then hold there is no duty, and consequently no liability. On the other hand, if the consequence is direct and is the type of occurrence that was or should have been reasonably foreseeable, the courts then hold as a matter of law a duty exists.

See id. The Court understands plaintiffs' medical experts are prepared to testify that black smoke was detrimental to Mr. Gambradt's lungs. This is sufficient testimony on causation for purposes of summary judgment. Where, as here, there was an arguably clear link to the release of the smoke and plaintiff's injury, the Court cannot grant summary judgment.

III. Conclusion

Construed in a light most favorable to plaintiffs, the Court finds there was no duty to warn of dangers inherent in the use of black smoke grenades. The absence of a duty is fatal to a tort

claim, because a breach of a legal duty is a central element. Accordingly, DTC's motion for summary judgment [Docket No. 26] is granted.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 29, 2003

JAMES M. ROSENBAUM
United States Chief District Judge